**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | Criminal Action No.:  08-0360 (RMU) |
| v. : | |
| : | Re Document No.:    141 |
| PAUL A. SLOUGH *et al.*, : | |
| : | |
| Defendants. : | |

**MEMORANDUM OPINION**

GRANTING IN PART AND DENYING IN PART THE DEFENDANTS' MOTION FOR
AN ORDER REQUIRING SECURITY MEASURES FOR THE DEFENSE TEAM'S
PRETRIAL INVESTIGATION IN IRAQ

**I.  INTRODUCTION**

This matter is before the court on the defendants' motion for an order requiring the government to provide security measures for the defense team's pretrial investigation in Iraq. The defendants contend that such measures are necessary to permit their counsel to properly investigate this case, which arises out of a shooting incident that occurred in Baghdad, Iraq.  The defendants, who have never asserted an inability to finance their own security measures, have offered to reimburse or defray the government for the cost of providing such security measures. The government opposes the motion, noting that it has already provided the defendants with a list of private security companies licensed to operate in Iraq and that are principal providers of security services for U.S. government personnel in Baghdad.  Furthermore, the government argues that this court lacks the authority to order the U.S. military to divert personnel and other resources from its current mission in Iraq to provide security to the defense team.

Because the defendants have not demonstrated that the private security companies identified by the government cannot ensure the safety of the defense team, the court denies their request for an order requiring the government to provide security measures.  The court, however,

grants the defendants' request that the government provide updated contact information for victims and witnesses in this case because there is a compelling need for the disclosure of such information.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

The defendants were security guards employed by Blackwater Worldwide ("Blackwater"), a private company that provided security services to U.S. employees operating in Iraq.  On September 16, 2007, the defendants were part of a Blackwater Tactical Support Team called "Raven 23," whose function was to provide back-up fire support for other Blackwater personal security details operating in Baghdad.  Around noon on that day, the Raven 23 convoy was involved in a shooting incident at the Nisur Square traffic circle in downtown Baghdad, which resulted in the death and injury of numerous Iraqis.  The government contends that the dead and wounded were the victims of unprovoked violence by the defendants.  The defendants maintain that they came under attack by insurgents and that their actions were a reasonable response to a mortal threat.

It is undisputed that to prepare a defense to the charges levied by the government, defense counsel must conduct a pretrial investigation in Iraq.  Defs.' Mot. at 4-5; *see generally* Govt's Opp'n.  The events underlying this prosecution occurred in Baghdad, and many of the witnesses in this case, including eyewitnesses, alleged victims and their family members, are located in Iraq.  Defs.' Mot. at 4-5.  Indeed, government prosecutors and investigators have traveled to Iraq on several occasions to investigate and gather evidence in connection with this case.  *Id*. at 3-4.

It is equally undisputed that present-day Baghdad remains a highly dangerous place.  *Id*. at 3; *see generally* Govt's Opp'n.  This danger is only magnified for the defense team, given the

notoriety of the Nisur Square shooting among the residents of Baghdad and the disdain with which the defense team's cause is likely to be viewed by some in that city.  Defs.' Mot. at 5.

In June 2009, defense counsel notified the government of their intention to send a defense team to Iraq for the purpose of collecting information and interviewing witnesses.  Decl. of Mark J. Hulkhower ("Hulkhower Decl."), Ex. 1.  Defense counsel requested that the government provide security measures to the defense team during their investigation.  *Id*.  In subsequent correspondence, defense counsel also requested contact information for individuals identified by the government as victims and witnesses in its *Brady* disclosures, as well as a point of contact at the U.S. Embassy in Baghdad to help facilitate the investigation.  Hulkhower Decl., Ex. 3.  Discussions regarding these issues continued through the summer of 2009.  *See* Defs.' Mot. at 5-8.

During an August 6, 2009 status conference, defense counsel advised the court that they were in ongoing discussions with the government regarding the provision of security.  *Id*. at 7.  Counsel indicated that they were hopeful the matter could be resolved without the court's intervention.  *Id*.  Over the following weeks, however, the parties were unable to reach an agreement on the security issue.  *Id*. at 7-8.  Advised of the impasse, the court contacted Jeh Charles Johnson, General Counsel of the Department of Defense ("DOD"), who graciously agreed to participate by teleconference in a hearing held on September 14, 2009, during which the parties voiced their positions on the security issue.  *Id*. at 8.

On September 30, 2009, the prosecution team forwarded to defense counsel a letter from the DOD's Office of General Counsel.  *See* Hulkhower Decl., Ex. 7 ("the September 30 Letter").  The September 30 Letter stated that as an accommodation to the concerns expressed by the court during the September 14 hearing, the Office of General Counsel was providing

> a list of private security contractors who, according to officials from the Multinational Force-Iraq (MNF-I): (1) are licensed by appropriate Iraqi officials to provide personal security services in Iraq; (2) have obtained arming approval as required by applicable MNF-I order; and, (3) perform personal security services under contract with one or more U.S. government agencies, including DoD, in Iraq.

*Id*.  The defendants filed this motion on October 6, 2009.

### III. ANALYSIS

The defendants seek an order requiring the government to provide (a) security for the defense team in Iraq comparable to that provided to the prosecution during its visits; (b) a point of contact at the U.S. Embassy to assist with the investigation; (c) contact information for all individuals identified in the indictment as victims and all witnesses identified in the government's *Brady* disclosures; and (d) in the event the court authorizes Rule 15 depositions, appropriate security for lawyers who conduct those depositions. *See* Proposed Order; *see generally* Defs.' Mot.  The court addresses each of these requests in turn.

### A. Security for Defense Lawyers in Iraq Comparable to That Provided to the Prosecution

The defendants contend that they cannot conduct their investigation and have fair access to witnesses and evidence without security, which they cannot obtain in the war zone of Iraq without the government's assistance. Defs.' Mot. at 10.  The defendants assert that American lawyers and investigators working in Iraq face mortal danger. *Id*. at 4.  Given the notoriety of this case in Baghdad, this danger is multiplied for attorneys and investigators representing the defendants in this case. *Id*.  The defendants indicate that they are willing to reimburse or defray costs incurred in providing security. *Id*. at 2 n.1.  As stated by the defendants, "[t]he dispute at bar does not concern costs, but rather the Government's unwillingness to assist the defense with security measures at all in the absence of a motion and order to do so." *Id*.

The government opposes the defendants' request, arguing that it has already provided the assistance necessary for defense counsel to safely conduct their pretrial investigation in Iraq. Govt's Opp'n at 4-9. The government notes that in the September 30 Letter, it provided the defendants with a list of qualified private security companies licensed to operate in Iraq that provide personal security services under contract with agencies of the U.S. government, including the DOD. *Id*. at 8. Furthermore, the government maintains that it is not constitutionally required to provide security for the defense team, stating that even in court-martial proceedings, civilian defense attorneys representing military personnel are expected to contract with a private security company if they desire to travel within Iraq with an armed escort. *Id*. at 6; Decl. of Capt. Nathan J. Bankson, Chief of Criminal Law for MNF-I ("Bankson Decl.") ¶¶ 4-5.

In addition, the government contends that this court lacks the authority to issue an order requiring the U.S. military to divert assets from its current mission in Iraq to provide personal security for defense counsel. Govt's Opp'n at 17-20. The government notes that the Executive Branch possesses the exclusive authority to command military forces, and that matters of foreign policy and national security are the exclusive province of the political branches. *Id*. at 18. Indeed, the government asserts that the order requested by the defendants would violate the bilateral Security Agreement between the United States and the Republic of Iraq, which limits the authority of the U.S. military to operate in Baghdad and other Iraqi cities. *See id*. at 10-12 & Ex. 1 (Agreement Between the United States of America and the Republic of Iraq on the Withdrawal of United States Forces from Iraq and the Organization of their Activities During Their Temporary Presence in Iraq) § 24.2; *see generally* Decl. of Lt. Col. Susan Arnold, Legal Advisor for the Security Agreement Secretariat ("Arnold Decl.") (asserting that the relief

5

requested by the defendants would implicate provisions of the Security Agreement limiting the operational authority of the U.S. military in Iraq).

It is well-established that "[w]itnesses, particularly eye witnesses, to a crime are the property of neither the prosecution nor the defense. Both sides have an equal right, and should have an equal opportunity, to interview them." *Gregory v. United States*, 369 F.2d 185, 188 (D.C. Cir. 1966) (noting that "elemental fairness and due process" require that the defendant in a criminal proceeding have the opportunity to question witnesses); *accord United States v. Skilling*, 554 F.3d 529, 567 (5th Cir. 2009) (observing that prosecutorial interference with a defendant's access to a witness implicates the Sixth Amendment, which guarantees a criminal defendant the right to present witnesses to establish his defense, and the Fifth Amendment, which protects the defendant from improper governmental interference with his defense); *United States v. Scott*, 518 F.2d 261, 268 (6th Cir. 1975) (stating that a "defendant is entitled to have access to any prospective witness although such right of access may not lead to an actual interview"). Thus, courts have held that prosecutors may not refuse to disclose the location of a witness, *see, e.g.*, *United States v. Opager*, 589 F.2d 799, 805 (5th Cir. 1979), instruct a witness not to speak to defense counsel, *see, e.g.*, *United States v. Munsey*, 457 F. Supp. 1, 4-5 (E.D. Tenn. 1978), or take other actions that would effectively deny the defendant in a criminal proceeding access to a witness, *see, e.g.*, *Gregory*, 369 F.2d at 188 (holding that a prosecutor may not advise a witness not to talk to defense counsel outside the presence of the prosecutor); *United States v. Black*, 767 F.2d 1334, 1337 (9th Cir. 1985) (concluding that "[a]bsent a fairly compelling justification, the government may not interfere with defense access to witnesses"); *Scott*, 518 F.2d at 268 (stating that "the prosecution has no right to interfere with or prevent a defendant's access to a witness (absent any overriding interest in security)").

Here, the defendants have made no showing that the government's unwillingness to provide security to the defense team would effectively deny them access to witnesses and evidence in Iraq.  More specifically, the defendants have offered no support for the assertion that none of the private security companies identified by the DOD in the September 30 Letter can provide the security necessary for the defense team to safely conduct a pretrial investigation in Iraq.  *See generally* Defs.' Mot.; Defs.' Reply.  As previously noted, these companies are licensed to provide security services in Iraq, have obtained arming approval as required by MNF-I orders and perform security services for U.S. government personnel in Iraq.  *See* September 30 Letter.  Robert Reed, the Regional Security Officer for the U.S. Embassy in Baghdad, who is responsible for the safety of U.S. personnel operating in Baghdad, states that "[f]or U.S. Government personnel assigned to Embassy Baghdad and those who are visiting, security is provided primarily by personal security contractors."  Decl. of Robert Reed ("Reed Decl.") ¶ 3.  He further states that "[a]ny non-U.S. Government visitors traveling to Baghdad can contract with a private security contractor for protection equivalent to that provided to employees of the U.S. Government."  *Id.* ¶ 5.[1]  Similarly, Lt. Col. Susan Arnold, Legal Advisor for the Security Agreement Secretariat in Iraq, states that "[s]ome United States Forces and all United States Embassy elements routinely use private security companies for travel to leader engagements or meetings within Baghdad" and that "it would be unusual for any civilian personnel to move around Baghdad in military vehicles."[2]  Arnold Decl. ¶ 8.  These facts, unchallenged by the defendants, undercut the defendants' assertion that only the U.S.

---

[1] Reed further states that "[t]he configuration of the personal security detail (PSD) for such visitors would be contingent upon the results of a security threat assessment, and would include an appropriate number of armored vehicles and trained security personnel."  Reed Decl. ¶ 7.

[2] Lt. Col. Arnold further states that such an arrangement "would also be provocative to the Iraqi public."  Arnold Decl. ¶ 8.

7

government is capable of providing necessary assistance with security in Iraq. *See* Defs.' Mot. at 11.[3]

Although the defendants maintain that private security alone, with no cooperation from the U.S. government, will not be sufficient to ensure the safety of the defense team, Defs.' Reply at 9-10, their concern that a private security company will not receive cooperation from the U.S. government is speculative at this point. Indeed, given the fact that the defense team will be in Iraq as officers of this court fulfilling their legal duty to represent the defendants in a criminal proceeding, as well as the fact that the defense team potentially faces a more severe threat of attack than would a typical U.S. citizen or official traveling to Iraq, the court fully expects that any licensed private security company identified for the defendants by the DOD and retained by the defense team will receive from the U.S. government full cooperation in conducting threat assessments, coordinating the defense team's movements, locating a safe location to conduct witness interviews[4] and otherwise ensuring the safety of the defense team during its pretrial investigation. The means for facilitating such cooperation are surely already in place, as the private security companies identified by the DOD in the September 30 Letter already operate

---

[3] The government contends that private security companies may be better suited to providing the type of security measures needed by the defense team, in that the private companies are not bound by the restrictions set forth in the Security Agreement, can provide security with a lower profile than would be possible for U.S. military units and may cause less friction with the Iraqi population. *See* Govt's Opp'n at 12-13.

[4] The defendants assert that without U.S. government cooperation, any witness interviews will have to be conducted in some unsecured space, such as a hotel or private office, that cannot be adequately safeguarded by a private security company. Defs.' Reply at 10. Yet the defendants have offered nothing to substantiate their speculation that a private security company cannot adequately safeguard a location to conduct witness interviews. *See generally id.*

8

under contract with the U.S. government and are the primary providers of personal security for U.S. government personnel operating in Baghdad. *See* Reed Decl. ¶ 3.[5]

The court declines to speculate as to whether there may be circumstances in which fundamental fairness and due process require the government to take a more direct role in providing security measures to defense counsel conducting a pretrial investigation in a hostile foreign war zone. *See Gregory*, 369 F.2d at 188. Whatever those circumstances might be, they are not present in this case, given that (1) the government has identified for the defendants licensed personal security companies that are the primary providers of personal security services to U.S. government personnel in Baghdad; (2) these companies can provide for the defendants the same security services that they currently provide to U.S. government personnel; (3) the defendants have made no showing that these private security companies are unable to provide the security necessary for their investigation; and (4) the defendants have acknowledged their ability to pay for such services. Accordingly, the court denies the defendants' request for an order requiring the government to provide security to the defense team for their pretrial investigation in Iraq.

**B. A Point of Contact at the U.S. Embassy in Baghdad to Facilitate the Investigation**

The defendants request that the government provide a point of contact at the U.S. Embassy for the purposes of facilitating the defense team's security and logistical needs, obtaining appropriate clearances for travel to Iraq, coordinating logistics within the "Green Zone," reaching out to witnesses whom the defense wishes to contact and arranging for interviews in a neutral location. *See* Defs.' Reply at 17-19; Proposed Order. The government

---

[5] Indeed, Reed notes that "[a]s the [Regional Security Officer] it is a part of [his] responsibilities to assign PSCs [private security companies] to escort U.S. government personnel and official representatives as they move in and around Baghdad, to schedule such movement, and to review the performance of PSCs in carrying out their duties." Reed Decl. ¶ 4.

asserts that it has already provided the defendants with a point of contact at the U.S. Embassy for consular services and contends that the defendants' requests for specific assistance from the U.S. Embassy are moot and improper. Govt's Opp'n at 7-9, 21-22.

The court considers the defendants' request for a point of contact within the U.S. Embassy to facilitate the defense team's security and logistical needs to be premature at the present time. As previously discussed, it appears likely that the private security companies identified by the DOD in the September 30 Letter, which operate under contract with U.S. government agencies, possess the necessary contacts at the U.S. Embassy to coordinate the defense team's security and logistical needs. *See* Reed Decl. ¶ 4. Because the defendants have yet to consult with the private security companies identified in the September 30 Letter, the court denies this aspect of the defendants' request.[6]

As for the defendants' request for assistance from the U.S. Embassy in facilitating clearances for travel to Iraq, the government points out that the Government of Iraq now controls entry into the country. *See* Govt's Opp'n at 21; Arnold Decl. ¶ 9; Bankson Decl. ¶ 3. The Iraqi Ministry of Interior and Ministry of Foreign Affairs are responsible for issuing visas to U.S. citizens seeking entry into the country. Bankson Decl. ¶ 3. Thus, the defense team will need to obtain entry clearances directly from the Iraqi government, rather than through the U.S. Embassy in Baghdad. Arnold Decl. ¶ 9. Likewise, it is undisputed that since the implementation of the Security Agreement, the Iraqi government, rather than the U.S. military, controls and has responsibility for the "Green Zone." Defs.' Mot. at 4; Govt's Opp'n at 8 n.4. Accordingly, the court denies the defendants' request for a point of a contact at the U.S. Embassy to facilitate appropriate clearances for travel to Iraq and logistics within the "Green Zone."

---

[6] Likewise, the court denies as premature the defendants' request for assistance from the U.S. Embassy in arranging a safe and neutral location for witness interviews.

As for the defendants' request for assistance in "witness outreach," the precise nature of the relief sought by the defendants is not entirely clear. *See* Defs.' Reply at 19. Insofar as the defendants seek updated contact information for witnesses identified by the government, the court grants that request for the reasons discussed below. *See infra* Part III.C. Yet to the extent that the defendants seek an order requiring the government to contact witnesses and persuade them to cooperate with the defense team's investigation, the defendants offer no authority for such relief. *See generally* Defs.' Reply. Although the government may not prevent a defendant from having access to a potential witness, it has no obligation to secure the cooperation of that witness with defense counsel's pretrial investigation. *Cf. United States v. Rice*, 550 F.2d 1364, 1374 (5th Cir. 1977) (holding that the district court did not err in refusing to compel a witness to submit to an interview by defense counsel because "[a]ll that a defendant is entitled to is access to a prospective witness"); *Scott*, 518 F.2d at 268 (noting that the criminal defendant's right of access to any potential witness may not lead to an actual interview); *United States v. King*, 368 F. Supp. 130, 131 (M.D. Fla. 1973) (concluding that "the United States Attorney's refusal to direct his witness to consent to interviews [was] entirely properl" because "[m]erely refusing to direct the witness to communicate with opposing counsel is far short of affirmatively urging them not to communicate"). Accordingly, the court denies the defendants' request for assistance with "witness outreach."

### C.  Contact Information for Witnesses

The defendants request that the government provide contact information for the alleged victims and *Brady* witnesses identified by the government. *See* Proposed Order. The government responds that this request is moot. Govt's Opp'n at 20, 22. The government states that on August 6, 2009, it provided the defendants with contact information for identified *Brady*

11

witnesses, and that on September 30, 2009, it provided the defendants with unredacted witness statements for approximately 120 Iraqi witnesses, including the named victims who survived the shooting. *Id.* at 22. The defendants acknowledge that the government has provided contact information, but states that in the intervening time, witnesses are likely to have moved, disappeared or become hard to reach. Defs.' Reply at 19.

In a non-capital case, a criminal defendant has no generalized right to discover the identities of prospective government witnesses. *See Weatherford v. Bursey,* 429 U.S. 545, 559 (1977); *United States v. Hughes*, 116 F.3d 903, 918 (D.C. Cir. 1997) (noting that "[t]he constitutional right to cross examine has never been held to encompass a right to pretrial disclosure of prosecution witnesses"). The court has the discretion, however, to order the production of witness information upon a showing of compelling need. *See United States v. Hsin-Yung*, 97 F. Supp. 2d 24, 35 (D.D.C. 2000) (denying the defendant's request for the names and addresses of government witnesses absent a showing of compelling need); *see also United States v. Cadet*, 727 F.2d 1453, 1468-69 (9th Cir. 1984) (holding that the district court did not err in ordering the government to produce the names and addresses of all government witnesses); *United States v. Cavallaro*, 553 F.2d 300, 304 (2d Cir. 1977) (stating that "[t]he address of a government witness is generally a proper subject of defense inquiry and may be necessary for in-and-out-of-court investigation of a witness"). "Preparation for trial, effective cross-examination, expediency of trial, possible intimidation of witnesses, and the intrinsic reasonableness of the request are among the factors a court may consider in deciding whether to exercise its discretion to allow discovery of the witness list." *United States v. Madeoy*, 652 F. Supp. 371, 375-76 (D.D.C. 1987) (granting the defendant's motion for a government witness list in light of the very

large number of witnesses involved in the case, the intrinsic reasonableness of the request and the unlikelihood of witness intimidation).

In this case, the government has been admirably forthcoming in providing information regarding witnesses to the Nisur Square shooting, including contact information for *Brady* witnesses. *See* Govt's Opp'n at 20. Nonetheless, the court is persuaded that there exists a compelling need for the disclosure of up-to-date contact information for all witnesses in this case, given that there are well over 100 Iraqi witnesses to the incident, that these witnesses are located in a foreign country still emerging from a period of violence and upheaval, that the trial date is fast approaching and that the government's disclosure of contact information was made more than three months ago. Accordingly, to the extent that the government possesses updated contact information for any witnesses identified in the government's *Brady* disclosures or in the indictment, the government shall disclose such information to the defendants.

### D.  Security for Any Rule 15 Depositions

The defendants have requested that the government provide appropriate security for defense counsel conducting any Rule 15 depositions authorized by the court. *See* Defs.' Reply at 19-20. Because the defendants have yet to identify any potential Rule 15 deponents, *id*. at 20, and because the parties have yet to meet and confer regarding what security assistance the government may provide in the event such depositions are authorized,[7] *see* Govt's Opp'n at 22, the court denies this request as premature.

---

[7]  The government indicates that "logistical arrangements" for any Rule 15 depositions will be made "in the ordinary course." Govt's Opp'n at 22.

## IV.  CONCLUSION

For the foregoing reasons, the court grants in part and denies in part the defendants' motion for an order requiring the government to provide security measures for the defense team's pretrial investigation in Iraq.  An Order consistent with this Memorandum Opinion is separately and contemporaneously issued this 16th day of November, 2009.

RICARDO M. URBINA
United States District Judge
