**FILED**

SEP 8 - 2009

Clerk, U.S. District and
Bankruptcy Courts

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Criminal Action No.:   08-0360 (RMU) |
| | : | |
| v. | : | **UNDER SEAL** |
| | : | |
| PAUL A. SLOUGH *et al.*, | : | **UNSEALED** |
| | : | |
| Defendants. | : | |

**MEMORANDUM OPINION**

**GRANTING THE DEFENDANTS' MOTION FOR A *KASTIGAR* HEARING**

**I. INTRODUCTION**

This matter is before the court on the defendants' motion for an evidentiary *Kastigar* hearing. The defendants have been charged with multiple manslaughter counts arising out of a shooting that occurred in Baghdad, Iraq on September 16, 2007. They contend that in the course of this prosecution, prosecutors have unlawfully utilized statements the defendants made to Department of State investigators shortly after the shooting, which were compelled under a threat of job loss. The defendants argue that immunity attaches to these statements by virtue of *Garrity v. New Jersey*, 385 U.S. 493 (1967), and that the court should hold a *Kastigar* hearing at which the government must prove that it has not improperly utilized immunized testimony.

As discussed below, the defendants have laid a firm factual and legal foundation for their contention that immunized testimony was used in the course of this prosecution. Accordingly, the court grants the defendants' motion.

## II. BACKGROUND

### A. Factual Background

#### 1. The Nisur Square Incident and Subsequent Investigation

The defendants were security guards employed by Blackwater Worldwide ("Blackwater"), a private company that provided security services to U.S. employees operating in Iraq. Govt's Opp'n at 3. On September 16, 2007, the defendants were part of a Blackwater Tactical Support Team called "Raven 23," whose function was to provide back-up fire support for other Blackwater personal security details operating in Baghdad. *Id.* Around noon on that day, the Raven 23 convoy was involved in a shooting at the Nisur Square traffic circle in downtown Baghdad, Defs.' Mot. at 4, which allegedly resulted in the death and injury of numerous Iraqis, Govt's Opp'n at 4. The government contends that the dead and wounded were unarmed civilians who were the victims of unprovoked violence by the defendants. Govt's Opp'n at 4. The defendants assert that they came under attack by insurgents and that a firefight ensued. Defs.' Mot. at 4.

Later that day, agents from the Department of State's Diplomatic Security Service ("DSS") interviewed members of the Raven 23 convoy regarding the shooting. Defs.' Mot. at 5; Govt's Opp'n at 4. The defendants assert that they were "ordered" to give verbal statements to DSS agents regarding their actions at Nisur Square ("the September 16 Statements"), that they understood the order to be mandatory and that they understood that their refusal to comply with the order would result in their termination. *See* Defs.' Mot., Ex. 5 (Decl. of Paul Slough) ("Slough Decl.") ¶ 6; Ex. 6 (Decl. of Nicholas Slatten) ("Slatten Decl.") ¶ 5; Ex. 7 (Decl. of Evan Liberty) ("Liberty Decl.") ¶ 5; Ex. 8 (Decl. of Dustin Heard) ("Heard Decl.") ¶ 4; Ex. 28 (Decl. of Donald Ball) ("Ball Decl.") ¶ 5. The defendants' understanding of the obligation and

import of the order to submit to DSS questioning finds support in statements provided by other

Blackwater employees. *See* Defs.' Mot., Ex. 4 ¶ 8; Ex. 10 ¶ 5; Ex. 11 ¶ 5; Ex. 29 ¶ 3; Ex. 30 ¶ 5.

In addition, the defendants' understanding of the order to submit to DSS questioning

finds further support in the State Department's written policies regarding the discharge of

firearms. *See generally* Slough Decl., Attach. A. The defendants state that as part of

Blackwater's in-country processing procedures, all Blackwater personnel were provided with a

State Department memorandum titled "WPPS[1] On-Duty Discharge of Firearm Reporting

Procedures." Slough Decl. ¶¶ 1-2; Slatten Decl. ¶¶ 1-2; Liberty Decl. ¶¶ 1-2; Heard Decl. ¶¶ 1-

2; Ball Decl. ¶¶ 1-2; *see also* Defs.' Mot., Ex. 4 ¶ 4; Ex. 9 ¶ 1; Ex. 10 ¶¶ 1-2; Ex. 11 ¶¶ 1-2; Ex.

29 ¶¶ 1-2; Ex. 30 ¶¶ 1-2. Pursuant to this memorandum, all Blackwater personnel were required

to report any incident of firearm discharge to State Department officials and to submit to

immediate debriefing following such an incident. *See* Slough Decl., Attach. A at 1. After

debriefing, the employee who discharged his weapon was to be given a form, a template for

which was attached to the memorandum, on which to prepare a written statement. *Id.* The form,

which bore the heading "Sworn Statement," provided as follows:

> I, _____, hereby make the following statement at the
> request of _____, who has been identified to me as a Special
> Agent of the U.S. Department of State, Diplomatic Security Service. *I understand
> that this statement is made in furtherance of an official administrative inquiry
> regarding potential misconduct or improper performance of official duties and
> that disciplinary action, including dismissal from the Department's Worldwide
> Personnel Protective Services contract, may be undertaken if I refuse to provide
> this statement or fail to do so fully and truthfully. I further understand that
> neither my statements nor any information or evidence gained by reason of my
> statements can be used against me in a criminal proceeding,* except that if I
> knowingly and willfully provide false statements or information, I may be
> criminally prosecuted for that action under 18 United States Code, Section 1001.
> I agree that the statement I furnish and any information or evidence resulting there

---

[1] The term "WPPS" stands for "Worldwide Personnel Protective Services," and refers to the contract for protective services between Blackwater and the Department of State. *See* Defs.' Mot., Ex. 4 ¶¶ 2.

from may be used in the course of disciplinary proceedings, which could result in disciplinary action, including dismissal.

*Id.* at 3 (emphasis added).

The defendants assert that before speaking with DSS agents on September 16, all of the members of the Raven 23 convoy were advised by one of their Blackwater superiors, Matthew Twigg, to "be completely honest" and that "they would be advised of a form of Garrity which compels them to tell the truth." Defs.' Mot., Ex. 13 at 13. Twigg allegedly stated to the defendants that "the only thing that [could] happen to them if they told the truth, if they violated some sort of policy, [would be that] they would lose their jobs." Moreover, three of the defendants indicate that they received express "*Garrity* warnings" during their interviews. Defs.' Mot. at 5; Slough Decl. ¶ 7; Heard Decl. ¶ 4; Ball Decl. ¶ 6. For instance, defendant Slough states that prior to the interview, a State Department employee told him that his statements could be used solely for administrative purposes and could not be used against him in a criminal proceeding.[2]  Slough Decl. ¶ 7.

Consistent with State Department procedures, on September 18, 2007 – two days after submitting to questioning by DSS agents – the defendants and other members of the Raven 23 convoy provided written statements regarding their conduct at Nisur Square. Defs.' Mot. at 6; Govt's Mot. at 4. These statements were submitted using the State Department's "Sworn Statement" form, Defs.' Mot. at 6; Govt's Mot. at 4-5, which, as previously noted, provided that refusal to respond fully and truthfully could result in termination and that neither the statements

---

[2]  Slough states that to the best of his recollection, the State Department employee told him that "[t]his is for you to keep your job. We can't use this against you. This is not a criminal investigation or interview. This is to gather information." Slough Decl. ¶ 7. Likewise, defendant Heard states that at the beginning of his DSS interview, the DSS investigating agents advised him that they were conducting an administrative, not a criminal, investigation, and that anything that he said could not be used against him in a criminal investigation or prosecution. Heard Decl. ¶ 4. Defendant Ball also states that he was told that his statements could not be used against him in a criminal proceeding. Ball Decl. ¶ 6.

themselves nor any of the information or evidence obtained by reason of those statements could

be used against them in a criminal prosecution, Slough Decl., Attach. A at 3.

Over the following week, several of the defendants were interviewed again by DSS

agents regarding the Nisur Square shooting. Defs.' Mot. at 7; Govt's Opp'n at 5. The

defendants assert that during these subsequent interviews, they were advised that their statements

could not be used against them during a criminal proceeding. Defs.' Mot. at 7; *see also* Slough

Decl. ¶ 9; Heard Decl. ¶ 6. For instance, defendant Heard states that he was re-interviewed on

September 20 and 24, 2007, and that during at least one of those interviews, he "was again

advised . . . that this is an administrative investigation, that [he] would be terminated if [he]

refused to provide a statement, and that [his] statement could not be used against [him] in a

criminal prosecution."[3]  Heard Decl. ¶ 6.

### 2. Exposure of Prosecutors and Witnesses to the September 16 and 18 Statements

On September 26, 2007, representatives of the FBI and the Department of Justice

("DOJ") Criminal Division met with State Department representatives to discuss the preliminary

findings of the DSS investigation into the Nisur Square shooting. *Id.*, Ex. 23 (Letter from Joseph

Kaster, DOJ, National Security Division, dated May 29, 2009) at 2.  At that meeting, State

Department representatives distributed copies of a DSS report that summarized the State

Department's initial findings, including information gained from the September 16 and 18

Statements. *Id.*

On September 28, 2007, the State Department's Office of Legal Counsel contacted the

DOJ's Criminal Division and expressed concern that some of the information used to prepare the

DSS report may have been based on compelled statements made by Blackwater personnel. *Id.*

---

[3]      Adopting the parties' conventions, the court refers to the defendants' written statement given on
September 18 and the subsequent statements given to DSS agents as the "September 18
Statements." Defs.' Mot. at 7; Govt's Opp'n at 5.

Accordingly, the government took steps to insulate the "taint" resulting from these statements, assigning to the case a team of prosecutors and investigators who had not participated in the September 26 meeting and had not been exposed to the information discussed at that meeting. *Id.* The newly assigned prosecutors and investigators were warned not to expose themselves to articles or stories about Blackwater and specifically to avoid any news reports containing Blackwater employees' accounts of the Nisur Square shooting. *Id.* at 6.

The defendants assert that by the time the government implemented these "taint" precautions, the September 18 Statements had been leaked to the media and disseminated globally. Defs.' Mot. at 7. Portions of these statements appeared in reports by ABC News (including in a nationally broadcast television segment), MSNBC/Newsweek, the *Washington Post* and the *New York Times*. *Id.* at 8-10. The earliest of these reports was a September 28, 2007 article in which ABC News reported that it had obtained "sworn statements given to State Department investigators" in which Blackwater personnel described the events that occurred at Nisur Square. *Id.*, Ex. 15. Subsequently, the *Washington Post* published an article contrasting the accounts of the four Blackwater guards with those of Iraqi eyewitnesses. *Id.*, Ex. 17. The defendants contend – and the government does not dispute – that these press accounts dominated the national news in both Iraq and the United States for two weeks and that it is overwhelmingly likely that any Iraqi witnesses relied on by the government were exposed to press accounts containing the September 18 Statements. *Id.* at 11-12.

Moreover, there is no dispute that members of the prosecution team read the September 16 Statements. *Id.* at 12. The DSS agents' notes of the September 16 Statements were compiled into two "Memorandum Reports of Interviews." Defs.' Mot. at 6; Govt's Opp'n at 4. In a letter dated June 30, 2009, the government acknowledged that

During the summer of 2008, [a current prosecutor] received two documents entitled 'Memorandum Report of Interview' prepared by the DSS agents regarding their September 16 interviews. After receiving them, [the prosecutor] read these documents . . . . In the Fall of 2008, [the prosecutor] referenced information contained in the DSS September 16 interview of Dustin Heard when speaking with Heard's counsel.

Defs.' Mot., Ex 12 ("June 30 Letter") at 4.[4]  In the same letter, the government also acknowledged that during an interview with a DSS agent held in January 2008, the agent provided to prosecutors her interview notes from September 16, 2007.[5]  *Id.*

### 3. Potential Exposure of the Grand Jury to the September 16 and 18 Statements

The government called on members of the Raven 23 convoy to testify before a grand jury. *Id.* at 5. Prior to calling these Blackwater employees to testify, the government warned them "not to tell the grand jury about information learned from the sworn statement of any other member of Raven 23" and to testify only "based on their personal experiences and not from what they may have read concerning the event." *Id.*

Yet prior to seeking an indictment, the government reviewed the grand jury record "to determine whether, despite the admonishments provided to the witnesses, some information derived from potential *Garrity* material could have been inadvertently presented to the grand jury." *Id.* Based on that review, "it appeared that the grand jury may have been indirectly exposed to information obtained from the September 18 statements." *Id.* Specifically, the

---

[4]     The same letter also details several instances in which members of the prosecution team could have been exposed to the September 16 and 18 Statements. June 30 Letter at 3-4. For instance, the letter notes that one of the prosecutors received, in response to a grand jury subpoena, unsigned copies of the September 18 Statements, but did not review them upon receiving them. *Id.* at 3. During the summer of 2008, members of the prosecution team purchased copies of a book which contained the accounts given by the defendants, though the government insists that "[b]oth prosecutors stopped reading the introduction before they saw any witness accounts by Blackwater guards concerning the events of September 16." *Id.* at 4.

[5]     The government asserts that the prosecutors and the FBI had identified which Blackwater personnel had shot the Iraqi victims prior to any exposure to the September 16 Statements. Govt's Opp'n at 5-6.

government found that at least four witnesses had provided information that may have been derived at least in part from the September 18 Statements. *Id.*

Rather than seek an indictment from the first grand jury, the government convened a second grand jury. *Id.* The evidence presented to the second grand jury consisted of a summary FBI witness, various exhibits from the first grand jury and several witness transcripts from the first grand jury proceeding. *Id.* The government redacted the testimony of witnesses who may have provided testimony derived from the September 18 Statements. *Id.*

The June 30 Letter also notes that numerous other witnesses who did not testify before the grand jury, but who may be called to testify at trial, may have been exposed to the September 16 and 18 Statements. *Id.* at 6-10. Chief among these potential witnesses is cooperating witness Jeremy Ridgeway. *Id.* at 9. The June 30 Letter noted that

> Two days after the shooting, Mr. Ridgeway recalls seeing the sworn statement of Nicholas Slatten while the two of them were waiting to deliver their respective sworn statements to DSS. Similarly, Mr. Ridgeway may have seen Dustin Heard's statement around the same time. On or about November 2007, Mr. Ridgeway saw Paul Slough's statement via media reporting on the internet.

*Id.*

## B. Procedural History

The second grand jury returned an indictment on December 4, 2008, charging the defendants with fourteen counts of voluntary manslaughter, nineteen counts of attempted manslaughter and one firearm count. *See* Indictment. In early May 2009, the government filed a "Motion for a *Garrity* Hearing in Lieu of a Pretrial *Kastigar* Hearing," in which it argued that a pretrial *Kastigar* evidentiary hearing is unwarranted in this case. On July 22, 2009, the court denied the government's motion on the grounds that there had been inadequate briefing on the legal and factual foundation for the application of *Kastigar*. Mem. Order (Jul. 22, 2009) at 4.

The court set aside dates for a *Kastigar* hearing and ordered the defendants to file a motion setting forth a "firm foundation" for their assertion that immunized testimony was improperly utilized in this case. *Id.* at 4. The court directed the parties to specifically address whether the immunity purportedly granted by the State Department was sufficient to implicate *Kastigar*. *Id.* Pursuant to the court's order, the defendants filed the instant motion on August 4, 2009, which is now fully submitted.

## III. ANALYSIS

### A. Legal Standard for the Application of *Kastigar*

In *Kastigar v. United States*, 406 U.S. 441 (1971), the Supreme Court held that

'Once a defendant demonstrates that he has testified, under a state grant of immunity, to matters related to the federal prosecution, the federal authorities have the burden of showing that their evidence is not tainted by establishing that they had an independent legitimate source for the disputed evidence.'

This burden of proof . . . is not limited to negation of taint; rather, it imposes on the prosecution the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony.

*Id.*, 406 U.S. at 460 (quoting *Murphy v. Waterfront Comm'n*, 378 U.S. 52, 79 n.18 (1964)). As the Circuit has noted, "[w]hen the government proceeds to prosecute a previously immunized witness, it has 'the heavy burden of proving that all of the evidence it proposes to use was derived from legitimate independent sources.'" *United States v. North*, 910 F.2d 843, 854 (D.C. Cir. 1990) ("*North I*") (quoting *Kastigar*, 406 U.S. at 461-62), *reh'g denied*, 920 F.2d 940 ("*North II*").

"A trial court must normally hold a hearing (a '*Kastigar* hearing') for the purpose of allowing the government to demonstrate that it obtained all of the evidence it proposes to use

from sources independent of the compelled testimony." *Id.* (citing *United States v. Rinaldi*, 808 F.2d 1579, 1584 (D.C. Cir. 1987)).  During the hearing, the government must show that for each witness it relies on, "no use whatsoever was made of any of the immunized testimony either by the witness or by the [prosecutor] in questioning the witness." *Id.* at 872-73 (noting that this inquiry "must proceed witness-by-witness; if necessary, it will proceed line-by-line and item-by-item").  The *Kastigar* hearing may be held "pre-trial, post-trial, mid-trial (as evidence is offered), or [through] some combination of these methods." *Id.* "A pre-trial hearing is the most common choice." *Id.*

Although the Circuit has yet to fully delineate the exact reach of *Kastigar*'s prohibition on the use of immunized testimony, *see United States v. Kilroy*, 27 F.3d 679, 687-88 (D.C. Cir. 1992), as a general matter, the government must show at such a hearing that it has made "no use whatsoever" of any immunized testimony. *See North I*, 910 F.2d at 858.  For instance, the government must demonstrate that immunized testimony was not presented to grand jury or trial witnesses "to refresh their memories, or otherwise to focus their thoughts, organize their testimony, or alter their prior or contemporaneous statements." *Id.* at 860 (noting that this principle "applies to witnesses who studied, reviewed, or were exposed to the immunized testimony in order to prepare themselves or others as witnesses"); *North II*, 942 F.2d at 942 (noting that "*Kastigar* is  . . . violated whenever the prosecution puts on a witness whose testimony is shaped, directly or indirectly, by compelled testimony, regardless of *how or by whom* he was exposed to that compelled testimony").  The government must show that immunized testimony was not used to obtain investigatory leads, *see United States v. Hubbell*, 167 F.3d 552, 585 (D.C. Cir. 1999), to focus the pre-indictment investigation, *see United States*

*v. Ponds*, 454 F.3d 313, 327 (D.C. Cir. 2006), or to compel a witness to testify, *see United States v. Hylton*, 294 F.3d 130, 134 (D.C. Cir. 2002).

The government's burden at a *Kastigar* hearing is not, however, insurmountable. For instance, "[d]ismissal of the indictment or vacation of the conviction is not necessary where the use is found to be harmless beyond a reasonable doubt." *Ponds*, 454 F.3d at 328 (quoting *North I*, 910 F.2d at 854). Thus, where "the immunized evidenced emerges early in the investigation, the court must determine whether the government 'would have taken the same steps entirely apart from the motivating effect of the immunized testimony." *Id.* (quoting *United States v. Nanni*, 59 F.3d 1425, 1433 (2d Cir. 1995)); *see also North I*, 910 F.2d at 859 (noting that "a prosecution is not foreclosed merely because the 'immunized testimony might have tangentially influenced the prosecutor's thought processes in preparing the indictment and preparing for trial'") (quoting *Serrano*, 870 F.2d at 17). It is clear, however, that the government does not satisfy this burden "simply by showing the availability of 'wholly independent' evidence from which it *might* have procured indictment or conviction had it not used immunized testimony." *Ponds*, 454 F.3d at 328. Rather, the government "must demonstrate beyond a reasonable doubt that [the prosecution] *would* have been vigorously pursued" and that the same investigative efforts would have been undertaken had the government not relied on immunized testimony. *Id.* at 328-29.

To demonstrate that a *Kastigar* hearing is warranted, a defendant must lay a "firm foundation resting on more than suspicion" that immunized testimony may have been unlawfully used. *North II*, 920 F.2d at 949 n.9 (internal quotations omitted) (noting that because the district court found that grand jury witnesses were exposed to the defendant's immunized testimony, the defendant clearly met this burden); *see also Kastigar*, 406 U.S. at 461-62 (noting that the

11

defendant must show that he testified under a grant of immunity for the burden to shift to the

government); *United States v. Jarvis*, 7 F.3d 404, 414 (4th Cir. 1993) (holding that "once a

defendant demonstrates that he previously testified under a grant of immunity purporting to

protect him against the subsequent use of his testimony as a source for evidence, the district

court must hold a hearing at which the prosecution carries 'the heavy burden of proving that all

of the evidence it proposes to use was derived from . . . sources' independent of the immunized

testimony").

## B. The Defendants Have Established the Necessary Foundation for a *Kastigar* Hearing

### 1. The Defendants Have Laid a Firm Foundation that Immunized Testimony was Improperly Used

The defendants contend that because the September 16 and 18 Statements were

compelled under a threat of job loss, those statements were immunized by virtue of *Garrity v.*

*New Jersey*, 385 U.S. 273 (1967), which prohibits the government from using statements

compelled under a threat of job loss in a subsequent criminal prosecution against the witness.

*See generally* Defs.' Mot.; Defs.' Reply. Each defendant maintains that he understood that his

failure to submit to questioning by DSS agents would result in his termination. *See* Defs.' Mot.

at 5-7. Furthermore, the defendants assert that prosecutors, investigators and grand jury

witnesses were exposed to these "*Garrity*-immunized" statements. *Id.* at 7-16. These facts, the

defendants argue, lay a sufficient foundation for a *Kastigar* hearing. *Id.* at 39-44.

The government does not dispute that members of the prosecution team and certain grand

jury witnesses were exposed to the defendants' September 16 and 18 Statements. *See generally*

*id.* The government does dispute, however, the assertion that *Garrity* affords the September 16

and 18 Statements the broad immunity from derivative use required by *Kastigar*. Govt's Mot. at

15-33. Rather, the government contends that *Garrity* statements amount to involuntary, coerced

confessions and, accordingly, should be analyzed under the same exclusion principles that guide

the suppression of coerced confessions. *Id.* The government also contends that the promises of

use and derivative use offered by DSS agents do not implicate *Kastigar* because those agents

lacked the authority to make binding offers of immunity. *Id.* at 7-15.

In *Garrity*, the Supreme Court held that statements obtained from police officers under a

threat of job loss could not be used against them in a criminal proceeding. *Garrity*, 385 U.S. at

500. The police officers were informed that unless they answered questions submitted by the

state attorney general, they would be terminated from their positions.[6] *Id.* at 494. The

statements elicited during these interviews were used in subsequent criminal case against the

officers. *Id.* The Court concluded that the Fifth Amendment's privilege against compulsory

self-incrimination prohibited the prosecutors from using these statements to prosecute the

officers:

> The choice given petitioners was either to forfeit their jobs or to incriminate
> themselves. The option to lose their means of livelihood or to pay the penalty of
> self-incrimination is the antithesis of free choice to speak out or to remain silent.
> That practice, like interrogation practices we reviewed in *Miranda v. Arizona*, is
> 'likely to exert such pressure upon an individual as to disable him from making a
> free and rational choice.' We think the statements were infected by the coercion
> inherent in this scheme of questioning and cannot be sustained as voluntary under
> our prior decisions.

*Id.* at 497-98 (internal citation omitted).

At no point did the *Garrity* Court suggest that use and derivative use immunity

automatically attaches to statements compelled under a threat of job loss. *See generally id.*

Rather, the Court analogized the situation to the *Miranda* context and held the statements

inadmissible as involuntary and coerced. *Id.* at 497-98.

---

[6] Before questioning, each petitioner was informed "(1) that anything he said might be used against
him in any state criminal proceeding; (2) that he had the privilege to refuse to answer if the
disclosure would tend to incriminate him; but (3) that if he refused to answer he would be subject
to removal from office." *Garrity v. New Jersey*, 385 U.S. 493, 494 (1967).

Yet subsequent Supreme Court decisions have suggested that *Garrity* provides a form of immunity over statements compelled under a threat of dismissal. *See Maness v. Myers*, 419 U.S. 449, 474 (1975) (White, J., concurring) (observing that *Garrity* provides a witness "immunity from being incriminated by his responses to his interrogation"); *cf. Lefkowitz v. Turley*, 414 U.S. 70, 82 (1973) (noting that by requiring public contractors to waive their immunity, "[i]t seems to us that the State intended to accomplish what *Garrity* specifically prohibited – to compel testimony that had not been immunized").

Indeed, the Circuits have now uniformly held that "a government employee who has been threatened with an adverse employment action by her employer for failure to answer questions put to her by her employer receives immunity from the use of her statement or their fruits in subsequent criminal proceedings." *Sher v. Dep't of Veterans Affairs*, 488 F.3d 489, 501-02 & n.12 (1st Cir. 2007); *United States v. Koon*, 34 F.3d 1416, 1431 (9th Cir. 1994) (stating that where public employees "make a statement under threat of removal from office, the statement is compelled and the government is precluded from using either the statement or information derived from it as evidence in the federal trial") *rev'd in part on other grounds*, 518 U.S. 81 (1996); *In re Grand Jury Proceedings (Kinamon)*, 45 F.3d 343, 348 (9th Cir. 1995) (holding that statements obtained from an employee required to answer questions under a threat of dismissal were subject to use and derivative use immunity); *In re Grand Jury Subpoenas (Stover)*, 40 F.3d 1096, 1102-03 (10th Cir. 1994) (observing that "*Garrity*'s protection . . . acts to immunize . . . compelled statements, as it prohibits their subsequent use against the officer so as not offend the Fifth Amendment Privilege" and that this prohibition "provides a comprehensive safeguard, barring the use of compelled testimony as an 'investigatory lead,' and also barring the use of any evidence obtained by focusing investigation on a witness as a result of his compelled

disclosures") (quoting *Kastigar*, 406 U.S. at 460); *In re Fed. Grand Jury Proceedings (Cohen)*, 975 F.2d 1488, 1490 (11th Cir. 1992) (observing that "[i]mmunity under *Garrity* prevents any statements made in the course of the internal investigation from being used against the officers in subsequent criminal proceedings"); *Kalkines v. United States*, 473 F.2d 1391, 1393 (Fed. Cl. 1973) (holding that "a later prosecution cannot constitutionally use statements (or their fruits) coerced from the employee – in an earlier disciplinary investigation or proceeding – by a threat of removal from office if he fails to answer the question"); *see also Wiley v. Mayor & City Council of Balt.*, 48 F.3d 773, 777 (4th Cir. 1995) (observing that "a state may compel job-related testimony from an employee in the course of a criminal investigation, provided, of course, that the state does not make direct or derivative use of the employee's statement against the employee in any criminal proceeding"); *United States v. Friedrick*, 842 F.2d 382, 395-96 (D.C. Cir. 1988) (holding that *Garrity* conferred immunity on statements made by the defendant during an administrative investigation during which he was obliged to answer all questions truthfully under threat of dismissal); *Uniform Sanitation Men Ass'n v. Comm'r of Sanitation of the City of N.Y.*, 426 F.2d 619, 626 (2d Cir. 1970) (stating that in *Garrity*, "the very act of the attorney general in telling the witness that he would be subject to removal if he refused to answer was held to have conferred . . . immunity"); *United States v. Tallia*, 1991 U.S. Dist. LEXIS 6654, at *18 (D.D.C. May 15, 1991) (holding that statements made by the defendant were "protected by derivative use immunity" because the investigative form on which the statements were given as well as the investigating agents "made clear to [the defendant] that he was compelled to answer all questions posed during the interview") (citing *Kastigar*, 406 U.S. at 453). These decisions make clear that the immunity afforded by *Garrity* does not depend on an official offer immunity extended by a government entity, but rather attaches automatically by virtue of the

Fifth Amendment. *See Sher*, 488 F.3d at 501-02 & n.12 (noting that "testimony compelled by the threat of adverse employment action *automatically* triggers a grant of immunity under *Garrity*"); *In re Grand Jury Proceedings (Kinamon)*, 45 F.3d at 348 (reversing the district court's determination that the police department did not have authority grant an officer immunity because *Garrity* immunity derives from the Fifth Amendment itself).

Accordingly, the Circuits have also uniformly held that "if a criminal defendant . . . demonstrates that she was compelled to testify by her government employer, 'the government must show that any evidence used or derived has a legitimate source wholly independent of the compelled testimony.'" *United States v. Moten*, 551 F.3d 763, 766 (8th Cir. 2008) (quoting *Kastigar*, 406 U.S. at 460); *In re Grand Jury (Doe)*, 478 F.3d 581, 583-84 (4th Cir. 2007) (noting that if a police officer believed statements compelled under *Garrity* "were used to indict him, he would be entitled to a *Kastigar* hearing, at which the government would bear the burden of 'prov[ing] that the evidence it proposes to use is derived form a legitimate source wholly independent of the compelled testimony'") (quoting *Kastigar*, 406 U.S. at 441); *In re Grand Jury Proceedings (Kinamon)*, 45 F.3d at 348 (ordering the district court to conduct a *Kastigar* hearing to determine whether statements obtained by threat of job loss were improperly used in a grand jury proceeding); *In re Grand Jury Subpoenas (Stover)*, 40 F.3d at 1103 (holding that "an officer, whose compelled statement [under *Garrity*] has been considered by the grand jury, ultimately is indicted, that officer will be able to challenge the indictment and the government will be required to prove that its evidence derives entirely from legitimate sources or that the grand jury's exposure to the officer's statement was harmless") (citing *Kastigar*, 406 U.S. at 460); *see also United States v. Blowers*, 2005 WL 3116090, at *3 (W.D.N.C. Nov. 21, 2005) (noting it was clear that the defendant's statement "was compelled under *Garrity*" and that as a result, "the only

issue remaining is whether the Government impermissibly 'used' this statement or its contents under *Kastigar*"); *Tallia*, 1991 U.S. Dist. LEXIS 6654, at *18-19 (analyzing the testimony adduced during an evidentiary *Kastigar* hearing held in connection with *Garrity* statements). In rejecting the government's objection to the application of *Kastigar* to *Garrity* statements, the Ninth Circuit explained the relationship between the two doctrines as follows:

> [I]n *Kastigar*, the leading Supreme Court case regarding use immunity granted pursuant to 18 U.S.C. § 6002, the Court upheld the constitutionality of the federal immunity statute because it concluded that the statute provided immunity that was coextensive with the Fifth Amendment protections. Because the use of compelled testimony in the *Garrity* context also directly implicates the individual's Fifth Amendment right against self-incrimination, *Kastigar*'s discussion of the scope of the Fifth Amendment privilege against self-incrimination is directly relevant in the *Garrity* context.

*Koon*, 34 F.3d at 1431 n.11. These authorities provide ample support for the defendants' assertion that potential violations of so-called "*Garrity* immunity" demand an evidentiary hearing under *Kastigar*.

While acknowledging the existence of these authorities, the government maintains that the court should analyze the September 16 and 18 Statements under a traditional "coerced confession" framework, which would impose fewer prohibitions on the indirect and nonevidentiary uses of the statements. *See* Govt's Opp'n at 18-22. Indeed, although the holding in *Garrity* stemmed principally from the Court's conclusion that the police officers' statements were coerced and involuntary, *see Garrity*, 385 U.S. at 497-98, *Kastigar*'s broad prohibition on the derivative use of immunized testimony has never been applied to coerced confessions generally, *see* Steven D. Clymer, Compelled Statements From Police Officers and *Garrity* Immunity, 76 N.Y.U. L. REV. 1309, 1342 (2001) (noting that only after *Kastigar* "would lower courts interpret [that ruling] and the privilege to impose prohibitions on nonevidentiary and

indirect evidentiary use of immunized testimony, restrictions that courts never have applied to

coerced confessions").[7]

However persuasive this argument may be in the abstract, it does not sway the court to

disregard the considerable weight of the aforementioned authorities, particularly under the

circumstances of this case. Here, not only were the defendants threatened with job loss; they

were repeatedly advised by State Department investigators that their statements could not be

used against them in a criminal prosecution, *see* Defs.' Mot. at 5-7, and were informed, in

writing on an official State Department document, that "neither [their] statements nor any

information or evidence gained by reason of [their] statements [could] be used against [them] in

---

[7]   Much like the government, Professor Clymer argues that in light of the context-specific approach
      that the Supreme Court has used in outlining the contours of the Fifth Amendment privilege,
      "[c]ourts can and should show the same flexibility when determining whether to permit collateral
      uses of compelled statements, particularly in light of the significant differences between formal
      grants of immunity and Garrity immunity." Steven D. Clymer, Compelled Statements From
      Police Officers and *Garrity* Immunity, 76 N.Y.U. L. REV. 1309, 1368-69 (2001).

a criminal proceeding," Slough Decl., Attach. A at 3.[8] Contrary to the government's suggestion,

this is not a case in which low-level law enforcement agents engaged in cronyism to protect their

fellow officers. *See* Govt's Opp'n at 9. It is, rather, a case in which government investigators,

operating on behalf of the U.S. State Department, deliberately and repeatedly assured the

defendants, over the course of a week-long investigation, that their statements would not be used

against them in a criminal prosecution. The court concludes that under the circumstances of this

---

[8]     As the government points out, courts typically refuse to enforce informal offers of immunity extended by government agents, like the State Department investigators in this case, who lack actual authority to confer such immunity. *See United States v. Flemmi*, 225 F.3d 78, 84-90 (1st Cir. 2000) (declining to enforce an informal grant of immunity extended by an FBI agent lacking the actual authority to grant immunity); *see also In re Corrugated Container Antitrust Litig.*, 662 F.2d 875 (D.C. Cir. 1981) (noting that there is "no authority for ruling that oral promises of immunity by an investigator, not in accord with statutory requirements, bind all federal and non-federal prosecutors"); *but see Peavy v. United States*, 31 F.3d 1341, 1347 (6th Cir. 1994) (remanding and instructing the district to "determine whether the agents had the *apparent authority* to make the disputed promises on behalf of the government, taking into account the secrecy surrounding [the defendant's] cooperation agreement, and whether [the defendant] relied to his detriment on the promises") (emphasis added). Yet subsequent Circuit decisions have made clear that "the reasoning of *Kastigar* is not confined to cases arising under [the federal immunity] statute." *United States v. Hylton*, 294 F.3d 130, 134 n.4 (D.C. Cir. 2002) (citing *United States v. Kilroy*, 27 F.3d 679, 685 (D.C. Cir. 1994)). Moreover, it is well-established that the government may be bound by the apparent authority of its agents where fundamental fairness so requires. *See United States v. Williams*, 780 F.2d 802, 803 (9th Cir. 1986) (noting that although a government employee other than the United States Attorney generally lacks the authority to enter into a binding non-prosecution agreement, "[a]n exception has been recognized where, although the United States Attorney was not a party to a cooperation agreement, breach of the agreement rendered a prosecution fundamentally unfair"); *United States v. Williams*, 519 F.2d 1058, 1059-60 (1st Cir. 1975) (affirming the district court's dismissal of an indictment on fairness grounds where the Securities and Exchange Commission induced an individual to testify by promising that it would recommend that he not be prosecuted, the individual provided testimony including self-incriminating statements and the SEC failed to make the promised recommendation); *see also United States v. Streebing*, 987 F.2d 368, 373 (6th Cir. 1993) (holding that the district court did not err in refusing to dismiss the indictment "because the prosecution in this case was not fundamentally unfair"). Thus, regardless of whether the explicit offers of use and derivative use immunity extended by the State Department are independently enforceable, the court finds that the circumstances of this case do not support the government's argument that it should depart from the consensus view of the other Circuits, which indicates that *Kastigar* applies to any *Garrity* violations that occurred in this case.

case, the full protections of *Kastigar*, as outlined by this Circuit in *North I* and *North II*, apply to the September 16 and 18 Statements to the extent they were compelled under *Garrity*.[9]

To demonstrate compulsion under *Garrity*, an employee must show that he subjectively believed his statements were compelled by the threat of job loss and that his belief was objectively reasonable. *See Friedrick*, 842 F.2d at 395. *Garrity* applies with equal force to public contractors compelled to give testimony under the threat of termination of a government contract. *Turley*, 414 U.S. at 78 (stating that "there is no room for urging that the Fifth Amendment privilege is inapplicable simply because the issue arises, as it does here, in the context of official inquiries into the job performance of a public contractor"). And although *Garrity* involved a criminal investigation undertaken by a state attorney general, *Garrity* applies equally to statements compelled during an administrative investigation. *See Sher*, 488 F.3d at 501 n.8.

With respect to the September 16 Statements, each of the defendants asserts that he understood that his refusal to respond to questioning by DSS agents would result in his termination. Slough Decl. ¶ 6; Slatten Decl. ¶ 5; Liberty Decl. ¶ 5; Heard Decl. ¶ 4; Ball Decl. ¶ 5. The objective reasonableness of this belief is supported by the fact that other Blackwater personnel interviewed by DSS agents on September 16 shared this understanding, *see* Defs.' Mot., Ex. 4 ¶ 8; Ex. 10 ¶ 5; Ex. 11 ¶ 5; Ex. 29 ¶ 3; Ex. 30 ¶ 5, by the fact that the State

---

[9]     The government also argues that other Circuits have applied *Kastigar* to *Garrity* statements because they impose less robust prohibitions on nonevidentiary uses of immunized testimony than those outlined in *North I* and *II*. Govt's Opp'n at 20-21. Beyond the fact that this court is constrained by the binding authority of those decisions, the court finds unpersuasive the government's assertion that this Circuit's *Kastigar* jurisprudence represents a radical departure from the decisions of other Circuits. *See North I*, 910 F.2d at 857 (observing that the Circuits have differed on whether *Kastigar* encompasses nonevidentiary uses of immunized testimony and expressing concerns about decisions permitting nonevidentiary uses of such testimony); *see also United States v. Semkiw*, 712 F.2d 891, 893-94 (3d Cir. 1983) (remanding the case for a determination on whether the prosecutor made use of immunized testimony in the preparation and conduct of the trial).

Department documents provided to all Blackwater personnel stated that failure to provide truthful testimony following a weapons discharge incident could result in termination, Slough Decl., Attach. A at 3, and by the fact that three of the defendants recall being given explicit *Garrity* warnings during their interviews, Slough Decl. ¶ 7; Heard Decl. ¶ 4; Ball Decl. ¶ 6.

The September 18 Statements also constitute compelled statements under *Garrity*. The "Sworn Testimony" form on which the written statement were provided expressly informed the defendants that failure to testify could result in termination and that nothing stated on the form (nor anything derived therefrom) could be used against them in a criminal proceeding. Slough Decl., Attach. A at 3. During the follow-up interviews, the defendants were again given express *Garrity* warnings by DSS agents.[10] *See* Slough Decl. ¶ 9; Heard Decl. ¶ 6. Indeed, the government does not dispute, for purposes of this motion, that *Garrity* applies to the September 16 and 18 Statements. *See* Govt's Opp'n at 6 n.8.

These facts are sufficient to support a preliminary finding[11] that the September 16 and 18 Statements were compelled under threat of job loss under *Garrity*. Accordingly, *Garrity* immunity attached to these statements, prohibiting the government from using them in any way to prosecute the defendants. The defendants have also provided ample evidence that members of the prosecution team as well as numerous witnesses, including those whose testimony was provided to the grand jury that returned the indictment, were exposed to the September 16 and 18 Statements. *See* Defs.' Mot. at 10-17. Thus, the court determines that the defendants have laid a firm foundation for the necessity of a *Kastigar* hearing.

---

[10] Even without those express warnings, the follow-up interviews were sufficiently related to the September 18 written statements that the defendants reasonably could have believed that they were still obliged to cooperate with the DSS agents. *See Friedrick*, 842 F.2d at 396-97.

[11] The government asserts that if the court holds an evidentiary hearing, the government will demonstrate that the September 16 Statements were not compelled under a threat of job loss. Govt's Opp'n at 33.

## 2. The *Kastigar* Hearing Should be Held Before Trial

In the Memorandum Order dated July 22, 2009, the court scheduled a *Kastigar* hearing to begin on October 14, 2009, pending resolution of the defendants' motion for a *Kastigar* hearing. The government argues that the court should postpone any *Kastigar* hearing until after trial. Govt's Opp'n at 33-42. The government contends that evidence adduced at the trial will demonstrate that the September 16 and 18 Statements were nothing more than false, exculpatory statements that deserve no Fifth Amendment protection. *Id.* at 33-37. Such a showing will require the production of extensive evidence to prove the falsity of the defendants' statements. *Id.* at 41. The government contends that holding a pretrial *Kastigar* hearing will effectively require the court to convene a second trial on the merits. *Id.* The defendants strongly oppose this request and ask that the court hold a pretrial *Kastigar* hearing. Defs.' Reply at 21-25.

The court is not persuaded to alter the previously imposed schedule and postpone the *Kastigar* hearing until after trial. Although the court possesses the discretion to hold a *Kastigar* hearing at any stage of the proceedings, including post-trial, a pretrial hearing is the most common choice. *North I*, 910 F.2d at 872-73. The logic behind this approach is obvious. It would make little sense to force the defendants, the court and jurors to endure the cost and uncertainty of what could be a lengthy trial while the validity of the indictment remains in question. Even if the indictment is not dismissed, a pretrial hearing will provide the parties guidance on what evidence will be inadmissible at trial on Fifth Amendment grounds, thus minimizing the risk that the trial will be tainted with evidence derived from immunized testimony.

To be sure, the government is correct that meeting its burden under *Kastigar* will require the expenditure of significant resources by the parties and the court. *See North I*, 910 F.2d at

872-73 (noting that this inquiry "must proceed witness-by-witness; if necessary, it will proceed line-by-line and item-by-item"). Yet the benefits of resolving these disputes prior to trial far outweighs these costs. Accordingly, the court denies the government's request to postpone the *Kastigar* hearing until after trial.

## IV.  CONCLUSION

For the foregoing reasons, the court grants the defendants' motion for a *Kastigar* hearing and denies the government's request to postpone any such hearing until after trial. An Order consistent with this opinion is separately and contemporaneously issued this 8th day of September, 2009.

RICARDO M. URBINA
United States District Judge