**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Cr. No. 08-360 (RCL)** |
| | : | |
| **v.** | : | |
| | : | |
| **PAUL ALVIN SLOUGH,** | : | |
| **NICOLAS ABRAM SLATTEN,** | : | |
| **EVAN SHAWN LIBERTY,** | : | |
| **DUSTIN LAURENT HEARD, and** | : | |
| **DONALD WAYNE BALL,** | : | |
| | : | |
| **Defendants.** | : | |

**GOVERNMENT'S STATUS REPORT AND
MEMORANDUM REGARDING *KASTIGAR* ISSUES[1]**

As the Court is aware, this matter has been the subject of extensive *Kastigar*[2] litigation. The United States of America, therefore, submits this status report and memorandum to advise the Court of the status of *Kastigar* issues and to address potential *Kastigar* issues that may arise in this matter. Following some brief background and procedural information, we first discuss the applicable legal principles; next, we describe the filter procedures that we have employed in this case; then, we provide a status report of the filter process and our expectations for completing that process; and, last, we look ahead and propose a methodology for addressing future *Kastigar* issues in the case.

**I.     Introduction**.

At approximately noon, on September 16, 2007, a group of Blackwater security contractors opened fire on civilians in a busy traffic circle in Baghdad, Iraq. When the shooting

---

[1]     The government is filing a redacted copy of this pleading on the public record and an unredacted, sealed copy with the court and parties pursuant to paragraph 3 of the Court's Order of April 13, 2009 [Dkt #83].

[2]     *Kastigar v. United States*, 406 U.S. 441 (1972).

stopped, twenty Iraqi civilians were dead and fourteen had been wounded.

Within hours of the shooting, well before the FBI was on the scene or the Department of Justice could make a considered decision about granting immunity, the State Department questioned the contractors about the shooting and then extended formal *Garrity*[3] immunity for their sworn statements two days later.  In the days and weeks that followed, versions of the contractors' accounts were reported in the media, raising the possibility that anyone who saw those reports might thereby be "tainted."

As set forth below, the government has developed a thorough, careful filter process to ensure that neither the assigned prosecutors, the grand jurors, nor the trial jurors will be exposed to tainted information.  The government will be prepared to demonstrate the efficacy of this process to the Court as these issues arise.  By adhering to this filter process, the defendants' Fifth Amendment privilege against self-incrimination will be scrupulously protected.

## II.     Procedural Posture.

On December 4, 2008, a grand jury empanelled in the United States District Court for the District of Columbia returned a thirty-five count indictment charging Blackwater contractors Donald Ball, Dustin Heard, Evan Liberty, Nicolas Slatten, and Paul Slough with fourteen counts of voluntary manslaughter, in violation of 18 U.S.C. §§ 1112, 2, and 3261(a)(1) (the Military Extraterritorial Jurisdiction Act ("MEJA")); twenty counts of attempted manslaughter, in violation of 18 U.S.C. §§ 1113, 2, and 3261(a)(1); and one count of using and discharging a firearm in relation to a crime of violence, in violation of 18 U.S.C. §§ 924(c), 2, and 3261(a)(1). The defendants were charged jointly with all of the offenses alleged in the indictment.

---

[3]      *Garrity v. New Jersey*, 385 U.S. 493 (1967).

After a *Kastigar* hearing, the district court (Urbina, J.) dismissed the indictment on December 31, 2009.  Judge Urbina found that the statements the defendants had made to the State Department on the day of the shooting and in its aftermath were compelled under a threat of job loss.  Pursuant to *Garrity*, 385 U.S. at 500, and *Kalkines v. United States*, 473 F.2d 1391, 1393 (Ct. Cl. 1973), such statements may not later be used against a public employee – here, government contractors – in a criminal proceeding.  Judge Urbina further found that those statements had been used to secure the indictment in violation of *Kastigar*.  *Slough,* 677 F.Supp.2d 112.

The government appealed the court's dismissal of the indictment, and, on April 22, 2011, the Court of Appeals for the District of Columbia Circuit vacated Judge Urbina's decision and remanded the matter for further proceedings.  *United States v. Slough, et al.*, 641 F.3d 544 (D.C. Cir. 2011).  On July 19, 2011, the Court of Appeals declined to rehear the matter *en banc* (*id.*); likewise, on June 4, 2012, the Supreme Court denied the defendants' petition for a writ of *certiorari*.  *Slough, et al. v. United States*, __ U.S. __, 132 S.Ct. 2710 (2012).

### III.    The Defendants' Immunized Statements.

On October 13, 2009, prior to the *Kastigar* hearing, the defendants submitted to the court the statements which they asserted had been obtained pursuant to *Garrity*. [Docket #144] Following the hearing, Judge Urbina found that these statements were protected.  The government did not press this issue on appeal.  Thus, it is the law of the case that these statements are immunized.

As the court of appeals recognized, in key and significant respects, the accounts of witnesses to the shooting bear no correlation to the defendants' statements.  *See Slough*, 641 F.3d

at 550-551; *id.* at 550 (noting the "specific recollections [by two Blackwater guards] with no referent either in defendants' immunized statements or news reports derived therefrom"[4]); *id.* (district court failed to identify "what the government could have done besides pointing to the complete absence of overlap").

## IV.    Applicable Legal Principles.

Under *Kastigar*, when the government prosecutes a previously immunized witness, it is prohibited from using either the immunized testimony against the witness or any evidence derived "directly or indirectly therefrom."   *United States v. North*, 910 F.2d 843, 853-54 (D.C. Cir.) ("*North I*"), *modified*, 920 F.2d 940 (D.C. Cir. 1990).   In such a case, the government must prove, by a preponderance of the evidence, that "'all of the evidence it proposes to use was derived from legitimate independent sources.'"   *Id.* at 854 (*quoting Kastigar*, 406 U.S. at 461-62).   As part of this showing, the government must also establish that its witnesses' testimony was not "refreshed[,] . . . shaped, altered, or affected" by their exposure to the immunized testimony.   *Id.* at 860-61, 863[5]; *United States v. Poindexter*, 951 F.2d 369, 373-74 (D.C. Cir.

---

[5]    It bears noting that in *North I*, 910 F.2d at 860-864, the grand jury and trial witnesses "soaked" themselves in immunized testimony to refresh their memories about who had said or done what years earlier in a series of complicated foreign policy events extending over a lengthy period of time.   Even then, the court did not foreclose the prosecution under *Kastigar*, but remanded for an inquiry into what testimony was tainted and what was not, and then, if necessary, into harmlessness.   *Id.* at 872-73.   The situation, here, is significantly different:  this case involves a single, uniquely dramatic event—not numerous events spanning several years.

1991).  Nor can immunized testimony be used to obtain investigatory leads, *United States v. Ponds*, 454 F.3d 313, 327-28 (D.C. Cir. 2006); obtain evidence by focusing an investigation on the witness, *id.*; or motivate another witness to give incriminating testimony.  *United States v. Hylton*, 294 F.3d 130, 134 (D.C. Cir. 2002).

###### A.      Scope of Fifth Amendment Protection.

An immunized witness, who is prosecuted, must be put in "'substantially the same position as if [he] had claimed his privilege.'"  *Slough*, 641 F.3d at 549.  Initially, the defendant must show that he testified under a grant of immunity.  *Murphy v. Waterfront Comm'n of New York Harbor*, 378 U.S. 52, 79 n.18 (1964).  Such a showing shifts to the government the burden of proving that all evidence it proposes to use was derived from independent sources.  *Kastigar*, 406 U.S. at 460 (prosecution has "the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony").

###### B.      Demonstration that Evidence is Free of Taint.

The government bears a "heavy burden" to show that all information presented to both the grand and trial juries is from a source independent of the immunized testimony.  *Kastigar*, 406 U.S. at 461.  The government may satisfy its burden in one of at least four ways.  First, the government may satisfy its burden with respect to a particular witness by demonstrating that the witness was "'never exposed to immunized testimony.'"  *Slough*, 641 F.3d at 550 (*citing North I*, 910 F2d at 872).  Second, the government may satisfy its burden with respect to a particular witness by demonstrating that "the investigators memorialized (or 'canned') a witness's testimony before exposure . . . ."  *Id.*  Third, with respect to a witness who was exposed to immunized testimony, the government may "point[] to the complete absence of overlap"

between specific elements of the witness's statement and the content of the immunized statement. *Id.*; *see also United States v. North,* 920 F.2d 940, 944 (D.C. Cir. 1990*)* ("*North II*") (once government makes *prima facie* showing that testimony is untainted, burden shifts to defendant to challenge that version). Fourth, with respect to a witness who was exposed to immunized testimony, the government may satisfy its burden with respect to specific elements of the witness's testimony that *do* overlap with the immunized statement by demonstrating an independent source for each element of testimony. *Slough*, 641 F.3d at 550; *North I*, 910 F.2d at 872.[6]

A witness's mere exposure to immunized testimony, therefore, does not necessarily disqualify that witness's testimony. The relevant *Kastigar* inquiry, rather, is whether the content of the witness's testimony was affected or shaped by that exposure. *See North,* 920 F.2d at 942 (*Kastigar* "call[s] for an inquiry . . . into the content and circumstances of witnesses' testimony"); *id.* (court must determine "what additional knowledge, if any" witness gleaned from exposure to immunized testimony) (citation, quotation omitted); *id.* at 943 (government must prove witness "did not draw upon the immunized testimony to use it against the defendant"). In other words, "'[u]se immunity does not protect the substance of compelled testimony, it only protects against the use of compulsory testimony as a source of evidence.'" *United States v. Montoya*, 45 F.3d 1286, 1292 (9th Cir. 1995); *United States v. Koon*, 34 F.3d 1416, 1432 (9th Cir. 1994) (prosecutor's *Kastigar* burden is met if he can show that the substance of the testimony to be used against the immunized witness is based on a legitimate source independent of the

---

[6]    This taint analysis must be conducted separately for each defendant. "To the extent that evidence tainted by the impact of one defendant's immunized statements may be found to have accounted for the indictment of that defendant, it does not follow that the indictment of any other defendant was tainted." *Slough*, 641 F.3d at 552.

immunized testimony), *judgment affirmed in part and reversed in part by Koon v. United States*, 518 U.S. 81 (1996); *accord Ponds*, 454 F.3d at 328.

Accordingly, where a witness has been exposed to an immunized statement, the government must demonstrate that there is another untainted source for the testimony, such as the witness's independent, first-hand recollection of the events at issue. *See United States v. Hubbell*, 530 U.S. 27, 40 (2000) (statutory immunity). The government, however, is not required to "'negate all abstract "possibility" of taint.'" *United States v. Dynalectric Co.*, 859 F.2d 1559, 1578 (11th Cir. 1988).

Determining the admissibility of testimony from a witness who has been exposed to immunized statements requires a painstaking and thorough analysis by the court:

> *North I* requires the court to parse the evidence "witness-by-witness" and "if necessary, ... line-by-line and item-by-item," [citation omitted], and to "separate the wheat of the witnesses' unspoiled memory from the chaff of [the] immunized testimony," [citation omitted]. *This sifting is particularly important in cases where, as here, a witness was exposed to a defendant's immunized statement but testifies to facts not included in that statement.*

*Slough*, 641 F.3d at 550 (emphasis added), *quoting North I*, 910 F.2d at 872.

## C.      Standard of Proof.

While the *Kastigar* court characterized the government's burden as "heavy," *Kastigar*, 406 U.S. at 461, our court of appeals has held that this language requires proof only by a "preponderance" of the evidence. *See, e.g.*, *Slough*, 641 F.3d at 550; *see also United States v. Schmidgall*, 25 F.3d 1523, 1528 (11th Cir. 1994) ("Although the government's task has been characterized as a 'heavy burden,' it is clear that the government is required to prove an absence of taint only by a preponderance of the evidence."); *United States v. Harris*, 973 F.2d 333, 336 (4th Cir. 1992) ("courts have interpreted [the heavy burden] to require the government to make its

proof by a preponderance of the evidence").   To meet the preponderance of the evidence standard, the government must present "evidence which is of greater weight or more convincing than the evidence which is offered in opposition to it; that is, evidence which as a whole shows that the fact sought to be proved is more probable than not." *Black's Law Dictionary* 1182 (6th ed. 1990).

## V.      Filter Procedures.

To address issues arising from the potential use of evidence tainted by exposure to immunized statements, the government has developed and is employing the following filter procedures.   First, both a new trial team and a new filter team have been assigned to this matter. Second, the filter team reviews all documentary and tangible evidence before it is passed to the trial team and passes only evidence that is determined to be free of taint.   Third, the filter team conducts a filter interview of every witness before the trial team meets with the witness and sits in on the trial team's interview of all witnesses, taking steps to ensure that the trial team is not exposed to tainted information.   Fourth, the trial team and supervisors will assess all charging decisions in this case based exclusively on the cleared evidence.   Finally, the filter team will handle any taint issues that arise either before or during trial.

### A.  The Government has Taken Steps to Ensure that the Trial Team is Not Exposed to the Defendants' Immunized Statements.

The filter team is comprised of John Crabb and David Mudd of the United States Attorney's Office, and they are supervised by Gregg Maisel, Chief of the National Security Section of the United States Attorney's Office.   The filter case agent is FBI Special Agent Katrice Jenkins, who is not on the same squad as the case agent and has a different chain-of-command from the case agent.

In setting up the filter procedures and in addressing various filter issues as they have arisen, the filter team has consulted, as needed, with a group of attorneys who have previously been involved in the *Kastigar* issues in this case: Raymond Hulser, currently an Acting Deputy Assistant Attorney General in DOJ's Criminal Division, who served as the original filter attorney in this case; Joseph Kaster and Michael Dittoe, both attorneys in DOJ's National Security Division, who litigated the *Kastigar* hearing before Judge Urbina; and Demetra Lambros, an attorney in the Appellate Section of DOJ's Criminal Division, who litigated the *Kastigar* issues on appeal.[7]   The filter team will continue to consult with this group of experienced attorneys as this process moves forward.

The trial team is comprised of Anthony Asuncion, John Han and Patrick Martin of the United States Attorney's Office, and they are supervised by Jay Bratt, the Deputy Chief of the National Security Section.  The trial team is ultimately supervised by Criminal Division Chief Mary McCord and United States Attorney Ronald C. Machen Jr.  Within the FBI's Washington Field Office, investigative responsibility for this case was transferred to a criminal squad that had not previously worked on the case.  The case agent is FBI Special Agent Marc Hess.  Neither he nor anyone in his chain-of-command had prior involvement in the investigation of this case.

Before reassigning this matter, it was confirmed that, while the new trial team and their supervisors may have had some passing familiarity with this case and with Judge Urbina's ruling dismissing the indictment, none of them had any specific recollection or knowledge of any

---

[7]     In addition, the filter team consulted with Roy McLeese while he served as the Chief of the Appellate Division at the United States Attorney's Office, prior to his assuming his current position as an Associate Judge of the District of Columbia Court of Appeals.

statements, immunized or otherwise, made by any of the defendants.[8]  Furthermore, the trial team and its supervisory chain have been instructed to avoid any media coverage (including news broadcasts, books, Internet reporting, etc.) of this matter.

A defendant's rights under *Kastigar* are protected, in part, by self-policing in this manner. *See In re Grand Jury Subpoenas*, 40 F.3d 1096, 1103 (10th Cir. 1994) (self-policing involved prosecutors having potential *Garrity* material reviewed and redacted by persons who are not part of the prosecution team); *United States v. Mapelli*, 971 F.2d 284, 288 (9th Cir. 1992) (noting government "often protects against a claim of indirect use by assigning the case to others not exposed and barring communication between them and the prosecutors who obtained the compelled testimony").

---

[8]        While we have endeavored to ensure that neither the prosecution team nor its supervisors have been exposed to the defendants' immunized statements, we note that exposure would not necessarily disqualify them from prosecuting this case.  *See, e.*g., *Slough*, 641 F.3d at 554 ("at least as to decisions to indict, we join those circuits refusing to find such decisions vulnerable on the ground of links to immunized statements"); *United States v. Velasco*, 953 F.2d 1467, 1474 (7th Cir. 1992) ("mere tangential influence that privileged information may have on the prosecutor's thought process in preparing for trial is not an impermissible 'use' of that information"); *United States v. Serrano*, 870 F.2d 1, 17 (1st Cir.1989) (rejecting argument that purpose of immunity is "automatically frustrated by the government's mere exposure to immunized testimony"); *United States v. Mariani*, 851 F.2d 595, 600 (2nd Cir.1988) (rejecting argument that prosecution is foreclosed because immunized testimony might have tangentially influenced the prosecutor's thought processes in preparing the indictment and preparing for trial").

**B.      The Government has Instituted a Stringent Filter Process.**

All case materials – documents (including even previously filed pleadings), evidence and witnesses – are being reviewed, redacted when appropriate, and cleared by the filter team before they are passed to the trial team.  *The trial team never has access to any case materials until after this filter process has been completed*.   Once a document or item of evidence has been cleared by the filter team, the filter agent passes it to the case agent, who disseminates it to the trial team.  The filter agent is maintaining a log of all items passed to the case agent.

After the trial team has completed its review of the cleared case materials, including interviewing relevant witnesses, the trial team and its supervisors will assess all charging decisions.  The filter team, of course, will have no substantive involvement in the decision-making process regarding appropriate charges.

**Documents and Tangible Evidence**.  When the new filter and trial teams were created, one of the first steps taken within both the United States Attorney's Office and the FBI was to ensure that the trial team would not have access to any of the documents or other evidence in the case without those materials first being reviewed by the filter team.  In addition to instructing the trial team about the filter procedure, the filter team took measures to deny access to any electronic or hard copies of documents in the case to anyone except members of the filter team. Subsequently, the trial team requested the filter team to provide all non-tainted case materials. As a result, the filter team has undertaken the process of reviewing the reports, documentary evidence and tangible evidence (including diagrams, videos and photographs) in the case to determine if each document or item of evidence either potentially contains tainted material or was potentially derived from tainted material.  As this review has proceeded, the trial team has

made specific requests for the filter team to prioritize certain categories of documents and evidence.

In conducting its review, the filter team has assiduously applied the legal principles outlined above, always in reference to the contents of the defendants' immunized statements. For many documentary and tangible items, this analysis can be conducted based simply on a review of the document, itself, and the information contained in it, *e.g.*, documents that neither contain information that overlaps with an immunized statement nor whose creation could have been motivated by an immunized statement. For other items, such determinations cannot be made until a filter interview is conducted of one or more relevant witnesses. To the extent that the filter team determines that any documentary or tangible item neither contains tainted material nor was derived from such material, the filter attorneys then instruct the filter agent to pass the item to the case agent for passage to the trial attorneys. If the item contains some tainted material or was derived in part from tainted material, it is appropriately redacted before being passed to the case agent. Any material that either contains only tainted material or was derived in whole from tainted material is embargoed from the trial team. In making these determinations, the filter team has taken a conservative approach, often redacting or withholding information that is only arguably or potentially tainted. Indeed, out of a great abundance of caution, the filter team has even applied its review procedure to briefs, orders and other filings on the public docket of this case.[9]

**Witnesses**. Based on the cleared case materials it has reviewed, the trial team identifies

---

[9]     With respect to any briefs or other filings by the defense on the public docket, the government believes that the defense has waived any claim that the contents of those filings could constitute tainted material vis-à-vis the trial team. Nonetheless, the filter team has chosen to apply its filter procedures even to such public filings.

witnesses that it would like to interview. *No witness is interviewed by the trial team without the filter team first conducting a filter interview of that witness.* The filter interviews are conducted by one or both of the filter team prosecutors and the filter agent, who documents each filter interview with an FBI 302 report. During the filter interview, the filter team seeks to determine if the witness has been exposed to an immunized statement either directly or indirectly, such as through media coverage or conversations with others. The filter team also admonishes witnesses to avoid any media coverage of this matter in the future. If it is determined that the witness has potentially been exposed to one or more immunized statements, the filter team seeks to determine whether the witness either has information that does not overlap with the immunized statements or has an independent source for the information. The filter team also seeks to determine whether the witness's exposure to an immunized statement motivated the witness to come forward, assisted the witness's memory, or helped to shape or organize the witness's thoughts. If it is determined that the witness was motivated to come forward by the witness's exposure to immunized statements, the witness and the witness's statements are embargoed from the trial team. If the filter team identifies any information known to the witness that is potentially derived from an immunized statement and lacks an independent source, the filter team admonishes the witness not to divulge that information to the trial team during its interview of the witness. *Members of the filter team then attend all witness interviews conducted by the trial team,* and they monitor those interviews to ensure that no tainted information is discussed in the presence of the trial team. Members of the filter team will also attend any grand jury proceedings that may be held to ensure that no tainted information is presented to the grand jury.

VI.     **Filter Status**

The filter team has reviewed a voluminous amount of material and passed it to the trial team, as appropriate, in accordance with the procedures described above.  This material includes transcripts, witness interview summaries, pleadings and opinions, videotapes, photographs, diagrams, laboratory reports, medical records, discovery materials, and records subpoenaed from third parties.  The filter team continues to review additional materials and pass them to the trial team, as appropriate, on an ongoing basis.

To date, the filter team has conducted approximately forty witness interviews.  These include interviews of Iraqi nationals that were conducted when the filter and trial teams traveled to Baghdad for a month this past summer.  Since returning from Baghdad the filter team has conducted additional interviews across the United States.  As these interviews are completed the filter team reviews related witness materials and then passes them to the trial team, as appropriate, to allow them to prepare for trial team interviews of the same witnesses.

We estimate that the filter process will be substantially completed by the end of January 2013.  By that point, we expect that the filter review of the critical mass of documentary and tangible evidence will be completed and the critical filter interviews will be completed.  We likewise expect that the trial team will have made significant progress in reviewing the filtered case materials and in completing its own witness interviews.  In addition, between now and the end of January 2013, we expect to provide the defense with discovery concerning the recent filter interviews and trial team interviews.  Knowing that discovery is a dynamic process, we anticipate that our discovery productions could lead to additional discovery requests from the defense, with the potential for disputes to arise that may need to be resolved by the parties or, if

necessary, the Court.  Therefore, we cannot say with certainty that this discovery process, related to post-appeal case developments, will be entirely completed by the end of January 2013.

Our best prognostication is that, by the end of January 2013, the primary task that will remain will be for the trial team and supervisors to analyze the cleared evidence and assess what charges, if any, are appropriate for which defendants.  We note that the defendants have asked to meet with the trial team and supervisors before any new charging decisions are finalized, so we expect that process also to be a dynamic one.

## VII.    Potential *Kastigar* Litigation.

Assuming that a new indictment is eventually returned, there is of course a great likelihood that there will be a *Kastigar* challenge by the defendants.  If a previously immunized defendant challenges the use of his statement in his prosecution, the court must hold a "*Kastigar*" or "taint" hearing to determine whether evidence that the government has presented or intends to present is tainted.  *See Kastigar*, 406 U.S. 441.  "Of course, to be entitled to a hearing on whether immunized testimony was before the grand jury, a defendant must lay a firm 'foundation' resting on more than 'suspicion' that this may in fact have happened."  *North II*, 920 F.2d at 949 n. 9.

The type of proof that will be appropriate and necessary to establish that no tainted material has or will be used will vary depending on the nature and the extent of any *Kastigar* allegations that the defendants raise.  *See, e.g., North II, 920 F.2d at 943* (government may shoulder its burden "in any fashion" or through "use of any techniques"); *see also United States v. Daniels*, 281 F.3d 168, 181 (5th Cir. 2002) (*Kastigar* evidence presented via FBI reports, grand jury transcripts, and case agent's testimony); *Montoya*, 45 F.3d at 1299 (government bore *Kastigar* burden via declarations and documents; no requirement that hearsay witnesses be

15

presented for cross-examination); *United States v. Rogers*, 722 F.2d 557, 560 (9th Cir. 1983) (declarations used).

As described more fully below, the government suggests that the Court conduct a pre-trial hearing to adjudicate any *Kastigar* challenges that the defendants may lodge against any superseding indictment. Assuming that the indictment passes *Kastigar* muster, the government suggests that the Court conduct additional hearings shortly before or during trial to adjudicate any *Kastigar* challenges to proffered trial evidence that had not been presented to the grand jury.

**A. Determining Whether any Evidence Presented to the Grand Jury was Tainted.**

The filter team will be prepared to address any *Kastigar* challenges raised by the defendants to a superseding indictment, assuming one is sought by the trial team. At the time of the *Kastigar* hearing, the filter team will present sufficient evidence of an appropriate nature to demonstrate that none of the testimony or tangible evidence presented to the grand jury was tainted.

The government suggests that the Court receive post-hearing briefing. As part of that briefing, the government would provide its position as to whether each witness, whose testimony was presented to the grand jury, had been exposed to immunized statements. For each such witness who appears to have potentially been exposed to immunized statements, we intend to present a chart. The chart would break down the witness's testimony into components, *see North I*, 910 F.2d at 872 ("That inquiry must proceed witness-by-witness; if necessary, it will proceed line-by-line and item-by-item."). For each component, it would indicate whether the testimony was either (1) "canned" before the witness's exposure to immunized statements, (2) non-overlapping with immunized statements, or (3) based on an independent source. The filter team

intends to present a similar chart for each item of tangible evidence presented to the grand jury, showing the item neither contained tainted information nor was derived from tainted information.

If the government fails to carry its *Kastigar* burden as to "any item or part of [a witness's] testimony," the court must then evaluate the tainted evidence in light of the evidence from independent sources that was presented to the grand jury to determine whether the *Kastigar* error was harmless beyond a reasonable doubt.  *North I*, 910 F.2d at 873; *see also Ponds*, 454 F.3d at 329 (use of *Kastigar* evidence harmless if "in light of evidence from independent sources, [it] was '"so unimportant and insignificant"'" that it had "'little, if any, likelihood of having changed the result of the proceeding'") (citation omitted); *United States v. Pelletier*, 898 F.2d 297, 303 (2nd Cir. 1990) (in deciding whether to dismiss indictment, court must assess "extent of use of the immunized testimony" in light of other evidence before the grand jury); *Rogers*, 722 F.2d at 560 (*Kastigar* error in grand jury harmless "in light of the more than adequate untainted evidence to support the indictment").

### B.    Determining Whether any Potential Trial Evidence is Tainted.

As is often the case, it is unlikely that all evidence that the trial team intends to present at trial will have been presented to the grand jury.  It will, therefore, be necessary to hold additional hearings, if the defendants make *Kastigar* challenges to proffered trial evidence that had not been presented to the grand jury.  *See United States v. Byrd*, 765 F.2d 1524, 1531 (11th Cir. 1985) ("The mere theoretical possibility of an eventual *Kastigar* violation at trial is no grounds for dismissing the indictment . . . .[the defendant's] testimony simply has not been used against him, and it is premature to predict that it will be.").

A *Kastigar* hearing may be held at almost any point in the criminal proceedings—before trial, during trial, after trial, or any combination thereof.

> As we noted in *North*, "a trial court may hold a *Kastigar* hearing pre-trial, post-trial, mid-trial (as evidence is offered), or it may employ some combination of these methods." [citation omitted].  Here Judge Jackson obviously intended to employ a combination of those methods.  Having made a final determination as to the grand jury evidence, he preliminarily determined the question of trial evidence, deciding, *no doubt wisely*, to take that question up once again when the record became *concrete and not merely predictive*.

*United States v. Kilroy*, 27 F.3d 679, 686-687 (D.C. Cir. 1994) (emphasis added), *citing North I*, 910 F.2d at 859; *United States v. De Diego*, 511 F.2d 818, 824 (D.C. Cir. 1975) (*Kastigar* hearing may held at any time including, "during the trial as the questioned evidence is offered"); *United States v. Tantalo*, 680 F.2d 903, 909 (2nd Cir. 1982) (it is within the district court's discretion whether the *Kastigar* hearing should be held before trial, during the course of trial, after the verdict, or a combination thereof).

In addition to the wisdom of waiting for the challenged evidence to become "concrete and not merely predictive," *Kilroy*, 27 F.3d at 687, here, there is another important reason not to attempt to determine whether any potential trial evidence is tainted before trial even begins. Many of the government's witnesses are Iraqi nationals; thus, it would be logistically difficult and burdensome for the witnesses if they were required to travel to Washington, D.C., twice — once for a *Kastigar* hearing and then again later for trial.  We, therefore, ask the Court to hold periodic *Kastigar* hearings shortly before and during trial to address defense challenges to proffered trial evidence that was not presented to the grand jury.

## VIII.   Conclusion

This matter presents several potential *Kastigar* issues.   The government has, therefore, instituted a stringent filter process to ensure that the defendants' Fifth Amendment privilege against self-incrimination is protected.    Accordingly, the government will be prepared to demonstrate that all evidence presented to the grand jury and later to the trial jury is free of taint.

Respectfully submitted,
RONALD C. MACHEN JR.
United States Attorney
D.C. Bar No. 447-889

By:       _____/s/_____
Gregg A. Maisel
Chief, National Security Section
D.C. Bar No. 447-902
gregg.maisel@usdoj.gov

By:       _____/s/_____
John Crabb Jr.
Assistant United States Attorney
N.Y. Bar No. 2367670
john.d.crabb@usdoj.gov

By:       _____/s/_____
David Mudd
Special Assistant United States Attorney
D.C. Bar No. 995154
david.mudd2@usdoj.gov

National Security Section
U.S. Attorney's Office
555 4th Street, NW, 11th Floor
Washington, D.C.  20530
(202) 252-7785