FILED
MAY 23 2014
Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA <br><br> v. <br><br> PAUL A. SLOUGH, <br> EVAN S. LIBERTY, and <br> DUSTIN L. HEARD, <br><br> Defendants. | Criminal No. 08-360 (RCL) |
| UNITED STATES OF AMERICA <br><br> v. <br><br> NICHOLAS A. SLATTEN, <br><br> Defendant. | Criminal No. 14-107 (RCL) |

## MEMORANDUM OPINION

Before the Court is the defendants' motion [411] to compel the production of certain evidence. Upon consideration of the defendants' motion [411], the government's opposition [427], the defendants' reply [431], the applicable law, the entire record herein, and for the reasons set forth below, the Court will DENY the defendants' motion to compel.

### I.  BACKGROUND

Both the District Court and the Court of Appeals for the District of Columbia Circuit have previously described the factual background of this case. *United States v. Slough*, 677 F. Supp. 2d 112, 116–129 (D.D.C. 2009) ("*Slough I*"), *vacated*, 641 F.3d 544, 555 (D.C. Cir. 2011) ("*Slough II*"); *Slough II*, 641 F.3d at 547–49. Thus, the Court will now only highlight the relevant facts and procedural background.

In 2007, the defendants served as diplomatic security contractors employed by Blackwater Worldwide. *Slough I*, 677 F. Supp. 2d at 116. "The defendants were part of a Blackwater Tactical Support Team answering to the call sign 'Raven 23,' whose function was to provide back-up fire support for other Blackwater personal security details operating in Baghdad [, Iraq]." *Id.*

"On September 16, 2007 a car bomb exploded near the Izdihar Compound in Baghdad, where a U.S. diplomat was conferring with Iraqi officials. American security officials ordered a team from Blackwater Worldwide to evacuate the diplomat to the Green Zone." *Slough II*, 641 F.3d at 547. In order to secure a safe evacuation route for the diplomat and the other Blackwater team, Raven 23 "took up positions in Nisur Square, a traffic circle located just outside the [Green] Zone in downtown Baghdad," and attempted to stop traffic. *Slough I*, 677 F. Supp. 2d. at 116. Shortly afterwards, "a shooting incident erupted, during which the defendants allegedly shot and killed fourteen [Iraqi civilians] and wounded twenty others." *Id.*

"In early October 2007, [Federal Bureau of Investigation ("FBI")] investigators arrived in Baghdad to investigate the Nisur Square shooting. . . . FBI investigators collected physical evidence from the scene, such as shell casings, bullet fragments and weapons, and examined the vehicles allegedly fired on by the defendants, the Raven 23 vehicles and the defendants' weapons." *Id.* Over the course of the year following the shooting incident, the government purchased "or otherwise acquire[d]" eleven of the vehicles damaged during the incident (the "Iraqi vehicles"), and secured "custody and control" over the evidence. Gov't's Opp'n at 2; *see also* Defs.'s Mot. at 2. The FBI proceeded to photograph and videotape the acquired vehicles. Opp'n at 2. The government states—and defendants do not deny—that it has produced "[a]ll of the FBI-generated or otherwise procured photographs and video footage" of the vehicles, which

amounts to "videotaped footage of 10 of the 11 . . . [v]ehicles . . . , over 2,000 close-up photographs of the 11 . . . [v]ehicles, including the hand measurements taken of the apparent gunfire damage to them . . . , as well as several videotaped recordings of some of the 11 . . . [v]ehicles that were abandoned on the scene shortly after the shooting." *Id.* In a letter from the original government prosecution team (the "original trial team") to defense counsel, dated April 13, 2009, the government disclosed that Iraqi vehicles were available at government facilities in Baghdad for defense counsel's "inspection." Mot. Attach. I at 15. On October 6, 2009, the defendants filed a motion [141] to order the government to provide defense counsel traveling to Iraq to investigate the case with security measures equal to those provided for the prosecution and FBI investigators. On November 16, 2009, this Court, Judge Urbina presiding, denied the defendants' request for an order requiring the government to provide such security measures. *United States v. Slough*, 669 F. Supp. 2d 51, 57-58 (D.D.C. 2009).

In 2008 and 2009, the FBI investigated the shooting incident on the ground in Baghdad, conducting a bullet trajectory analysis based on an examination of the bullet holes on the Iraqi vehicles. Opp'n at 3. The data collected from the FBI's bullet trajectory analysis provided the basis for the government's 2009 computer-generated evidence ("CGE") simulating the shooting incident in Nisur Square (the "2009 CGE") and for a comparable demonstrative simulation that may be prepared for the upcoming trial (the "2014 CGE"). Opp'n 5-8.

Following a letter sent by defense counsel to the government, dated July 1, 2009, requesting "an original usable copy and all underlying data, relating to any [CGE] that the government may seek to use at trial," Mot. Attach. A, the Defendants filed their first motion [103] to compel discovery pursuant to Federal Rule of Criminal Procedure 16 ("Rule 16") on July 27, 2009. On September 14, 2009, this Court, Judge Urbina presiding, ordered the original

3

trial team to produce the "computer-generated evidence." Opp'n Attach. D (Status Hr'g Tr. 31:13-21, 49:3-23, Sept. 14, 2009).

On December 31, 2009, this Court, Judge Urbina presiding, dismissed the indictment against the defendants. Mem. Op., ECF 217; Order, ECF 218. However, on April 22, 2011, the Circuit reversed and remanded, *Slough II*, 641 F.3d 544, and reissued the mandate on June 6, 2012, ECF No. 252. The case was reassigned to this Court on June 8, 2012, and the first status conference of the renewed case was held on July 25, 2012.

Defense counsel sent a letter to the government on November 19, 2013 that restated the defendants' 2009 Rule 16 request for the government's CGE, among other requests. Mot. Attach. E. On February 28, 2014, defense counsel sent another letter to the government specifically demanding that the government (a) produce the 3ds Max files associated with any CGE simulating the shooting incident in Nisur Square and (b) transport the Iraqi vehicles to the U.S. Mot. Attach. F. The defendants then moved, on April 4, 2014, to compel the same.

## II. LEGAL STANDARD

Federal Rule of Criminal Procedure 16(a)(1)(E) obligates the government to "permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and: (i) the item is material to preparing the defense; (ii) the government intends to use the item in its case-in-chief at trial; or (iii) the item was obtained from or belongs to the defendant." Since the government proffers that it "will not seek to use at trial the particular items the defendants seek to inspect or copy," Opp'n at 9, and the items in question neither belonged to nor were obtained from the defendants, the government must permit the defendants to inspect the Iraqi vehicles and the relevant 3ds Max

4

files only if these items (1) are "within the government's possession, custody, or control" and (2) are "material to preparing the defense." *See United States v. Libby*, 429 F. Supp. 2d 1, 5 (D.D.C. 2006). For the purpose of Rule 16, evidence is material "as long as there is a strong indication that it will play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal." *United States v. Lloyd*, 992 F.2d 348, 351 (D.C. Cir. 1993) (internal quotation marks and citation omitted). It matters not whether such evidence is inculpatory or exculpatory. *United States v. Marshall*, 132 F.3d 63, 67-68 (D.C. Cir. 1998). While the materiality standard "is not a heavy burden," *Lloyd*, 992 F.2d at 351, the evidence must bear "more than 'some abstract logical relationship to the issues in the case,'" *Marshall*, 132 F.3d at 69 (quoting *United States v. Ross*, 511 F.2d 757, 762 (5th Cir. 1975)). Thus, the government must disclose Rule 16 evidence "only if it enable[s] the defendant significantly to alter the quantum of proof in his favor." *United States v. Graham*, 83 F.3d 1466, 1474 (D.C. Cir. 1996) (internal quotation marks and citation omitted).

### III. ANALYSIS

*A. The Iraqi Vehicles*

As a threshold matter, the government concedes that it maintains "custody and control" over the Iraqi vehicles. Opp'n at 2. Moreover, the Iraqi vehicles damaged during the Nisur Square shooting incident are material to preparing the defense. The condition of the vehicles following the shooting incident will undoubtedly "play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal" throughout the forthcoming trial. *See Lloyd*, 992 F.2d at 351.

Given the government's custody and control over evidence material to the defendants' trial preparation, Rule 16(a)(1)(E) obligates the government to make available for inspection the

5

Iraqi vehicles. Yet the defendants further demand that the government organize and fund the shipment of the Iraqi vehicles from Baghdad to the U.S. Citing a projected aggregate cost of $45,000, the dangers of traveling to Iraq, and the refusal of some private security companies to provide protective services in Iraq for the defendants, the defendants seek to fashion a justification akin to impossibility to explain why the government should bear the logistical burdens and expenses. Mot. at 8-10. According to the government, transporting the Iraqi vehicles to the U.S. via surface and ocean carriers would cost $190,000 and take seven months, while moving the Iraqi vehicles to the U.S. via air carrier would cost over $1.7 million and take six weeks. Opp'n at 5. Since the defendants' motion was filed less than ten weeks before the scheduled trial date of June 11, 2014, the only viable option that would allow the defendants sufficient opportunity to inspect would be air transportation at a cost of more than $1.7 million. While recognizing the unique difficulties associated with travel to Baghdad, the Court will not order the government to assume the extra-statutory responsibility for shipping the Iraqi vehicles out of the country.

An obligation to produce should not be construed as an obligation to transport. *Cf. United States v. George*, 786 F. Supp. 11, 15 ("At least one of the rationales behind the materiality requirement (and limiting discovery by criminal defendants generally) is to insure that the government not expend excessive time and effort securing documents for the defendant"). The clear wording of Rule 16(a)(1)(E) requires the government to "permit the defendant[s] to inspect . . . tangible objects"—and, as the defendants note in their motion, the government has permitted such inspection since April 2009. Mot. at 7 (citing Mot. Attach. I at 15). In fact, this Court, Judge Urbina presiding, denied the defendants' 2009 motion to require the government to shoulder the cost of providing security for the defense team in Iraq—a ruling

6

consistent with the denial of a motion to require the government to bear the much greater expense of transporting the Iraqi vehicles out of the country. *United States v. Slough*, 669 F. Supp. 2d at 57-58.[1]

In accordance with Rule 16(a)(1)(E), the government has produced videotaped recordings and "over 2,000 close-up photographs" of the Iraqi vehicles, as well as all materials stemming from the on-the-ground investigation conducted by the government's FBI expert. Opp'n at 2-3. While such a production is not equivalent to an in-person investigation of the Iraqi vehicles, it is nevertheless a substantial and meaningful production, especially in the face of the defendants' inexplicable delay in making this motion. Indeed, between the defendants' first indictment on December 4, 2008, and the initial dismissal of the case on December 31, 2009, the defendants never requested that the government transport the vehicles from Iraq to the U.S. The only demand made by the defendants throughout that timeframe was for the government to provide security so that the defense team could travel to Iraq. ECF No. 141. Furthermore, by the time of the first status conference of the renewed case on July 25, 2012, the defendants should have had the expectation that this case would proceed to trial. Yet even with the arrival of a superseding indictment on October 17, 2013, the defendants chose not to make any transport request until February 28, 2014. *See* Mot. Attach. F. By waiting until the eve of trial to present this motion, the defendants, through their inaction, have effectively caused the potential price for transporting

---

[1] The motion for government-provided security was denied on the grounds that "(1) the government has identified for the defendants licensed personal security companies that are the primary providers of personal security services to U.S. government personnel in Baghdad; (2) these companies can provide for the defendants the same security services that they currently provide to U.S. government personnel; (3) the defendants have made no showing that these private security companies are unable to provide the security necessary for their investigation; and (4) the defendants have acknowledged their ability to pay for such services." *Id.* The defendants claim, through a vaguely worded declaration by defense counsel, that the private security companies they contacted refused to provide services upon learning that the security mission was for this case. Mot. at 10 (citing Mot. Attach. J). However, the defendants offer no indication of the number of security companies that they actually contacted, out of the more than 70 company names supplied by the Department of State and the Department of Defense in 2009. Opp'n at 3-4 (citing Opp'n Attach. A). In addition, the defendants' current claim that the $45,000 cost of safely traveling to Iraq is beyond their financial means, while simultaneously demanding that the government pay $1.7 million to transport the Iraqi vehicles to the U.S., Defs.'s Reply at 5, rings hollow given their long delay in making the present motion.

the Iraqi vehicles to the U.S. to rise by more than $1.5 million. This Court will not permit the defendants to supplement the wording of Rule 16(a)(1)(E) with arguments sounding in due process and "[f]undamental fairness" when the defendants made no mention of such alleged injustice for years.

*B. The 3ds Max Files*

The 3ds Max files are unquestionably within the government's possession, control, and custody. Yet determining whether the files are material for the purposes of Rule 16(a)(1)(E) applicability requires the Court to consider the role that the files play in the creation of any CGE prepared by the government to simulate the alleged crime. After such consideration, it is apparent to the Court that 3ds Max files are not material to preparing the defense.

To simulate the shooting incident in Nisur Square, the government must first collect and assemble the data gathered by the FBI investigators during their visits to Baghdad. Second, the government must input the data into a software program that can generate three-dimensional simulations. The underlying data appears to be saved and organized within 3ds Max files. Third, the 3ds Max files are used to produce the output—*i.e.*, the CGE. *See generally* Opp'n Attach. C at 2-4; Mot. Attach. H at 3. In other words, the 3ds Max files sit in between the underlying data and the resulting CGE.

The defendants seek the 3ds Max files for both the 2009 CGE and any 2014 CGE. Pursuant to Rule 16(a)(1)(E), the defendants are entitled to the data underlying the CGE as well as the final CGE. *See* Opp'n Attach. D (Status Hr'g Tr. 31:13-21; 49:3-23) (Order compelling original trial team to produce "computer-generated evidence"). Both items are surely material under *Lloyd*. 992 F.2d at 351. Here, the defendants have received the "underlying raw data used to create" any 2014 CGE. Reply at 7 n.3. The government also must produce any completed

CGE—demonstrative or otherwise—prior to the start of trial. *See* Opp'n Attach. D (Status Hr'g Tr. 49:3-23). Of course, such a production is ineffective for the purposes of evaluating a 2014 CGE if the defendants cannot access the software used to create the CGE. The software employed for a 2014 CGE is, in fact, commercially available. Opp'n Attach. C at 3. Thus, the government fulfills its Rule 16 obligations regarding any CGE that simulates the alleged shooting incident if (1) the government produces the data underlying the simulation, (2) the software used to generate the simulation is accessible to the defendants, and (3) the government produces the completed simulation.

The Court remains unconvinced, however, that access to the 3ds Max files would allow the defendants "significantly to alter the quantum of proof in [their] favor." *Graham*, 83 F.3d at 1474. A distinction must be drawn between the files that lie within a software program and the software program itself. The 3ds Max files are simply the intermediaries between the required disclosures—the underlying data and the completed CGE. Most importantly, the defendants can populate their own 3ds Max files using the same set of data employed by the government. The Court wonders whether the defendants merely seek to shortcut the exercise that the government undertook in preparing CGE, since all of the means to prepare their own simulation for adequate comparison with any 2014 CGE—the underlying data, the simulation itself, and the commercially accessible software from which the simulation was created—are available to the defendants. Regardless of the defendants' motives, the 3ds Max files are not material for the purposes of Rule 16(a)(1)(E). As such, it is unnecessary to consider the government's contention that the 3ds Max files qualify as attorney work product protected from discovery pursuant to Rule 16(a)(2).

The defendants cannot find present relief in the September 14, 2009, order of this Court,

Judge Urbina presiding. *See* Mot. at 3, 15-16 (implying that, to comply with the order, the government ought to have produced the 3ds Max files for the 2009 CGE). There, the CGE that the Court ordered to be produced can only be construed to have included "the information underlying the [CGE]" and the completed CGE. Mot. Attach. B (Status Hr'g Tr. 31:13-21; 49:11-13). Indeed, at the time, the defendants only requested the data underlying the simulation and the simulation itself. Mot. at 2-3 (citing Mot. Attach. A). The defendants requested the 3ds Max files for the first time in a letter to the government dated November 24, 2009—two months *after* the Court's order. Mot. Attach. C at 1.

Finally, after discussing *Brady v. Maryland*, 373 U.S. 83 (1963), in just a single sentence in their original motion, ECF No. 411 at 13, the defendants proceed to argue at length in their reply brief, ECF No. 431 at 9-13, that *Brady* obligates the government to turn over its 2009 3ds Max files, specifically. The *Brady* Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment . . . ." 373 U.S. at 87. Like Rule 16(a)(1)(E), however, *Brady* is inapplicable to the 2009 3ds Max files. The defendants claim that the 2009 3ds Max files "could expose flaws in the government's theory or cast serious doubt about the reliability of the government's evidence" if there prove to be discrepancies between the 2009 CGE, which will play no role in the forthcoming trial, and any 2014 CGE. Mot. at 13. Since the 2009 3ds Max files would not, on their own, bolster the defense case, the defendants' *Brady* argument depends upon their ability to use the files to impeach a potential government witness. *Safavian*, 233 F.R.D. at 16 ("The meaning of the term "favorable" under *Brady* is not difficult to discern. It is any information in the possession of the government—broadly defined to include all Executive Branch agencies—that relates to guilt or punishment and that tends to help the defense

10

bolstering the defense case or impeaching potential prosecution witnesses."). However, since any 2014 CGE simulating the shooting incident will be used as a demonstrative exhibit rather than as admissible evidence, Opp'n at 8, there will be no government witness for the defendants to impeach. More importantly, as described above, the 3ds Max files are, at most, a compilation of data that has already been produced to the defendants. In actuality, it is this underlying data that would be the root cause of inconsistencies between the 2009 CGE and any 2014 CGE. Therefore, the government has already produced the evidence that the defendants would use to object to or attempt to impeach the credibility of the government's 2014 CGE. Consequently, the 3ds Max files are not material under *Brady*. *See United States v. Bagley*, 473 U.S. 667, 682 (1985) (noting that, under *Brady*, "[t]he evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.")

## IV. CONCLUSION

For the foregoing reasons, the Court DENIES the defendants' motion [411] to compel the government to transport the Iraqi vehicles to the U.S.[2] and to produce the 3ds Max files involved in the creation of a potential CGE.

A separate Order consistent with this Memorandum Opinion shall issue this date.

5/23/14
Date

Royce C. Lamberth
ROYCE C. LAMBERTH
United States District Judge

---

[2] After this Memorandum Opinion was substantially prepared but before it was released, the government disclosed that several of the Iraqi vehicles "sustained damage" and one Iraqi vehicle had been "crushed" in transit after U.S. Embassy Facility Management personnel in Baghdad had bafflingly marked the Iraqi vehicles for destruction. Notice of Disclosure, May 22, 2014, ECF No. 477. Such disclosure has no bearing on the determination made by the Court herein. However, the Court is still pondering the realm of reality in which the Department of State exists. The Court looks forward to receiving promptly the results of the government's promised investigation into why the Department of State failed to properly preserve this evidence.

11