```
 1                  BEFORE THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF COLUMBIA
 2

 3   UNITED STATES OF AMERICA,        .
                                      .  Case Number 08-CR-360
 4             Plaintiff,             .
                                      .
 5        vs.                         .
                                      .
 6   PAUL ALVIN SLOUGH,               .
     EVAN SHAWN LIBERTY, and          .  Washington, D.C.
 7   DUSTIN LAURENT HEARD,            .  September 5, 2019
                                      .  10:17 a.m.
 8             Defendants.            .
     - - - - - - - - - - - - - - - - -
 9

10               TRANSCRIPT OF RESENTENCING HEARING
                      (SEALED PORTION REDACTED)
11            BEFORE THE HONORABLE ROYCE C. LAMBERTH
                    UNITED STATES DISTRICT JUDGE
12

13   APPEARANCES:

14   For the Government:        T. PATRICK MARTIN, AUSA
                                FERNANDO CAMPOAMOR-SANCHEZ, AUSA
15                              JOHN CRABB, JR., AUSA
                                United States Attorney's Office
16                              555 Fourth Street Northwest
                                Washington, D.C. 20530
17
     For Defendant Slough:      BRIAN HEBERLIG, ESQ.
18                              BRUCE BISHOP, ESQ.
                                LINDA BAILEY, ESQ.
19                              MICHAEL BARATZ, ESQ.
                                NICHOLAS SILVERMAN, ESQ.
20                              Steptoe & Johnson LLP
                                1330 Connecticut Avenue Northwest
21                              Washington, D.C. 20036

22   For Defendant Liberty:     WILLIAM COFFIELD, ESQ.
                                LAINA LOPEZ, ESQ.
23                              Berliner, Corcoran & Rowe, L.L.P.
                                1101 17th Street Northwest
24                              Suite 1100
                                Washington, D.C. 20036
25
                           -- continued --
```

```
 1    APPEARANCES (CONTINUED):

 2    For Defendant Heard:        DAVID SCHERTLER, ESQ.
                                  Schertler & Onorato
 3                                901 New York Avenue Northwest
                                  Suite 500 West
 4                                Washington, D.C. 20001

 5

 6

 7    Official Court Reporter:    SARA A. WICK, RPR, CRR
                                  333 Constitution Avenue Northwest
 8                                U.S. Courthouse, Room 4704-B
                                  Washington, D.C. 20001
 9                                202-354-3284

10

      Proceedings recorded by stenotype shorthand.
11    Transcript produced by computer-aided

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

<pre>
1                    P R O C E E D I N G S
2              THE COURTROOM DEPUTY:  Your Honor, we are on the
3    record in Criminal Case 08-360, United States of America versus
4    Paul Alvin Slough, Evan Shawn Liberty, and Dustin Laurent Heard.
5              Counsel, please approach the lectern and identify
6    yourselves for the record.
7              MR. MARTIN:  Good morning, Your Honor.  Patrick
8    Martin, Fernando Campoamor-Sanchez, and John Crabb for the
9    United States.
10             MR. HEBERLIG:  Good morning, Your Honor.  Brian
11   Heberlig from Steptoe & Johnson.  With me is Bruce Bishop, Linda
12   Bailey, Michael Baratz, Nick Silverman, and two of our
13   colleagues who are paralegals on the case, and Paul Slough is
14   here in the courtroom.
15             THE COURT:  All right.
16             MR. SCHERTLER:  Your Honor, good morning.  David
17   Schertler on behalf of Dustin Heard, and Mr. Heard is present.
18             MR. COFFIELD:  Good morning, Your Honor.  Bill
19   Coffield on behalf of Evan Liberty, and Laina Lopez with our
20   office is also here with me.
21             THE COURT:  All right.  I take it everyone is
22   prepared, and I have read your pretrial submission --
23   presentencing submissions.  I take it we are ready to go
24   forward.
25             My normal practice would be to let the government allocute
</pre>

1    first and then hear from the defendants.  Counsel, I don't know

2    if you all have discussed among yourselves how you want to

3    proceed, but I normally go in the order in which the defendants

4    were named in the indictment.

5        And have you all talked about how you want to have people

6    speak and whether you want to do that first or -- go ahead,

7    Mr. Heberlig.

8            MR. HEBERLIG:  Thank you, Your Honor.  We discussed it

9    and assumed that, without the Court's objection, we would

10   proceed like we did last time.  I assume that means the

11   government will proceed first, and then on our side, I will

12   speak for Mr. Slough.  We have three character witnesses.  The

13   first time we were here, those witnesses followed the lawyers'

14   argument before turning to the next defendant, which in this

15   case would be Mr. Schertler for Mr. Heard, and then they have a

16   few individuals as well and likewise for Mr. Liberty and

17   Mr. Coffield.

18       Last time the Court waited to hear from the defendants

19   until the very end of the proceeding.  We are also fine if

20   that's the way you would like to proceed today.  Otherwise, I

21   think all three do intend to speak, and they could speak at the

22   end of their character witnesses, whatever the Court prefers.

23           THE COURT:  Okay.  I think we will do it the way we

24   did last time, then.

25           MR. HEBERLIG:  Thank you, Your Honor.

1           THE COURT:  The government may proceed, then.

2           MR. MARTIN:  Your Honor, we would like to be heard on

3      the Eighth Amendment argument.  We did not respond in writing,

4      but I think we will address that first, and then if the Court

5      would like to separate that from an allocution, I think that

6      would make sense.

7           THE COURT:  Sure.

8           MR. MARTIN:  May it please the Court.

9      Your Honor, we are here requesting that the Court

10     essentially adopt its prior sentencing package as to Mr. Slough,

11     but also taking into account the D.C. Circuit's admonition to

12     individually sentence Mr. Heard and Liberty, we are requesting a

13     lesser sentence for both of those, and we will get into that in

14     an allocution.

15          But fundamental to this, we believe, Your Honor, is that

16     the Court in 2015 had made a determination appropriately so that

17     this could be a sentencing package, and the Court had said,

18     after having sat through the trial and heard all the evidence,

19     heard about this horrifying event, that --

20          THE COURT:  I'm sorry.  I need to go back one step.  I

21     do think, in connection with allocution, I have to make clear

22     that I have determined, as I did last time, that the sentencing

23     guidelines on the manslaughter and attempted manslaughter counts

24     would be 151 to 188 months.  So the Court has to, under the

25     sentencing procedures, determine the guideline range before

1    allocution.

2        So I think there is no dispute over that, if I am correct,

3    and then there is still the question of whether I can add the

4    10-year mandatory firearms sentence to that.

5        But I think there is no dispute, am I correct, over the

6    guidelines, that if I applied the guidelines, that would be the

7    guideline?  And then I have to still balance the 3553(a)

8    factors, but that's the guideline determination, I think.  I

9    think the Court has to announce that it has determined that will

10   be the guidelines.

11       Does each defendant agree?

12           MR. HEBERLIG:  Yes, we do, Your Honor.

13           MR. SCHERTLER:  Yes, Your Honor.

14           MR. COFFIELD:  Yes, Your Honor.

15           THE COURT:  Okay.  I'm sorry I neglected to do that.

16       And then the question you are currently addressing is

17   whether the Court has the power to add, in light of the Court of

18   Appeals opinion, the 10-year mandatory firearms count.

19           MR. MARTIN:  That's correct, Your Honor, and I would

20   like to address that and, if possible, address also a request

21   for an upward variance, so outside of the guideline estimation,

22   upward variance given the nature of this offense and other

23   unique aspects of this particular incident.

24       As to the Eighth Amendment piece, though, it seems clear to

25   us that in the context clearly of the 30-year mandatory minimum,

1    the D.C. Circuit said a number of things.  What shouts out to us

2    is the holding, which is on page 811, where the Court of Appeals

3    said, We conclude the mandatory 30-year sentence imposed by

4    Section 924(C) based solely on the type of weapons Slough,

5    Heard, and Liberty used during the Nisur Square shooting is

6    grossly disproportionate to their culpability for using

7    government-issued weapons in a war zone.

8         And via an as-applied challenge to these circumstances, the

9    D.C. Circuit said that was disproportionate, grossly so, and so

10   the 30-year was not appropriate.

11        Now, what the Court of Appeals did not do is say that the

12   924(c) statute or count went away.  They did not vacate that.

13   And as the Court is well aware, the 30-year was under a

14   provision of 924(c), namely 924(c)(1)(B)(ii), but there is a

15   provision and provisions for other mandatory minimums in terms

16   of how you may use a weapon, so type versus use.

17        The government's position is that when the D.C. Circuit was

18   looking at the 30-year mandatory minimum under that particular

19   provision, which was tied to the type of weapon, machine gun or

20   grenade launcher, the D.C. Circuit clearly said can't do it, not

21   in this case as applied, unconstitutional.

22        However, the 10-year, which is under a different provision,

23   for discharging any firearm in a crime of violence does apply,

24   and that concerns the use of a weapon versus the type of weapon

25   used.  And we think that does apply for three reasons:  First of

1     all, the plain language says it applies.  Second of all, 10

2     years in comparison to the gravity of this offense with so many

3     victims dead and injured, it's nowhere near grossly

4     disproportionate.  In fact, as the Court has acknowledged today,

5     the manslaughter and attempted manslaughter counts have a range

6     above 10 years.  So those underlying offenses actually have a

7     higher exposure than the 10-year.

8         And so consistent with the D.C. Circuit's opinion, if the

9     Court were to apply the 10-year, it would, one, not be grossly

10    disproportionate, and two, it would not be based upon the type

11    of weapon, which the Court of Appeals said you can't do that.

12    It would be based upon their use of the weapon, discharging it

13    in the course of a crime of violence.

14        And so for that reason, Your Honor, we believe the 10-year

15    does apply, and it in no way is violative of what the D.C.

16    Circuit said.  The D.C. Circuit said at one point -- and this is

17    at 865 F.3d 814.  It said, quote, The type of weapon, again

18    emphasizing the type, the type of weapon used should not be more

19    determinative of their punishments than the death and

20    destruction that resulted from their decisions to fight,

21    focusing again on their use.

22        Here, the 10-year mandatory minimum under that separate

23    provision of the statute, that would be on top of manslaughter

24    and attempted manslaughter, a range that is higher than the

25    firearms count.  So there would be -- that would not be more

determinative than the underlying substantive offense.  And for

that reason, we believe that it does apply.

     And as I alluded to earlier, had the D.C. Circuit wanted it

not to apply in any situation in a war zone, the D.C. Circuit

could easily have said 924 is just not appropriate in a war

zone.  They did not say that.

          THE COURT:  Was this argument not presented in the

D.C. Circuit?

          MR. MARTIN:  It was not.

          THE COURT:  And it was not made in the rehearing en

banc petition?

          MR. MARTIN:  I can't speak to that, Your Honor.

Perhaps Mr. Bishop could help the Court there.  I don't know.

          THE COURT:  Okay.

          MR. MARTIN:  So that is where we think the 924(c)

result should be, which is that the 10-year applies.

     Now, in terms of the allocution, Your Honor, and Your

Honor, we are basing our recommendations on essentially three

things.  The nature and circumstances of this offense, it was a

one of a kind, and that is good.  This should never happen

again.  It should never have happened in the first place.  There

is no comparable case.  The D.C. Circuit itself said that.  They

cited to one case.  I believe the case is *Drotleff* or something

along those lines.  I will get it here in a second, Your Honor.

*Drotleff*, and in that case, as the Court is aware, two DoD

1    contractors were found guilty of a single count of involuntary

2    manslaughter.  So the best we could get is something completely

3    on its face different than this case.

4        And so I won't get into in terms of the defendants citing

5    certain cases that are quasi analogous.  There is just no

6    analogous case.  This is sui generis, and the Court itself

7    recognized that in the first sentencing.  Nothing has changed.

8        The seriousness of the offense cannot be overestimated or

9    overenunciated here.  There were, grand total, 30 victims in

10   terms of convictions by Mr. Slough, 13 dead, 17 injured.  With

11   respect to Mr. Liberty and Mr. Heard, less so certainly, eight

12   for Mr. Liberty that were killed, six for Mr. Heard, 11 each

13   injured.  That is astounding that that could happen in one

14   incident.  And it didn't happen in a matter of seconds.  It

15   happened over the course, as the Court is aware, of 15 to 20

16   minutes.  People were running for their lives.

17       That was clearly the evidence before this Court in 2014.

18   It was also clearly the evidence before the Court in 2018 twice

19   over.  The Court has lived through this more than most people,

20   both in this courtroom, outside the courtroom, and the litigants

21   themselves.  Longer than I have been on this case, Your Honor,

22   you have been on this case.  So I don't need to reiterate the

23   devastation caused by these men's actions, as well as their

24   co-defendant Mr. Slatten.

25       But I would be remiss if I didn't represent the victims

here at this setting because many of them don't have a voice
because they are no longer with us.  And many of them, to the
extent they have a voice through family members or otherwise,
they can't be here.

I do have two individuals that I will ask that the Court
hear from.  One I will speak for that person via his written
victim impact statement but also a second who will come up to
the lectern.

But to talk about just, for example, the nature and
circumstances of the offense -- Madam Courtroom Deputy, could I
have the ELMO?

Your Honor, this is Exhibit A, and I can't see it here, but
these are the pictures of all the victims.  The Court heard in
2014 from many of the injured victims, not dead, and many of the
family members of the victims who passed away that day who were
the slain victims of these men's actions.  And to remind the
Court, because they are not here today, I want to focus on just
a few of them.

First would be the passenger of the white Kia, and that is
Dr. Khazali.  Dr. Khazali, as you know from the testimony, was
46 years old at the time.  She was the mother of three,
including Ahmed, who also perished in this incident.  She was a
practicing medical doctor in Iraq, rare in those days.  And the
bullets that riddled her car killed her, and those bullets and
grenades came from defendant Slough, Heard, Liberty, and their

1    co-defendant, Mr. Slatten, as well as cooperator Ridgeway and

2    Mr. Watson, and the Court is well aware of that.

3        Secondly, this individual right down here, Mr. Osama

4    Fadhil, you know, Your Honor, he was 40 years old.  He was a

5    businessman.  He and his passenger were going to the stock

6    market so that they could get the money out of the stocks they

7    had exchanged.  It was a regular day for him.  He was a married

8    man, father of two sons and two daughters.  He couldn't escape

9    the vehicle initially.  When he did escape the vehicle, his body

10   was riddled with bullets on that asphalt.

11       Ali Mohammed Hafedh, whose father is here today, he was

12   nine years old at the time, youngest of four boys.  He loved

13   soccer, and he was wearing his favorite team's soccer jersey.

14   He wore those regularly.  He was shot in the head and killed

15   that day while ducking for cover.

16       Mohamed Mahmoud, he worked with chemicals, batteries.  He

17   had a Bongo truck.  Work gloves were the only thing left in

18   addition to the shattered windshield of his car.  He was a

19   married man, father of two daughters and two sons.  Again, he

20   worked in battery acids and at a battery manufacturing shop.  He

21   perished that day while trying to escape the onslaught.

22       Qasim Mohamed, his son, 11 years old at the time, he had

23   recently graduated fifth grade.  He, too, along with his father

24   in an effort to escape the onslaught of oncoming bullets, was

25   racing towards the east side of that curb towards the bus

1   shelter, and he was gunned down in the street with his father.

2       Ghaniyah Ali, highly religious woman, she was on a red Tata

3   bus west of the Circle at the time.  Her daughter came to

4   testify.  You will remember that gripping testimony where her

5   daughter said, I was sitting next to my mother, I put my head

6   down, she pulled it into her lap, and when I put my head up, she

7   was shot in the head and was dead, she had left me.  At that

8   time they had been going to get travel documents so they could

9   do their pilgrimage under their faith, deeply religious woman,

10  and they were never able to get there because of this incident.

11      Sa'adi Alkarkh, you will remember, Your Honor, his car was

12  turned around.  He was fleeing these bullets.  He was fleeing

13  the terror coming from the Circle from these defendants.  He was

14  shot in the head.  His --

15          THE COURT:  That's why it can't be self-defense, when

16  he's going the other direction.

17          MR. MARTIN:  And he was -- he crashed into that bus

18  stop.  He was not the only one that was shot while he was trying

19  to flee.  You may remember there was an attorney who testified

20  at great length about how he was able to turn around, how he was

21  able to get some distance away from the Circle.  He, too, his

22  car was shot while he was fleeing the incident.

23      Mr. Abid Ayash, he was on the west side of the Circle.  He

24  was the gardener that the Court has referred to.

25          THE COURT:  He's the 84 year old?

1            MR. MARTIN:  We have him as 77.

2            THE COURT:  77.  I called him 84 at the sentencing.

3            MR. MARTIN:  And then last but certainly not least,

4    Ali Hussein.  This was the man on the northeast side of the

5    Circle who at some point puts his hands up and, according to

6    Mr. Mealy, somebody who he attributes to be Mr. Liberty

7    essentially by process of elimination, shoots Mr. Hussein who

8    has got his hands up, and he doubles over on his back.

9        That's just nine people, Your Honor.  13 dead, 17 injured.

10   That alone, the nature of the offense, the gravity of the

11   offense, the seriousness, and the consequences of these men's

12   actions give you all you need to impose the same sentencing

13   package with respect to Mr. Slough and a little bit lesser so

14   for Heard and Liberty, and we urge you to do so.

15       However, there's more.  And that is this:  If you take the

16   individual actions of the defendants, you know that Mr. Slough

17   was a part of the initial onslaught into that white vehicle.

18   You heard from Mr. Matt Murphy who talked about how Mr. Slough,

19   not in split seconds but over the course of many seconds, was

20   able to lodge one of those grenades into his M203 grenade

21   launcher, shoot it at the white vehicle, discharge the shell,

22   put another one in there, cock it again, shoot it again, and,

23   according to Mr. Murphy, perhaps even a third time, not split

24   seconds, not fractions of seconds, deliberate action tossing

25   those grenades into that vehicle that was no more than 50 feet

away, the back splash of which caused the dents on the command
vehicle, and I will talk more about that in a second.

You also know about Mr. Slough, how after they rounded the
corner heading out of the Circle, there was gunfire going to the
west, including the red Tata bus.  We've already talked about
the elderly woman who died as a result of those shots.

Up north further, after there had been a gap of time, if
you will, and there had been a silencing of the guns, the guns
erupt again because Mr. Slough decides that a man who is picking
his hands up off of a steering wheel in a car that is going the
opposite direction on a side road to the road that they are
heading up.  Mr. Bara Sadoon, he testified in 2014, My hands
were going up, and I was shot.  And then only then, as the Court
is aware, did Mr. Slough stop, and only because one of his
co-team members, Matt Murphy, says, Cease fire, cease fire.  And
that is the only thing that stopped that shooting that day.

As to Mr. Slough in particular, what was not in his
sentencing memorandum was any acceptance of responsibility for
what he did.  There was a lot of talk about it not being
intentional and about overreacting and panicking and quoting the
D.C. Circuit, but not once was there, I accept responsibility
for my actions.  And not a small thing, because what was in
Mr. Slough's sentencing memorandum -- and kudos to him for being
this to other people in jail, that is, a figure that could help
them find their way to a higher faith -- is the first step to

repentance, which is accepting responsibility for your own actions, that was not there. Maybe we will hear today, Your Honor. I hope we do for the victims' sakes, but it was not in his sentencing memorandum.

I am going to move on, Your Honor, if I can, to Mr. Liberty. Mr. Liberty's individualized actions as well warrant the high sentence that we have asked for, but not the highest of sentences. We have asked for 26 years for him based upon the eight individuals he was jointly responsible for killing and the 11 that he is jointly responsible for attempting to kill, as well as the firearms count.

Your Honor, Mr. Liberty's actions that day, as set forth by his own teammates, were not only reckless but recklessly indifferent to human life. He, as Your Honor is aware, was the driver of the command vehicle, in an armored vehicle, safe from incoming shots. I wish there were none, but safe from there. Opens the driver's door, gets out of the vehicle, leaves two magazines on the ground. Whether you believe the witnesses or not, he leaves two empty magazines on the ground, each of which can hold 30 rounds. So he fires at least 60 at that time and then after the fact says to cooperating witness Ridgeway, who the Court largely credited, I pulled a grade 55, an allusion to a prior instance where he had fired his machine gun on fully automatic, not semi where you are picking a target or somebody that is actually threatening the convoy and you are eliminating

1    the target.  No, pull the trigger once, fire out 30 bullets in a

2    matter of seconds.  That is not only poor judgment, that is not

3    only panic, that is more.  That is called reckless indifference

4    to human life.

5         And as I mentioned earlier, Your Honor, there was also the

6    victim in the northeast portion of the Circle, Ali Hussein, who

7    Mr. Mealy identified as being the victim of Mr. Liberty as he

8    got out of the vehicle during the tow-up.  And the D.C. Circuit

9    said, based on the evidence, the jury could reasonably infer

10   that, in fact, Mr. Liberty had shot the man who had his hands up

11   and was no threat to anyone.

12        And then I will turn, Your Honor, to Mr. Heard.  Mr. Heard,

13   we are asking for 25 years.  That would be the top of the

14   guidelines.  We are not asking for an upward variance for him.

15   He is responsible, per the jury verdict, for six killed and 11

16   attempted killed, as well as the firearms count.

17        With respect to Mr. Heard, he was a part of that initial

18   onslaught to the south of the Circle where the majority, as the

19   D.C. Circuit announced, the majority of the victims were.  He

20   was a part of that big 240 going off.  According to

21   Mr. Ridgeway, he was firing more rounds than Mr. Ridgeway and

22   Mr. Slough, who were both also up gunners, who both also had

23   those 240s.  According to Mr. Ridgeway, while the Raven 23

24   members who were firing were shooting at the white vehicle,

25   Mr. Heard appeared to be firing further south, further south of

1    the white vehicle.  And Mr. Heard is jointly responsible for all

2    the death and destruction reeked south of the Circle.

3         To his credit, though, Your Honor, and we absolutely would

4    like to acknowledge this, and we think this is a part of the

5    reason why he deserves a lesser sentence than Mr. Slough and

6    Mr. Liberty, is he did stop firing after they left the Circle,

7    didn't fire west, didn't fire north, and in fact, appropriately

8    so was heard to comment, I'm not firing because I don't see

9    anything to fire at, or words to that effect.  So he showed

10   restraint later on in the incident, and he absolutely deserves

11   credit for that.

12        But I will note, Your Honor, there were, I believe, five

13   people with M203 grenade launchers out there that day.

14   Mr. Slough was one of them.  Testimony, two to three rounds from

15   him.  Mr. Heard also acknowledged firing one of those weapons

16   early on when he was firing to the south.

17        So while we are not asking the Court, clearly, to impose a

18   mandatory minimum based upon the type of weapon, the Court can

19   take the type of weapon used into account when applying the

20   3553(a) factors, because that goes into the nature of the

21   offense.

22        So Mr. Heard's use of an area weapon there, the grenade

23   launcher and the grenade which is a high-casualty weapon, should

24   be accounted for, we believe, Your Honor, and you can

25   appropriately take that into account.

1      For those reasons, Your Honor, we do believe that the

2   recommended sentence is consistent with the Court's sentencing

3   package, consistent with the D.C. Circuit's admonishment to

4   individually sentence these defendants, is a very appropriate

5   sentence, and we would ask the Court to impose those sentences,

6   30 for Mr. Slough, 26 for Mr. Liberty, and 25 for Mr. Heard.

7      But before I conclude, Your Honor, there are two victims

8   that are here.  One is Mr. Wisam Al-Amiri, and I would like to

9   introduce him.  He's not here?  Okay.  I guess he didn't make

10  it.

11     I will say a brief bit about Mr. Al-Amiri.  As Your Honor

12  is aware, he works at the bar out in Fairfax.  He has been in

13  the United States now for a few years.  At the time, however, he

14  had been working for the military.  He was off duty.  And he was

15  down by the bus stop, and he was shot in the shoulder at that

16  time.  And he had testified before Your Honor, I believe, three

17  separate times.  But this has devastated him.  He has managed to

18  get his life back together clearly, but this was a tough event

19  for him.

20     And then the second person who I will ask to stand up is

21  Mr. Mohamed Kinani.  Mr. Kinani?  Mr. Kinani comes to us from

22  Detroit, Michigan.  He is a businessman.  He has been in the

23  States now for some time.  He is the father of Ali Kinani, and

24  he has asked me to read a statement for him, which I will do at

25  this time.

1    "Dear Honorable Judge, although it has been 12 years since

2    our entire life has changed, I am still not strong enough to

3    speak without breaking down.  12 years ago, my family and I

4    became victims, and our lives have changed forever.  We lost our

5    nine-year-old son in front of our eyes, and this is something

6    that I would not even wish for an enemy.

7    "It is a life-long healing process that we continue to deal

8    with on a daily basis.  Not a single day passes by that we don't

9    think about how our son died and what he could have been today.

10   This is something that hurts forever.  Our son died in our arms.

11   It is a lifetime sentence for us.  We suffer every day and will

12   continue to suffer every day.  Until this day, my wife wakes up

13   every night calling his name.  At every dinner table, she asks

14   if he has eaten.  My children speak of their little brother and

15   how much they love and miss him.

16   "We are grateful and thankful for coming to the United

17   States.  The United States provided my family and I an

18   opportunity to live in a safe environment and provide a better

19   lifestyle for our children.  But we paid a big price for it,

20   again a price that I would not even wish for an enemy.  All the

21   money in the world cannot bring him back or bring peace to our

22   soul.

23   "We are thankful and grateful for the justice system and

24   the United States government.  My family and I thank you,

25   Honorable Judge, and thank the prosecution and the FBI for all

their hard work and dedication to justice.

"And for you, the defendants" -- excuse me, "the defendant, I hope that you do not and will not ever have children so that you don't ever feel the pain that my family and I go through every day.  I do not sympathize with you.  I try to say I forgive you.  But deep inside, the pain of losing my son in my arms is something that we cannot heal from or forget.

"Best regards, Mohammed Kinani."

Thank you, Mr. Kinani.

Your Honor, in summary, I would just say this:  Your Honor is so aware of these facts and the acts of these men, and I know it has been described in some instances as panic.  But I implore the Court to see it for what it is, which is, if you call it panic, that may be one way to call it.  Overreacting to tense circumstances, that's what the D.C. Circuit said.

Clearly, the manslaughter and attempted manslaughter are not intentionality-type crimes.  But nonetheless, the reckless indifference meted out by these men on that day over the course of 20 minutes, not seconds or fractions of seconds, but 20 minutes, had dire consequences.

That's why this case is not like any other, and that's why these sentences, while severe, are perfectly appropriate, given the loss of life and the maiming of countless innocent civilians that day.  There was no need for it to happen.  It happened. There was no incoming.  The Court is aware of that.  You have

1    found that.  The evidence has borne that out, not at one trial

2    but at three trials.

3         There have been countless witnesses, both on the Raven 23

4    side and the civilian side.  Some of their own teammates said,

5    never saw anyone shooting at the convoy.  And the Court knows,

6    both based on testimonial witnesses -- by witnesses, but also by

7    forensic evidence that those ding marks and the damage to the

8    command vehicle were caused by, most likely, Mr. Slough's own

9    grenade, having fired it too close to the vehicle.

10        There's just no accounting for the loss of life, but to

11   bring some measure in terms of punishment, general deterrence,

12   and closure, if you will, to the victims, we implore the Court

13   to impose a 30-year sentence, 26, and 25 as to the defendants

14   respectively.

15        Thank you.

16             THE COURT:  Thank you, Mr. Martin.

17        Mr. Heberlig?

18             MR. HEBERLIG:  Thank you, Your Honor.  Can I proceed?

19             THE COURT:  Sure.

20             MR. HEBERLIG:  I am going to address the mandatory

21   minimum, but I would like to do so during the course of my

22   argument.

23             THE COURT:  Sure.

24             MR. HEBERLIG:  Your Honor, to say that this case has

25   haunted everyone on this side of the courtroom for the last five

years would be a significant understatement.  We have all struggled to come to terms with what happened in Nisur Square and what happened in this courtroom.

But today is not about looking backward.  It's about moving forward.  We are here for one purpose only, and that is to reunite Paul Slough with his family as soon as humanly possible.  The Court of Appeals has untied your hands and given you back the sentencing discretion that was so sorely needed five years ago, and we are here today to ask you to exercise that discretion to the fullest extent possible under the law.

In April 2015 at the original sentencing, the outpouring of love and support for Paul and his colleagues was unlike anything I have ever seen.  This Court surely recalls the throngs of people who traveled here from Texas, Tennessee, New Hampshire, and beyond to stand behind these young men.  I think the Court referred to it as extraordinary, and it was.

I feared that with the passage of five years, memories would fade, people would have moved on, and the courtroom would be filled only with a few close family members and friends.  I am overwhelmed by the support of the people who are here today, people who traveled long distances to support these men at no small expense.  This outpouring of love is remarkable, and it demands recognition.  So thank you.

I'm not going to repeat the sentencing presentation we made five years ago.  We resubmitted it to the Court.  The letters of

1    support are still amazing to me.  They tell the story of Paul

2    Slough, a decent, honorable, loving, and faithful man, a cowboy

3    from west Texas who has deep family ties to the community, a

4    decorated veteran of the U.S. Army and the Texas National Guard,

5    a charitable man who loves children, a man of faith and service

6    to God, and above all, a dedicated husband to his wife,

7    Christin, and a loving father to his precious daughter, Lilly.

8        So in our sentencing memorandum, we focused on Paul's

9    conduct over the last five years.  Again, I wondered, all of

10   these years later, would Paul still be the man I knew him to be,

11   the same man who was so worthy of recognition and leniency for a

12   rich life that extends so far beyond those 15 minutes in Nisur

13   Square?

14       Well, I am here to tell you, he is a better man.  He faced

15   this adversity head on, and he decided to rise above it.  Of

16   course, he's not had a single disciplinary incident in the

17   entire five years he has been in prison.  He hasn't succumbed --

18            THE COURT:  It was very impressive.  I agree.

19            MR. HEBERLIG:  He hasn't succumbed to prison life.  He

20   hasn't joined a gang.  He hasn't done drugs.  He's used the time

21   to better himself.  He's read hundreds of books.  He taught

22   himself basic Greek.  He leads the prison chapter of

23   Toastmasters to help people learn how to public speak.  He has

24   been there for his family.  Letter after letter submitted to the

25   Court speaks of people who call Paul expecting needing to cheer

him up, and it goes the other way around.  Paul is the one who
is constantly lifting their spirits, who is always positive, who
has never wallowed in any kind of self-pity.

His faith in God has become stronger.  He works in the
prison chapel.  He leads bible study groups.  He sends out to
his friends and family members weekly scriptures.  He has
authored articles in Christian publications.

The one thing that stands out above all else in the
submission we made to the Court is the dozens of letters from
fellow inmates.  And one word in particular they all use to
describe Paul, or most of them use, is the word "mentor."  And I
only want to highlight a few of them, but there are many beyond
these.

One was an inmate named Marshall Duncan.  He entered jail
at the age of 19.  He acknowledges that he certainly deserves to
be there.  He writes that his life was transformed --

THE COURT:  I don't see many of those letters.

MR. HEBERLIG:  I actually commend the Court to read
it.  It's quite a remarkable letter.

THE COURT:  I did.  It wasn't the kind of letters I
usually get from prisoners.

MR. HEBERLIG:  I understand.  He wrote that his life
was transformed when he became cellmates with Paul three years
ago.  He said in his letter that "for the last 10 years," and I
am quoting from his letter, "I refused to step in a prison

chapel due to my arrogance and pride.  Paul most graciously and humbly helped me remove that pride and led me back to Christ. He is my spiritual mentor."

Another inmate, Casey Luker, self-described career criminal, wrote that Paul helped him discover his faith and finally act like a man over the last couple of years, crediting his mentor, Paul.

Third inmate I want to highlight, his name is Clayton Tetter.  He also described Paul as a mentor who counseled him to -- the many times he thought about leaving the residential drug treatment program, Paul counseled him to stick with it, and he did, and he got out of it, and he got successfully transferred to a low-security facility because of Paul's counseling and mentoring.

These are not isolated stories.  Paul has helped dozens and dozens of inmates step up and become a better man.  All of this matters.  This Court has discretion to consider post-sentencing rehabilitation.  Post-sentencing conduct is a basis for a downward variance.  That's in the guidelines.  The Supreme Court and the circuit have recognized it.  Paul's time in prison has been exemplary, and it deserves significant credit.

Now, I want to move into some of the legal issues, and I will first address the mandatory minimum.

THE COURT:  Let me add one other.  I followed the case of the former mayor of Detroit.  So I was most interested in his

letter.  And it was very impressive.

MR. HEBERLIG:  I had his letter highlighted originally.  I cut it out for brevity.  But you are correct. Mayor Kwame Kilpatrick described himself as a corrupted politician --

THE COURT:  It was a very candid letter.

MR. HEBERLIG:  -- difficult relations with his family, and he credits Paul for bringing them back together.  I agree. It was a candid, powerful letter, and it is not alone.  There were many that had struck a similar sentiment.

So on the legal issue of whether the mandatory minimum of 10 years can apply here, Your Honor, I see no way in which that can be applied consistent with the D.C. Circuit's opinion.  All of the reasons the circuit found the 30-year mandatory minimum unconstitutional apply to the 10-year as well.

The Court gave clear direction on remand that there was to be no one-size-fits-all sentencing approach, that the Court needed to use all of the available tools that are now available under 3553(a).  And most importantly, I think the reason that stands out the most from the opinion that demonstrates why the mandatory can't apply is the Court held that this was an exceedingly rare case where the Court owes no deference to the legislative judgment of 924(c) because, they said, that law was aimed at persuading criminals to keep their guns at home, and it was so obviously not intended to apply to defendants who were

1    required by the United States government to carry their weapons

2    in a war zone.

3         The Court stated, and I quote, Congress could not have

4    possibly contemplated applying Section 924(C) against private

5    contractors providing diplomatic security.  That applies whether

6    it's 10, 30, or five.  This law was not intended to apply to

7    these circumstances.  The Court held that explicitly.  It's

8    already spoken on this issue.

9         Had the government intended to come here on remand and say

10   oh, no, the 10-year still applies, they had ample opportunity to

11   address that to the Court, to seek it on rehearing.  They did

12   not.  The Court clearly spoke.  The mandatory does not apply.

13        Secondary reasons they gave that apply equally well is that

14   applying that statute in a war zone would improperly

15   second-guess split-second decisions that were taken in that zone

16   with the 20/20 vision of hindsight that we can all exercise

17   today.  They said that would be inappropriate, it would deter

18   future contractors from doing their jobs, and again directed the

19   Court on resentencing to individually sentence these men both

20   based on aggravating and mitigating circumstances, but as an

21   individual, as this Court, of course, as a sentencing judge does

22   every day and should do here without the undue restriction of

23   that mandatory minimum.

24        So for those reasons, our view is it does not apply, and we

25   spelled them out in more detail in our papers.

1    So on to the other sentencing factors.  We have already

2  addressed the guidelines.  I won't linger on them.  There is no

3  dispute there.  But I will say, under today's sentencing

4  framework, they are merely one of the factors that the Court

5  must consider.  They're not presumed reasonable.  They're not

6  entitled to any greater weight than another factor.  And the

7  Court does not have to find extraordinary reasons to justify a

8  variance from them.  That's, of course, spelled out in the

9  Supreme Court law that has followed the *Booker* decision.

10    The Court's job is to impose a sentence sufficient but not

11  greater than necessary to comply with the purposes of 18 U.S.C.

12  3553(a).

13    So what are those relevant sentencing factors the Court

14  should consider here?  First of all, they're the history and

15  characteristics of the defendant.  Sentencing courts have

16  recognized in this modern era, this post-*Booker* era, that if

17  ever a man is to get credit for the good he has done in his

18  life, for his character, independent of the offense, it has to

19  be at the time of sentencing.

20    I have already talked at length about the history and

21  characteristics of Paul Slough.  I can sum it up simply.  In my

22  23 years of practice, Paul stands apart as the finest man I have

23  ever had the privilege to represent.  His history and

24  characteristics warrant leniency.

25    The Court also has to consider the nature and circumstances

1   of the offense.  Obviously, this was a serious and a tragic

2   incident with significant loss of life and injury.  All civilian

3   casualties in a war zone are tragic.  The stories we heard from

4   the witnesses at this trial, the victims, were sad and

5   upsetting.  It was difficult to hear Mr. Martin go through it

6   again today.  We don't dispute that.

7        But we do submit to the Court that the incident has to be

8   viewed with some context.  Paul's motive that day was simple.

9   It was to get the U.S. diplomat who had been car bombed out in

10  the Red Zone in Baghdad back to the Green Zone safely, plain and

11  simple.

12       I would also say that this Court and the Court of Appeals

13  has highlighted that the manslaughter convictions were not

14  premeditated or intentional.  In the words of both this Court

15  and the Court of Appeals, convictions resulted from panic,

16  exaggerated responses to perceived threats, poor judgment,

17  hypervigilance, and misperceived threats.  They were

18  nonintentional killings.

19       This was a split-second war zone environment in Baghdad,

20  the most dangerous city in the world at the time and the most

21  dangerous time of the war.  We made this observation in our

22  first sentencing memorandum, but in September 2007 alone, 29

23  soldiers were killed and 214 were wounded in action within

24  Baghdad.  In only the week leading up to the incident in Nisur

25  Square, Raven 23 was attacked twice by insurgents in Baghdad.

1    Under everyone's version of what happened that day, the

2    incident was precipitated by a white Kia approaching the convoy

3    that fit the profile of a car bomb, a VBIED.  We are not here to

4    litigate, relitigate all other contested parts of this case.  I

5    don't intend to do so.  But all of those circumstances I just

6    described are undisputed, and they warrant leniency and

7    consideration of this offense in the context in which it

8    occurred.

9        The Court is also required under Section 3553(a)(6) to

10   avoid unwarranted sentence disparities among defendants with

11   similar records who have been found guilty of similar conduct.

12   And there are two types of disparities that the Court needs to

13   avoid pursuant to that factor:  One, disparities between

14   sentences of co-defendants or participants in the same criminal

15   conduct and, two, nationwide disparities between similarly

16   situated defendants in other cases.  Both warrant leniency here.

17            THE COURT:  Well, not Slatten.

18            MR. HEBERLIG:  I will get to that.

19            THE COURT:  Okay.  You didn't talk about it in your

20   memo, but that's a big problem for you.

21            MR. HEBERLIG:  I don't think it is.  And let me start

22   by saying, the first potential disparity relates, obviously, to

23   Jeremy Ridgeway.  This Court sentenced Ridgeway to 12 months and

24   a day in prison.

25            THE COURT:  I do not agree with comparing a

cooperating person like Ridgeway at all.  I don't agree with

anything Judge Huvelle said in the transcript you gave me from

*Ring*.  I don't think that is good law at all.  So you can argue

that to the Court of Appeals.  I don't buy that argument.

MR. HEBERLIG:  Well, I will say, it wasn't just Judge

Huvelle.  It was Judge Collyer in the *Burden* case, with circuit

after circuit.

THE COURT:  I understand.  You can't compare

cooperators who fully come forward and agree that they did

wrong, who have changed their lives, you can't compare how a

Court sentences them to how a Court sentences your client.

MR. HEBERLIG:  No one contests that cooperators are

entitled to leniency and a break at sentencing.  None of those

cases, with the possible exception of Judge Huvelle's opinion,

provided for equal sentences between the individual who went to

trial and the individual who pled guilty and cooperated, and we

don't suggest otherwise.  I wouldn't be here saying that they're

similarly situated and should receive the same sentence.

Obviously, our system rewards cooperation.

But the sentencing factor does talk about unwarranted

sentencing disparities.  And if you look at the conduct, the

culpability of Paul Slough against Jeremy Ridgeway, I submit to

you his culpability, putting aside cooperation for a moment, is

certainly no greater than Jeremy Ridgeway's.  Ridgeway admitted

to being out of control that day, to laying down suppressive

fire to the south, unaimed fire where most of the victims were
located.  Witnesses described him as out of control and firing
hundreds of rounds.

So the disparity we are talking about, of course, he should
get a break for his cooperation, and he did.  But it can't be
unwarranted.  I think back to -- I have talked about the *Ring*
and the *Burden* case that Judge Collyer presided over.

I think back to my first big trial as a criminal defense
attorney.  We represented the CEO of WorldCom, Bernie Ebbers.
He went to trial in New York.  In the lead-up to the trial, the
chief financial officer, Scott Sullivan, pled guilty and
cooperated.  It was a two-man conspiracy.  Sullivan described
meetings that occurred with just the two of them.  There was no
doubt that Sullivan did exactly the same as Ebbers and more.
Sullivan got five years; Ebbers got 25.

At the time that disparity was staggering.  It was
difficult to live with.  It was a month or two after *Booker* had
been decided.  Sentencing courts still hadn't, I submit,
appreciated the new-found freedom from the guidelines, hadn't
focused on the factors of 3553(a).  I've heard that judge,
Barbara Jones, say many times since that case it is one of the
biggest regrets she's had on the bench.  Be that as it may, it
was a disparity of 5 to 1.

That's what we already have here.  Paul Slough and these
men have served five years in prison.  Jeremy Ridgeway got 12

months and a day, and he served six.  The only factor
distinguishing them is his cooperation.  And frankly, if you
stack up the lifetime of good works and character of Paul Slough
against Jeremy Ridgeway's, I will take that bet any time.

So what does the value of cooperation entitle a defendant
to?  Avoiding sentencing disparities, the cases have said this,
is necessary to promote respect for the law.  Our system, of
course, rewards cooperation, but cooperation alone, I submit,
can't justify a 5-to-1 or even greater disparity.  But the
government, of course, is seeking a disparity of 30 to 1 with
respect to Paul.  That type of sentence would shock the
conscience and promote, I submit, flagrant disregard for the
law.  5 to 1 is already unwarranted.  It is surely enough to
reward Ridgeway for his cooperation.

In my experience, a usual break for a cooperator, an
individual who has pled guilty, does everything the government
has asked him to do, and helps obtain a conviction gets 20
percent off the guidelines.  Maybe if he hits it out of the
park, 50 percent.  I wish I had cooperating defendants who got
more.

We are already at the stage where Ridgeway's break is 80
percent.  He served one year; these men have served five.  A
sentence of 30 to 1 would be 98 percent off.  That would be
unconscionable, and that would shock the system.  I submit it is
absolutely unwarranted.

1          So let me address head-on the issue the Court raised with

2     respect to Nick Slatten.  To the extent you are worried about a

3     disparity between these men and him, I submit to you that you

4     shouldn't be.  Nick Slatten was convicted --

5               THE COURT:  I understand he is convicted of murder,

6     and intentional murder, I agree.

7               MR. HEBERLIG:  You are absolutely correct.  Nick

8     Slatten was convicted of first-degree murder.

9               THE COURT:  Right.

10              MR. HEBERLIG:  The government's theory was that using

11    his sniper rifle, he laid in wake in his truck, and he fired

12    unprovoked at the driver of the white Kia.  They've argued to

13    you in multiple forums that it was that event that set the

14    wheels in motion, caused the white Kia to move forward, and

15    caused the rest of the shooting to erupt.

16         Now, Nick Slatten is not my client.  We did work together

17    in the first trial.  I don't agree with that verdict.  That

18    doesn't matter.  We are not here to relitigate that case.  The

19    jury spoke.  They, obviously, had a different view of the

20    circumstances.

21         Under the government's theory that led to that conviction,

22    he was obligated to be sentenced to a mandatory life in prison.

23    And if the events occurred as the government said they did and

24    as, I guess, we have to assume the jury found, then any

25    disparity between these men and Nick Slatten would be warranted,

not unwarranted, because there is a world of difference between
first-degree pre-meditated murder at a purely innocent civilian
and misperceiving the events that followed.

So I don't think it poses an issue at all.  And that
doesn't mean I have to accept Nick Slatten's sentence, because I
don't.  But that's not my job.  I'm not here to deal with that
issue.  He has fine lawyers who can deal with it in their own
case.  But I think the true comparison here that both the
conduct and the convictions are identical, except for
cooperation, are Jeremy Ridgeway and these men.  And, I submit,
5 to 1 is enough.

THE COURT:  Tell it to the Court of Appeals.

MR. HEBERLIG:  Well, I hope we don't have to get
there, Judge.

There is also a requirement under 3553(a)(6) to avoid
nationwide disparities.  This is a tougher one.  It is tough to
find a comparable case.  I submit that's --

THE COURT:  No manslaughter with this many victims
that I have seen.

MR. HEBERLIG:  That's because it is virtually
unprecedented for the United States government to criminally
prosecute events that took place in a war zone that didn't
involve premeditated murder.  There aren't those cases around.

THE COURT:  Well, even My Lai would involve
premeditated murder, I guess.

1      MR. HEBERLIG:  That's absolutely correct.  The closest

2  comparator we could find was the Doctors Without Borders

3  incident we cited.  There actually are some striking

4  similarities.  The U.S. Army commander didn't follow the rules

5  of engagement, misperceived the situation, and ordered an air

6  strike of a hospital in Kunduz, Afghanistan.  He was wrong.

7  That wasn't a threat.  And his actions led to the deaths of 42

8  civilians.  But that was within the jurisdiction of the Army,

9  and what the Army decided was appropriate was administrative

10  discipline, not criminal punishment, no incarceration of any

11  kind for that individual.

12      In terms of criminal cases, the closest comparator the

13  Court of Appeals could find was the case that Mr. Martin

14  mentioned.  That is the *Drotleff* or *Cannon* case, I think, were

15  the two individuals.  Those two contractors for the Department

16  of Defense got drunk.  They acted totally recklessly, and they

17  fired 30 AK-47 rounds into a car, killing the driver, killing a

18  pedestrian, badly wounding a passenger.  One of those defendants

19  had a level 3 criminal history, and they got 30 months and 37

20  months, obviously significantly less than the sentences that

21  have already been served here.

22      THE COURT:  That was one victim.

23      MR. HEBERLIG:  Two dead, one injured, drunk

24  contractors, absolutely no business doing what they were doing,

25  nothing like the circumstances these men face today -- or faced

1    back in Nisur Square.  Excuse me.

2         The final case, and it is not a perfect comparison -- as I

3    said, it is impossible to find perfect comparisons, but it

4    involved the ferry pilot, Staten Island ferry case.  That

5    individual, Richard Smith, got high on a cocktail of drugs, fell

6    asleep at the wheel of his commuter ferry, crashed, pled guilty

7    to manslaughter for killing 11 people and wounding 85 others,

8    many of whom who had amputations.  The sentencing court there

9    sentenced him to 18 months.

10        It's not a perfect comparison, and we don't say it is, but

11   what is clear is the government has certainly cited no

12   comparable case, no case involving nonintentional killings in a

13   war zone that is remotely in the ballpark here.  There frankly

14   isn't one.

15             THE COURT:  Right.

16             MR. HEBERLIG:  A sentence of time served of five years

17   would already be far higher than those sentences imposed in the

18   comparison cases, and accepting our proposal would avoid those

19   unwarranted sentencing disparities.

20        I guess finally, the last thing I want to address is the

21   government's sentencing proposal.  You know, somewhat

22   unbelievably to us, they asked for a 30-year sentence for Paul,

23   as if the Circuit decision reversing the same length of sentence

24   as grossly disproportionate to his culpability never happened.

25        How do they get there?  They invoked the sentencing package

1    cases.  But I submit to you that they turn those cases upside

2    down.  What those cases say is that when the Court is faced with

3    multiple counts of conviction, one involving a significant

4    mandatory minimum and others in which a discretionary sentence

5    can be imposed or should be imposed, the Court's job is to

6    determine an overall just sentence and then package it.

7        So for instance, if there is a case with a five-year

8    mandatory, some other counts of conviction, if the Court

9    believed eight years is an appropriate sentence, you can

10   sentence to three years on the remaining counts, even if you

11   wouldn't go there independent.

12       Now, you know, this may not matter if the Court is not

13   inclined to apply the mandatory minimum, but I will say, they do

14   the exact opposite.  They say first we are going to start at the

15   high end of the guidelines, 188 months.  On top of that, we are

16   going to stack the 10-year mandatory minimum.  And because

17   that's not enough, we are going to go 52 months higher for an

18   upward variance.

19       But that's not the true upward variance here.  Because of

20   the Court's discretion under the sentencing package cases, to

21   account for the mandatory, if it applies, within the overall

22   sentence, what they are really asking you to do is to double the

23   guidelines, to go from a range of 151 to 188 to 360 months.

24   There is no basis in law to do it.

25       And I want to address two of the reasons they give in

1   support of it which I find particularly appalling.  The first is

2   an argument they make in footnote 11.  Mr. Martin reiterated it

3   today.  And that is their claim that Paul deserves an upward

4   variance because he exhibited some greater -- I wrote it down in

5   quotes, some greater degree of intentionality or a more

6   nefarious mens rea than those associated with manslaughter

7   convictions.

8       They invoke some hotly contested evidence about an

9   individual who he allegedly shot with his hands off the wheel.

10  Factually, that's not true, but it's beside the point.  I'm not

11  here to relitigate the facts.  I could go into all the reasons

12  why, but that's really not the point.  The point is, the

13  government didn't charge Paul with murder.

14      We urged the government pre-indictment, when we were back

15  after the Court of Appeals decision and talking about this case,

16  if they really believed a 30-year sentence was warranted in this

17  case, charge him with murder.  Don't include this B.S. 924(c)

18  count.  Make it a fair fight.  If you believe 30 years is

19  warranted, bring that charge.  Did they do it?  No.  What did

20  they do instead?  They sought and obtained jury instructions

21  that allowed a conviction even if Paul believed, subjectively

22  believed he was in imminent fear of danger, as long as he acted

23  unreasonably or with excessive force.

24      And they didn't just seek the jury instructions.  That's

25  what they argued in closing and rebuttal.  And I will quote it.

They said, The judge will instruct you that even if you find
that the defendants believed in their heart of hearts, even if
they believed it, that they shot their weapons because they or
their teammates were in danger, that alone won't justify the
killings; if the government proves that the defendants acted
unreasonably or excessively, then you can find them guilty.

And they went further in rebuttal.  In rebuttal, they said,
We submit to you, ladies and gentlemen, that this case can be
decided on excessive force alone, not intentional killing,
excessive force, overreaction but a reaction in response to a
real, perceived, honestly held, even if mistaken, belief that
they were in harm's way.

So it is particularly galling to me to hear them now come
into court and seek an upward variance to essentially equate
this case to murder when they didn't have the guts to bring that
charge and prove it to the jury.  It's completely unwarranted.
There is no basis for an upward departure on some sort of
enhanced mens rea.

The second argument that I find completely disturbing is
their request for a 30-year sentence based on comparing this
case to that of Staff Sergeant Robert Bales.  This is a
throw-away aside in their sentencing memorandum.  Sergeant Bales
pled guilty and received life imprisonment after killing 16
Afghan citizens.  I find this a disgusting comparison, much like
the FBI lead case agent's statement years ago that this incident

was comparable to My Lai in Vietnam.

Sergeant Bales got drunk.  He snorted Valium, and then he went out and terrorized two Afghan villages, coming back in between villages to get more ammo.  He broke into people's homes unprovoked in the middle of the night.  He gunned down innocent fathers, mothers, and children, killing nine children and two elderly women.  When one of those elderly women didn't die after he shot her twice, he stomped on her skull.  And then he dragged the bodies out and lit them on fire.

Bales pled guilty to murder.  There was no self-defense, no conceivable self-defense.  That case is not in the same universe of culpability as this case.  And again, the government did not charge or try this case as a murder case with respect to these defendants.  But now they invoke those cases to justify their draconian sentencing proposal.  It's dishonest, and it is unpersuasive.

Your Honor, I will just close by saying, at the first sentencing hearing, we urged you to use what little discretion the government's charging decision left you with, to sentence Paul to 30 years and a day so he could go home in time to one day see his daughter get married, to see her have children, to have some semblance of a life, being the young man that he was.

This time, your discretion is real.  You have the power to send Paul home to do the little things his family so sorely misses, to make breakfast together, to attend the tea party that

Lilly so desperately wants him to come home to attend, to rejoin his community in west Texas that so badly needs him home.

I submit to you that Paul has earned that opportunity.  He has fully paid any debt that he owed to society.  We respectfully urge you, Judge, to sentence Paul to time served and to send him home.

THE COURT:  Was the other -- was an argument made in the Court of Appeals, the same question I asked Mr. Martin, about the other mandatory gun count?  Was it never presented to the Court of Appeals?

MR. HEBERLIG:  It was never presented to the Court of Appeals.

THE COURT:  So they simply never addressed it, either on rehearing or in the initial briefs either?

MR. HEBERLIG:  Not directly on the 10-year.  I think they just direct overall the legislative intent of 924(c), and I think it is indistinguishable across sentencing categories.

THE COURT:  Okay.

MR. HEBERLIG:  Unless the Court has further questions for me, I would like Ms. Bailey to please introduce the witnesses we have to speak.

THE COURT:  Thank you, Mr. Heberlig.

MS. BAILEY:  Good morning, Your Honor.

THE COURT:  Nice to see you, Ms. Bailey.

MS. BAILEY:  Good to see you, Judge.

1      Among the over 60 people who have come from all ends of

2    this country to speak for these men, we have three speakers on

3    behalf of Paul Slough that came to us from Texas.

4      The first is his pastor in actually more than one church,

5    Dr. James Eagan.

6              THE COURT:  Good morning.

7              PASTOR EAGAN:  Good morning, sir.

8              THE COURT:  You got the prime seat.  I could see you

9    through the whole thing here.

10             PASTOR EAGAN:  Yes, sir, and I can see you.

11     My name is Dr. James Eagan.  I am a pastor and also

12   professional counselor.  I live in Gainesville, Texas.

13             THE COURT:  Great spot.

14             PASTOR EAGAN:  Sir?

15             THE COURT:  Great spot.

16             PASTOR EAGAN:  Yes, sir.  We're the back door to Texas

17   or the front porch, one or the other.

18     Your Honor, I work with our courts in Gainesville and Cook

19   County, both the district court, District, I believe, 235, and

20   also our county court there with both judges and as a counselor.

21   They have been sending people to me instead of sending them to

22   jail, and if they are worthy to come, I see those people

23   regularly with their probation officer.  And we have had quite a

24   success rate there with rehabilitating and also bringing these

25   people not only into the faith community but also becoming

upstanding citizens in our community.  This has gone on for
about four years.  It's an honor of my life, and I do not charge
anything to do it.

I have known Paul for six years, when Lilly was just
brand-new on the lap of her mother in the first church we met,
and then they came with me in the next one.  I baptized
Christin.  I have dedicated Lilly.  Our congregation has prayed
for him for these six years, as they have prayed for you.  They
all know who you are, and they pray for you, obviously for
reasons for which we are here for today.

I want to just speak briefly on behalf of my friend, Paul.
I was here before he started trial.  I had a meal with him and
his brothers.  I was here during closing arguments.  I came back
during the sentencing.  I visited him when he was in jail here
prior to the trial and during.  And then I visited him in the
penitentiary as well.  Just every week, I receive an e-mail, and
we correspond.  He calls me "Doc" or "Top."  I don't know what
that means, but I know what "Doc" means.

But to hear of the things that he has been doing in prison,
they mentioned his books.  I'm the one that had provided those
books.  It would be such a great thing if he could have all of
those books.  I don't know how that works, but all of those
books have been great for him.

But I want to tell you, I am also his confessor, and I am
also what he calls his spiritual father and his mentor.  I do

not take credit for the good work that he has done in prison.
That is the work he has done, that God has done through him.

My honorable friend over my right shoulder mentions that
all faith leading to God starts with repentance.  I am reminded
in the scriptures that the scriptures say that our works without
deeds are dead.  Our faith without deeds are dead.  And what I
have seen my friend Paul do over the course as he has written to
me and shared his heart with me is that he has not been talk, he
has been action in doing.

And it is our plan and our prayer that if he were to come
home, that he would come work with me and help me and at my
church and in my counseling ministry to help these people who
have found themselves in legal peril.

I want you to know, Your Honor, as he has written me
copiously, we have heard that he has learned Greek.  He has not.
He's learned some words, but he needs some training.  My Ph.D.
is in theology.  I can help him with that.  He uses English
grammar with Greek words.  It doesn't really work.  But his
heart's in the right place.

But he has never demonstrated to me, Your Honor, and before
you -- and I have the utmost respect for you, sir -- any
bitterness or malice.  He has written me things that are hard to
read.  But it has never been anything adversarial to the Court
or to the prosecutors.  I know what happened.  He's told me.
He's told me as he understands it.

1      I want to help him with his PTSD.  I want to help him with

2  those things.  I think society would benefit from having him

3  amongst us, and he could come alongside of me and help folks get

4  to where they need to be, having been on the inside.

5      His heart has been one that has been softened.  I am from

6  west Texas, too, out in the middle of the Odessa area.  I'm

7  sorry to say -- I know where you went to school, but I went to

8  the one up in Lubbock.  And I am trying to talk a little faster

9  instead of showing my west Texas nature here, sir, and use

10  proper grammar.

11      But he and I are from the same part of the country and, in

12  fact, even the same town where I pastored for years.  That town

13  is Post, Texas.  No one has ever heard of it.

14          THE COURT:  I have.

15          PASTOR EAGAN:  I have sometimes wondered whether God

16  knew where Post was.  But that's where C.W. Post, the cereal,

17  came and planted his heaven on earth.  Paul may not know this,

18  but the people of Post remember him, and they know I am here.

19  There are folks all over the country, I have six congregations

20  in India that are praying for him and praying for you.

21      And Your Honor, I am asking you for mercy.  Leniency does

22  not do -- leniency does not work in my vocabulary, and this is

23  why:  I am asking you to do something that is not deserved.

24  Mercy cannot be mercy if it is deserved.  And I am asking you,

25  and I have been praying for you, that in these moments, the time

1    he has served, the good he has done, the good man he is -- and I

2    was so moved when you sentenced them.  I was here.  I saw it,

3    and I knew it was hard, and I admire you and honor you because

4    you have to do those things.

5         But mercy is a great attribute.  And I ask for mercy for

6    him.  I've asked the Lord so many times, Judge, that you would

7    grant him mercy.  I want to have a steak with him.  I want to

8    help him heal, because he has given.  He has given these five

9    years.

10        His daughter comes, and every time I see her, I get on my

11   knees, and she knows who I am.  It touches me in my own heart

12   that I can never be the one she really wants to hug.  And I know

13   Lilly.  She's a precocious little six year old and delightful.

14   My daughter is her nanny.

15        I ask for mercy for Paul, but then I ask for grace.  I ask

16   for grace for Lilly and Christin.  Mercy, as I understand it

17   from the book, mercy tells me that it's when you don't get what

18   you deserve.  Mercy is when you don't get what you deserve, and

19   grace is getting what you don't deserve.  And I ask for grace

20   for Lilly and for Christin and for our family, our community.

21        I have a pile of letters, Your Honor, addressed to you.  I

22   have so many things.  I have all of his e-mails.  I have

23   everything.  I have the letters he's written.  I have a book

24   that he's asked me to edit that I have in my bag.

25        His life is more valuable, and so mercy is what I ask you

1    for, Your Honor, for Paul.  Let him come home to us today.  And

2    I ask for grace that he may come home to his wife and his

3    daughter.

4        I thank you so much, Your Honor.

5            THE COURT:  Thank you very much.

6            MS. BAILEY:  The next speaker will be Paul Slough's

7    wife, Mrs. Christin Slough.

8            THE COURT:  Good morning.

9            MRS. SLOUGH:  I am a little nervous.  Bear with me.

10        I am the wife.  I am Christin.  I have wanted to speak with

11   you for years.  I am really grateful for the opportunity to do

12   that today.  Some of what I say will be, you know, the wife

13   stuff; right?  And then some of it is going to totally surprise

14   you.

15        One thing you might be surprised about is that we

16   celebrated our 15-year anniversary this last May.  And through

17   his service to the government and his incarceration, we have

18   been separated for more than half of our marriage that we have

19   not been able to live together.  And I have fought for this and

20   he has fought for this because he is worthy of fighting for.

21        So after the first sentencing five years ago when they were

22   leaving, you know, it was very heavy.  And Evan turned to the

23   guys, including Paul, and said, There is no way we are going to

24   walk away from this without changing, so we simply have to

25   choose whether we're changing for the better or for the worse.

1    THE COURT:  I read that last night.  That was very

2    interesting what he said and how you took it to heart.

3    MRS. SLOUGH:  How he had clarity in that moment.  You

4    know what I mean?  And Paul has chosen to go for the better,

5    which is astounding to me, because we have been married -- I

6    consider myself, like, the foremost expert on Paul after as long

7    as we've been together and as much time as we've spent together.

8    And when I look at this human being that I have been married to

9    for 15 years, he was this person every day of his life, and then

10    there's this 20 minutes on September 16, 2007, and then here he

11    is for the rest of his life.

12    And, like, tigers don't change their stripes.  So when I am

13    looking at the totality of all of this in juxtaposition of the

14    20 minutes, it is so hard to look at the situation that we are

15    in.

16    Paul has spent nearly every moment enriching his mind, his

17    body, and his spirit, and a lot of what I was going to say on

18    that has already been said.  So I will just skip to the good

19    stuff.

20    Until Paul left for D.C. to come here from Oklahoma, my

21    daughter and I were driving -- so we live in Corinth, Texas, and

22    we were driving three hours up, visiting for three hours, and

23    three hours back pretty much every single week.  As a matter of

24    fact, I had to choose a different schooling structure for her.

25    I home school her three days a week and run a business so that

1    we can make those visits and have her daddy day.

2         And you would think that a six year old would complain

3    about a nine-hour day, six hours in the car, three hours in a

4    visiting room, no toys, no nothing, but she doesn't, because she

5    looks forward to daddy day.  She climbs all over him and then

6    has him throw her up in the air.  It's my little break.  I'm

7    like, No, you can't climb on me, climb on dad for these three

8    hours a week.

9         And he makes it so special for her.  He had me send for

10   origami books so he could make little animals out of the paper

11   towels that are in there because it's the only thing we have to

12   play with her.  So he spent his time learning origami, and he

13   makes these little frogs that hop out of dollars.  It's the most

14   impactful thing I've seen.

15        When she took up ballet, he ordered all of these ballet

16   books, and we sent them to him.  He learned the positions.  He

17   did everything.  And then she quit after her first season

18   because she thought it was too boring.  And I guarantee you, to

19   this day, this man knows more about ballet than my daughter

20   does.  And it's just -- he does everything he can to make that

21   time special for her.

22        So that is the good part; right?  That's, like, the silver

23   lining to the tragedy of the separation from our family.  Being

24   a single parent is really hard.  Like, I'm exhausted most of the

25   time, and I made a commitment early on that Lilly would have the

life that we otherwise would have provided for her.  And both
Kelly and I, Dustin's wife, have worked so hard to give that to
our kids.  We scrape for the Disney trips.  We show up to all
the extracurriculars.  There is nothing that they are denied
because their fathers aren't there to contribute.

But I honestly, like, even in the big moments, the Disney
trips, of course, we miss him, but we miss him most for the
Saturday morning cartoons, for swimming, for the cooking we used
to do together.  I haven't had gravy in five years because I
don't know how to make it.  It's absolutely ridiculous.  You
would think I would have picked it up by now, but it just turns
into gum.  I don't know.

On a little bit heavier note, so just this past Tuesday,
the day before yesterday, I went to my grandmother's nursing
home to say my final good-byes to her, and I had missed her by a
few minutes.  Instead of getting to tell her that I loved her
and sing to her like I did to my grandfather before he passed, I
got to authorize the release of her body.  And if my husband had
been home, he would have been there with me, and it wouldn't
have been quite so difficult to do that.  Her funeral is this
coming Wednesday in Texas, and it is really hard to think of
going to another funeral without him.  I attended my
grandfather's without him, who he adored.  I attended Paul's
brother-in-law's and one of his best friend's without him, and I
attended his own mother's funeral without him.

1       And all of those things were very hard to do alone and to

2   stand for our family.  Nothing that I can say or do will ease

3   the pain felt by any of these families.  We don't suppose or

4   believe that our lives are more valuable than theirs by any

5   means.  At this point, you know, all we can say is that we are

6   so sorry for all of the grief and the loss that have resulted,

7   and we just pray that you see that the answer to this question

8   is not more grief and loss.

9       There are dozens of people, obviously, in the courtroom and

10  in an overflow courtroom that have flown across the country,

11  even after five years, even after his limited ability to even

12  communicate -- he gets 10 minutes on the phone a day, which he

13  always spends with Lilly and I -- limited number of people that

14  he can e-mail.  So he hasn't even got to communicate with most

15  of these people in that five-year period, and still, they left

16  work.  We are not people of means.  This is hard for us to do,

17  and we did it.  And a lot of us booked the original date for

18  August 14th.  Due to clerical concerns, it had to change.  We

19  lost thousands of dollars on travel expenses, and yet, we still

20  made it happen to be here because it is so important to us.  We

21  believe the world is better with him in it.

22      We understand, we respect the gravity of what has happened

23  here for everyone, and we just hope that we have come to a point

24  where after years of just compounding grief and sorrow that

25  compounds every single time we find ourselves back in these

halls, that we've at last arrived at a place of mercy where we can start taking steps away from more grief and more loss.

So thank you for your time.

THE COURT:  That was very impressive.  Thank you very much.

MRS. SLOUGH:  Thank you.  I appreciate that.  I am going to go barf now.

MS. BAILEY:  The final speaker for Mr. Slough will be his father, Mr. Ricky West.

THE COURT:  You even look Texan.

MR. WEST:  Thank you, sir.  I sound it, too.

Good morning, Your Honor.  Thanks for the opportunity to let me talk to you today about my son, Paul.

If you remember, I spoke to you at the last sentencing. And I'm not Paul's biological father.  He come to my wife and I when he was 13, went to work on my ranch.  Well, Paul was a lost child looking for a path.  He's found that path, and he's got his feet on him, and from the time he come to live with us, he's -- whether it be home, work, school, he gives 110 percent.

And I knew Paul and his family before he moved in with us. Paul got through high school.  It wasn't easy for him, but he did it, and he worked dang hard at it.  I talked him into joining the military because he's raised in a town with 300 people.  Well, you don't see what life is like with 300 people around.

1        So he joined the military and served his time honorably,

2   with distinction.  He got out with an honorable discharge.

3   Well, as Paul's character, he gave 110 percent there.  Since his

4   incarceration, he has done the same.  He gives 110 percent to

5   himself, to society.  It's all he can do, the same way he does

6   his wife and family.

7        You're not going to find a young man, very many, that has

8   had the life Paul's had and has such a good outlook and such a

9   strong faith.

10       I have worked in the prison community as a jailer, and it

11  is very seldom you find somebody that is sincere about their

12  faith in the correctional facilities.  All of them pick a bible

13  up.

14            THE COURT:  Oh, at sentencing, they always have it.

15            MR. WEST:  Yes, sir.  And that's the first thing they

16  ask for when they go to jail, but that's the first thing they

17  leave when they walk out the door.  Paul is not that man.

18            THE COURT:  I agree.  That's what all these letters

19  say to me.

20            MR. WEST:  Well, he's the man I hoped him to be, and

21  he hasn't let me down.  And I can tell you as his dad, there is

22  not a man in this courtroom that has a biological son that is

23  any more proud of than I am of that man right there.  And I'm

24  not his biological dad, but he can call me dad until the day I

25  die.

1          Thank you.

2               THE COURT:  Thank you.

3          Let's take a short recess, and then we will start with the

4     next defendant.  But I do have to, as you know, because the

5     Court has a special session at 12:00, but we will just take a

6     very short recess now and come back, and we will start on the

7     next defendant.

8          (Recess taken from 11:40 a.m. to 11:47 a.m.)

9               MR. SCHERTLER:  Judge, as you know, my name is David

10    Schertler.  I represent Dustin Heard.

11              THE COURT:  I might know that.

12              MR. SCHERTLER:  I have represented Mr. Heard now for

13    over 10 years.

14         I guess initially for the record, I would like to adopt a

15    number of the arguments that Mr. Heberlig made, especially with

16    regard to the legal arguments related to the government's

17    request for a packaging and a 10-year mandatory minimum.  Those

18    arguments apply with equal force to Mr. Heard as do

19    Mr. Heberlig's responses.

20         At this point you are probably about as knowledgeable about

21    this case as any case you have presided over, and I know you

22    have presided over quite a few over many years.  Also at this

23    point Dustin Heard has now served close to five years in a

24    federal prison.

25         You presided over his original sentencing in 2015.  I'm

sure you will remember.  We were in the ceremonial courtroom,
and there were hundreds of people that came from all over the
country in support of Mr. Heard and Mr. Slough and Mr. Liberty.
And I think you even expressed how remarkable that was in your
vast experience in these cases because you don't see that and
never see that in a case where you are sentencing defendants.

And I think what is amazing to me is that five years later,
five years after these men have been incarcerated, you basically
have the same group of hundreds of people in this courtroom, in
the overflow courtroom that are here to support and who have
hope for these three men.

On behalf of Dustin Heard, his entire family is here,
including his two children, Hannah, 14, Quinn, his son, nine
years old, his mother and father, his wife, brothers, cousins,
aunts, uncles, friends, friends of friends who are here to
support him.  And they have come from great distances to be
here.

Let me start by emphasizing what we all recognize and, I
think most importantly, what my client, Dustin Heard,
recognizes, and he said this to you back in 2015, but how sorry
and regretful he was for the loss of life and the wounding of
individuals that occurred in Nisur Square on September 16, 2007.
He, Dustin Heard, not me, not the other lawyers, recognize and
appreciate the loss of life and the traumatic effect on the
families that experienced the loss of life, that experienced

1    wounded relatives.  It's not something that Dustin Heard ever

2    wanted to happen, and I think that's clear from the evidence.

3           Today, using the guidance of the Circuit Court, as

4    Mr. Heberlig said, you must decide what punishment really is

5    appropriate for these three men, how much jail time do they

6    really need in this case, weighing all the factors, the factors

7    the government has pointed out and the factors that the defense

8    attorneys have and will continue to point out.

9           But today, you are not constrained by the 30-year mandatory

10   minimum that you, obviously, felt constrained by.  And I know

11   that a number of things were said in that sentencing hearing by

12   you.  This is just my reaction, but at the end, my reaction was

13   you came to a realization that these three men -- and this is

14   different from Nick Slatten.  But these three men were in a

15   wartime situation where they panicked and they overreacted.  And

16   while I know it's difficult to criticize the law that constrains

17   any federal judge, I felt that you were uncomfortable in having

18   to sentence those men to 30-year mandatory minimums, and you

19   sentenced them to 30 years and a day, which is the minimum that

20   you possibly could.  The D.C. Circuit has now said you're not

21   constrained by that.

22           THE COURT:  And I said enough to get a reversal.

23           MR. SCHERTLER:  That happens to all of us.

24           And for the reasons that have been articulated by

25   Mr. Heberlig, I also strongly agree that the 10-year mandatory

minimum does not apply.  I don't think that was addressed in any

of the post-sentencing proceedings on appeal.

THE COURT:  So it is a question of first impression,

but there is an impression from some of the language they gave

me.

MR. SCHERTLER:  I think the government latched on to

the fact that the Court of Appeals, in their opinion, was simply

focused on the 30 years and not the 10 years.  And I think it's

a weak argument on the part of the government to claim that a

10-year mandatory minimum now applies.  I think you may face the

same arguments on appeal if that were the case.

In its opinion, the D.C. Circuit emphasized that you must

view when you're sentencing each defendant -- I think the quote

was each defendant as an individual.  Of course, that makes

sense, and that's what you do all the time in your many other

cases.

So let me make five following points about Dustin Heard as

an individual and why we believe, using the Circuit's guidance

in its opinion, that a sentence of time served, which is what we

are asking for, is completely appropriate.  It's sufficient and

no more than is necessary to accomplish all of the goals of

sentencing that we espouse in Section 3553.

And you know, we talk in legal language on those things,

but I think a lot of it comes down to common sense, the common

sense that you have used in decades of experience as a federal

1  judge.

2      So first, the individualized circumstances of each

3  defendant's involvement in the offense at issue, Nisur Square,

4  September 16th, 2007.  At trial, any evidence -- the

5  government's conceded this, that any evidence as to the shooting

6  of Dustin Heard was minimal, at best.  And I think even the

7  government concedes that exclusively that evidence came from

8  Jeremy Ridgeway, who was their cooperating witness.

9      And as we emphasized in our memo -- I come to this -- when

10  we look at what we're thinking happened that day and what was

11  going on through the minds of these men as they felt they were

12  taking incoming fire and how they reacted to that and whether

13  they were excessive and whether they were reckless, there's a

14  piece of government evidence that relates to Mr. Heard

15  exclusively that, I think, is the most probative piece of

16  evidence that you should consider when you decide what sentence

17  to impose on Mr. Heard.

18      It was a government witness, Adam Frost.  I'm not sure if

19  you recall him from way back when in 2014.  He testified -- Adam

20  Frost was a government witness.  He was one of their biggest

21  government witnesses.

22          THE COURT:  He's the one that did the diary; right?

23          MR. SCHERTLER:  He did the diary, that's correct.

24      He testified that as they're driving out of Nisur Square,

25  he hears Dustin Heard -- and recall, Dustin Heard is the last

guy in the convoy.  He's the rear turret gunner in vehicle 4.
So he is the one that is looking back at what's happening.  And
he says, Dustin Heard says, We're still taking fire from the
rear.  Now, look, the government would say there was no incoming
fire, but Dustin Heard at that time perceives incoming fire from
the rear at them as they're pulling out.

Somebody on the radio says, Well, shoot back.  Dustin
Heard's response -- the government's evidence, Dustin Heard's
response is, I can't shoot back because --

THE COURT:  I agree, that was an important point for
your client.  I agree.  And he didn't shoot.

MR. SCHERTLER:  And he didn't shoot.  Not only did he
say, I can't shoot, and not only did he not shoot, but then what
he does is he throws down smoke bombs to conceal the convoy as
they're moving out, a rational, a reasonable, a logical decision
in the heat of what had occurred.

Now, I know the government claims that he fired at a
different point.  I know he would say that he fired when he felt
he was threatened by incoming fire.  But even when he's got
incoming fire that he perceives and he doesn't see a target to
shoot at, he says, I'm not shooting, and he doesn't shoot.

The government's also conceded that in -- with Mr. Heard
that, you know -- the whole sequence of events, they come into
the Circle.  Then there's a breakdown on one of the trucks.  So
they have to hook it up.  The government concedes that Mr. Heard

1    did not fire his weapon at any time while there was a hook-up to

2    get the third vehicle towed up.  The government concedes that he

3    did not fire at any point while they were exiting the traffic

4    circle.  And in fact, as you have just heard, he refused to fire

5    when he could not identify a target.  And the government

6    concedes that Mr. Heard did not fire as they were traveling

7    north out of the Circle when other people, notably Mr. Ridgeway,

8    continued to fire.

9        So when you look at his involvement, his involvement is --

10   I'm not sure that "minimal" is the right word, but greatly --

11            THE COURT:  Not in the Circle.  It wasn't minimal when

12   he was in the Circle.

13            MR. SCHERTLER:  It was minimal.  There's really --

14   there's not a lot of evidence about him firing that day.  It

15   comes from Ridgeway, and I accede that, and I accede that the

16   jury probably credited Mr. Ridgeway's testimony in that regard.

17       But here is a man who at the same time the government is

18   claiming he was excessive does show tremendous restraint in

19   terms of how he reacts.

20       Second point with respect to Dustin, there was never any

21   evidence of animus toward Iraqis or any prior misconduct by

22   Mr. Heard at all.  And I think you heard, particularly with

23   maybe Mr. Slatten, evidence of that ilk.  Mr. Heard, no evidence

24   that he ever said anything disrespectfully towards Iraqis, never

25   conducted himself dishonorably at any other point.  He never

discharged his weapon irresponsibly in any other situation.

And I do appreciate the fact that you have read these memos carefully and you are able to recall certain things.  You read the ample letters also like Mr. Slough in support of Mr. Heard that talk about his character, that talk about his honesty, that talk about integrity, that talk about him being a good, strong man.  And frankly, I am amazed that after five years, especially somebody who is isolated in prison, you are getting so many letters on behalf of all these men still in support of them.

THE COURT:  Well, it was impressive at the time of the original sentencing, but it's really impressive now that five years have gone by and they have done well.  All three of them have done well.

MR. SCHERTLER:  I completely agree.

THE COURT:  And it does show something about their character.  I agree.

MR. SCHERTLER:  It shows a tremendous amount about their character.

You have been doing this longer than I have, but I have been doing it a long time now as well.  You get a lot of letters.

THE COURT:  Not like this.

MR. SCHERTLER:  One of the letters that stood out -- you just mentioned about how not only did you hear back then about how these were men of character and integrity and honesty

who might have made a mistake on this one particular day for 10

or 20 minutes of their lives, but now you are five years later,

and you've got another dimension of their lives to examine them

by.

You heard about Mr. Slough and all of the great things and

tremendous things he has done while he is in prison.  You've

seen the same thing on behalf of Dustin Heard, all of the

programs that he has been involved in, all of the courses he's

took.  We had some pictures of the bags that he had been making

while in these prison vocational classes.

But I think what stands out most is this quite unusual

letter from a fellow named Gregory Winston, who is in prison

with Mr. Heard.  When I read it, part of me was laughing a

little bit, but here's a guy who says -- he never knew Dustin

Heard before, never heard of Blackwater.  He met him in prison,

and he says -- first of all, he acknowledges he's a criminal,

hard, stone-cold criminal.

THE COURT:  I liked his opening.

MR. SCHERTLER:  I think he said, "Let me level with

you, Judge."  But he says, "I will go a little deeper.  The day

he arrived, word came to me a white guy had got here from

Tennessee and he may have trouble with the Muslim religion sect.

So I come to Heard, and he tells me his story.  It's this reason

that I write.  I tell Heard I've got his back, that if the

Muslims step to him, we will" have the situation -- "we will

handle the situation."

And Heard says this:  I do not have a fight with the Muslims, and what happened that day, they are not my enemies. Confused, Mr. Winston asked Mr. Heard, Well, who are your enemies?  And he says, I have no enemies, no one is my enemy.

This is a man who has now been in jail, who has recognized the dynamics of what happens in jail, just like Mr. Winston is well accustomed to, and he doesn't succumb to it.  That's not him.  That's not his character.

He goes on to say at the very end, very honest for a prisoner, right, "I do not expect for anyone to trust I am being honest or that this letter may even do any good for Dustin, but this is the man I have come to know behind razor-wire fences where no one else can see, where convicts brag of past crimes that boost the ego, where the strong survive on the rules of evil that breed hate among races, but this guy, Dustin Heard, still has the loyalty for justice no one else on this side of the fence has, not even me."

When you put somebody under that test, under those conditions, that's when you see -- I think you and I can agree, that's when you see the true man.  And I think what Mr. Winston's letter describes is the true man you see in Dustin.  He is not going to be affected by those circumstances, no matter how horrible they are.  He is going to remain true. He told Mr. Winston that if he had to fight for his country

1   today, he would gladly do it.

2       Third, and this segues into this, but jail has to be one of

3   the most miserable experiences one can imagine.  We sit here and

4   sentence people.  I'm not sure that any of us, hopefully, have

5   ever spent a day in jail or really know what it's like.  But in

6   five years of incarceration, he has shown his true character

7   through the evidence that we provided, the programs, the

8   letters, exemplary inmate, what a guy like Winston says about

9   him.

10      He's taken advantage of these programs to improve himself.

11  Our memorandum includes all the certificates and all the reports

12  he has acquired while in prison.  And most importantly, despite

13  the adversity of being in prison, despite being away from his

14  family, he has maintained a strong and loving relationship with

15  his family and, in particular, with his two children,

16  14-year-old Hannah, who will speak to you, and his nine-year-old

17  son, Quinn.  He has continued to be a father to them over the

18  five years of separation.

19      Judge, I am going to go back to something Mr. Heberlig

20  said.  I heard your remarks, and I completely appreciate where

21  you are coming from.  The D.C. Circuit, obviously, discussed --

22  and isn't this the whole origin of the guidelines and what we

23  are trying to do in the guidelines?  But they discuss the need

24  to consider unwarranted --

25          THE COURT:  Actually, let's do that when we come back.

We will go ahead and take our recess now.  I regret having to do
that, but the full court is meeting.  So we will come back at
2:00.

(Recess taken from 12:03 p.m. to 2:08 p.m.)

(Call to order of the court.)

MR. SCHERTLER:  May I approach, Your Honor?

THE COURT:  Yes.

(Defendants entered courtroom.)

THE COURTROOM DEPUTY:  Your Honor, we are back on the
record in Criminal Case 08-360, United States of America versus
Paul Alvin Slough, Evan Shawn Liberty, and Dustin Laurent Heard.

THE COURT:  All right.  Mr. Schertler, sorry for the
interruption.

MR. SCHERTLER:  Not at all, Your Honor.

Just to quickly recap, I was going over five factors that
we are asking the Court to consider with respect to the
sentencing decision on Dustin Heard.

First, we talked about his involvement or the individual
circumstances of his involvement in this particular offense.  I
went through that with the Court.

Second, we also talked about his character, in particular
that he never said anything disrespectfully toward Iraqis, never
conducted himself dishonorably or discharged his weapon in any
irresponsible way before that.  And you have a plethora of
letters that attest to his character, both before and after this

1  incident.

2      Third, we talked about the rehabilitation, the progress

3  that he has made in the five years he's been incarcerated, the

4  many courses that he has been involved in, the many programs

5  that he has successfully completed, in addition to showing

6  himself to be an exemplary inmate and one who has -- one who has

7  avoided the issues and the problems that most inmates encounter

8  in jail, another testament to his character.

9      Judge, the fourth -- where I was about to start when we

10  broke for lunch, the fourth consideration I would ask the Court

11  to take into account is, obviously, the D.C. Circuit discussed

12  in its opinion the need for the Court to consider unwarranted

13  disparities in sentencing for people who commit similar

14  offenses.  You know, this is just common sense, and I think it

15  is a part of the underpinnings actually of the guidelines that

16  were instituted back in the 1980s.

17      With this case, I think Mr. Martin alluded to the fact that

18  in its opinion the D.C. Circuit cited to the *Drotleff* case as

19  being the closest case that it could come up with in locating a

20  similar situation, and it was pointed out that the defendants in

21  that case were two Department of Defense contractors.  They,

22  likewise, were convicted of voluntary manslaughter, sentenced to

23  30 and 37 months respectively for those crimes.  Now, the

24  Court -- I will acknowledge, the Court also agreed there were

25  limitations to that comparison or analogy.

1    In your discussion with Mr. Heberlig, the case of Nicholas

2    Slatten came up.  Obviously, Nicholas Slatten was involved in a

3    different way in this incident.  But as Mr. Heberlig pointed

4    out, Mr. Slatten was charged with and convicted of first-degree

5    murder.  That makes his case completely different for comparison

6    purposes with what our clients have been charged with, which is

7    involuntary manslaughter, not acting in a premeditated or

8    deliberative way as Mr. Slatten was found guilty of but acting

9    excessively and under the circumstances that they faced.  The

10   intent that's at issue here is completely different.

11   Judge, I know the prosecutors have had a lot of experience.

12   We all grew up in Superior Court doing homicide cases.  I did

13   homicide cases for almost 10 years in that office.  First-degree

14   murder was either a mandatory 30 years, or if there were

15   extenuating circumstances, you get life in prison.  We charged

16   so many other cases that were either second-degree or voluntary

17   manslaughter for the same reasons.  And the sentences in those

18   cases rarely, if ever, came anywhere close to that 30-year

19   mandatory minimum.  And in fact, in some cases, depending on the

20   circumstances, in a manslaughter case, a defendant could get

21   probation.

22   So I don't see that Nicholas Slatten's case and the fact

23   that the Court was required to impose a life sentence dictates,

24   gives the Court any guidance for what it should do with respect

25   to these defendants.

1       And at the -- I understood the Court's comments about

2   Ridgeway.  But when you look at comparable conduct, the most

3   comparable conduct we have to look at is Jeremy Ridgeway.  And I

4   think there's no dispute from the government's evidence that

5   Jeremy Ridgeway, by his own accounts, accounted for far more

6   shooting at all stages of this encounter than any of the three

7   defendants that you are about to sentence today.  I do -- his

8   conduct was more egregious, certainly far more egregious than

9   anything Mr. Heard did.

10      And Judge, we all understand and the Court clearly

11  understood this, when you cooperate, when you come forward and

12  you provide that kind of assistance to the U.S. government in

13  pursuing other defendants in other cases, you get cooperation.

14  You get leniency in your sentence.  Mr. Ridgeway was sentenced

15  to one year and one day.  And we're not -- we don't take any

16  issue with the appropriateness of that sentence by the Court,

17  and we understand the Court's reasons for doing it.

18      But then when you look at in comparison -- obviously, you

19  get the cooperation credit, and then the question is, what's

20  reasonable cooperation credit.  And I think in my experience,

21  you know -- and it depends on what U.S. Attorney's Office you

22  are with.  You go to Maryland, and they say well, you only get

23  60 percent of what the other people get.  Other U.S. Attorney's

24  Offices seem to have point systems where you get so many points

25  off your guidelines, and you will be sentenced under those

1   guidelines.  It just varies tremendously.

2        But in a case like -- in the typical cases that I have seen

3   where the cooperation is extraordinary and it's very important,

4   something like a 20 or 25 percent sentence based upon what the

5   other defendants are getting has always been considered an

6   extremely lenient consideration.

7        And if we look at this case, if we looked at that 20 to 25

8   percent figure -- and again, this is coming from my experience.

9   I don't have statistics on this.  But if Mr. Ridgeway got a

10  year, then these defendants, if it was 20 percent, that would be

11  five years for these defendants.

12       And I do think -- and that may not be a precise calculation

13  that the Court would ever rely on or employ.  But I do think

14  that when you consider what sentence these defendants get, you

15  need to look a lot closer at Jeremy Ridgeway and where he was,

16  understanding his credit for the cooperation, when you decide

17  what sentence these gentlemen should get and not at all look at

18  the life sentence that was given to Nick Slatten, because that's

19  a completely different charge, a completely different case.

20       And I just think it goes to really, when we come down to

21  sentencing, this comes to the most fundamental notions of

22  fairness in sentencing.  If Jeremy got one year, how much more

23  should these gentlemen get?  What really is fair?  Obviously,

24  that's a decision that I leave to the Court, but I would ask you

25  to consider the sentence that Jeremy Ridgeway obtained and what

1    the government had even asked for.

2         THE COURT:  I don't recall, actually, what they did

3    ask for.  I'm not sure they didn't ask for more than a year.  I

4    recall I gave a year, but --

5         MR. SCHERTLER:  I can't recall off the top of my head

6    either, Your Honor.

7         THE COURT:  I'll ask them.

8         MR. SCHERTLER:  And then finally your Honor, my fifth

9    factor, under seal we submitted medical information related to

10   Mr. Heard.

11        THE COURT:  I read it.

12        MR. SCHERTLER:  And we did that -- and I won't go into

13   the details of that, but we did it because the Court of Appeals

14   in its decision specifically covered that and said that that

15   could be a factor that the Court would consider.

16   Judge, coming to a close, the five factors that I have

17   tried to explain and articulate to the Court are all, in our

18   view, classic, compelling, and viable bases on which to justify

19   a substantial downward departure from the guidelines that you

20   have already established in this case.  We all agree they are

21   151 to 188 months.  We would ask that you impose a downward

22   variance from those guidelines with respect to Mr. Heard.

23   And specifically, we believe that five years for Dustin

24   Heard in this case is enough.  It's sufficient.  It's more than

25   necessary for him or what other objectives we might have in the

goals of sentencing.  And on his behalf, we would respectfully
ask you to sentence him to a sentence of time served.

Judge, we do have three persons that we would like to make
very short statements about Mr. Heard.  I would like to begin
with his father, Stacey Heard.

THE COURT:  Good afternoon, Mr. Heard.

MR. STACEY HEARD:  Good afternoon, sir.  My name is
Stacey Heard.  I'm from Texas also.

THE COURT:  Always nice to have another Texan here.

MR. STACEY HEARD:  I'm about like a duck out of water
in this area up here, too.

First, I would like to thank my son and these men for their
service that they did for our country, and I apologize for
however it's turned out.  It's not what we all thought we was
doing.

But thank you, Honorable Judge Lamberth, for the
opportunity to speak to you and these men.

I have to say, Dustin's sentence did not start at his
incarceration.  It actually started when he first enlisted to
the United States Marine Corps.  While Dustin was protecting our
country, his children were growing up basically without him
while he was serving our country.  Then he went into Blackwater
and spent another three years in there.  So he was basically
away from home.  And now you can say he's basically serving his
country from behind bars.

1      All the while, his children are still growing.  They're

2  getting -- they're just growing up basically without a daddy.

3  Kids need their father.  They need a father figure in the house.

4  They need him to be able to live the life that Dustin fought so

5  valiantly for.

6      We cannot buy time.  We cannot go back in time and change

7  things.  But we can plan for a better future, a future where a

8  father can hold and love his children.

9      All of Dustin's grandparents, except for one, have passed

10  away while he's either serving in the Marine Corps or in the

11  United States -- or Blackwater, and while he's been

12  incarcerated, he's lost his granny.  He's got one grandmother

13  left, and that is my mother, and she's 79 years old.  And I

14  would love for her to be able to see my son, not behind bars but

15  out in the real world with everybody else.

16      So if you would, please, sir, would you please consider

17  time served.  Thank you.

18          THE COURT:  Thank you, Mr. Heard.

19          MR. SCHERTLER:  Your Honor, I would like to call up

20  Dustin's daughter, Hannah, Hannah Heard.

21          MS. HANNAH HEARD:  Hello.

22          THE COURT:  Good afternoon.

23          MS. HANNAH HEARD:  If you wouldn't mind, I would like

24  to say this to you as if I was saying it to my dad.

25      I love you, Daddy.  You have always made me laugh any time

we are together.  I've always looked up to you, and you are so

openly caring of me and Quinn.  You are also so extremely brave,

and I need help always, and I always know that I can ask you for

help any time that I need to talk to you about something, and

you will help me fix it.  Above all, I have never questioned

your love for me and Quinn.

I have had some wonderful times with you, Daddy.  Every day

when you took me to preschool, we practiced memorizing phone

numbers and spelling.  Besides that, helping me in school, the

patience you showed me doing this is one of my greatest

memories.  When you would play Legos with me and Quinn and watch

movies with us, things that seemed so small to some made me so

happy.  And I miss it.

I still remember on my ninth birthday, my last birthday

with you, you took us fishing and then drove us to a lakeside

restaurant where we all ate and just had a great time together.

We would go swimming and just be with each other, and that made

me so happy.  I loved it when you rough-housed with me as that

was something only you did with me.

Even in prison, you've created some of my greatest

memories.  One is when you hugged me so tight after not seeing

me for over a year, and just that feeling made me so happy

inside, and I can never forget that feeling.  Others involve

when we were hanging out in the little family room in the

Memphis prison playing checkers or some made-up games with the

few supplies that they had in there.

Just since you have been traveling to D.C., you are able to video call me, and I got to show you what my new room looks like.  My brother got to show you things he made out of Legos, and I got to work on homework while talking with you.  I thought it was amazing because it was like you were there in person again.

But I have also experienced so much without you, too.  One was my first formal.  I wish you could have been there to give me a hard time for getting dressed up.  When I was in sixth and seventh grade and now this year, I have been on the cheer squad and the unicyling team, I wish you could have been in the bleachers cheering me on.  I went from intermediate school to middle school to high school while you've been in, and although they've been pretty good years of my life, it's been hard not having you around.

I've grown so involved with my church, and I have loved all the family events that we do, but it is hard when all my other friends' dads are there and you're not.  And all I can do is picture you there with that supportive smile that you always give me.

Since I'm getting older, I have more experiences I would like to share with you.  I want you to help me through my first major breakup, even though you say that won't be until I'm 45.  I want you to playfully scare my prom date, and when I turn 16,

1    I want you to be there to celebrate with me.  And most of all, I

2    would like you to be there for my high school graduation.

3        I miss you so much, and I love you, Daddy, and I pray every

4    day that you can come home and do regular things with me again.

5        Thank you.

6             THE COURT:  Thank you very much.

7             MR. SCHERTLER:  Your Honor, finally, a close friend of

8    Mr. Heard, Billy Ross.

9             MR. ROSS:  Your Honor, I was here during the last

10   sentencing, and up front, I would like to thank you for allowing

11   me to speak on behalf of my friend, Dustin Heard, and for the

12   men of Raven 23.

13       And with that, I also appreciate your service to this

14   country as well, as I understand that you served in Vietnam as a

15   JAG with the United States Army.  So thank you for that.

16       With that, by way of background, I have given just under 20

17   years of service to this great nation thus far, and I am still

18   young.  So I am going to be around for a while.  So I have

19   served as a federal agent, as a high-threat protections

20   contractor for Blackwater, and also as a United States Marine

21   wherein I'm now a master sergeant.  And I've served here on the

22   American home front and also overseas.  Ultimately, I've

23   dedicated my entire adult life to serving something much greater

24   than myself, our great nation.

25       And with that, Your Honor, I would argue that each one of

these men, including Dustin, possesses a very similar mind-set and a very similar story.

George Orwell once noted, people sleep peacefully in their beds at night because rough men stand ready on their behalf. President Ronald Reagan once quoted, some people live an entire lifetime and wonder if they have ever made a difference in the world, but Marines don't have that problem.  And as I understand it, it was President Reagan that did appoint you, sir, to the bench.

And finally, G. K. Chesterton once spoke, the true soldier fights not because he hates what is in front of him, because he loves what is behind him.

Your Honor, you see, each one of us has stepped up and answered the call of duty, and we all share the brotherhood of having served in combat together.  And in my opinion, there is no greater glory, no greater honor.

And I would like to touch on for just a minute having served within the federal government, also as a contractor for Blackwater, and within the United States military, that my service as a contractor parallels that of everything else I've done as a federal agent and also a Marine.  And during my time as a contractor, I was attacked more than when I was overseas with the Marine Corps.  I was blown up multiple times, shot at. I lost two of my best friends, watched them die right in front of me.

1    And so I guess the point I'm getting at is I think there's

2    often the disconnect between the contracting realm and then that

3    of people who serve in the military as well.  And these fine

4    gentlemen have a combination thereof.

5    So in regards to Dustin and our history, I stood beside him

6    when as young men we checked into First FAST Company together

7    and provided protection and security of nuclear-powered war

8    ships on the American home front.  I stood beside him when our

9    beloved towers fell on September 11th and as we geared up to

10   defend this great nation.  I stood beside him when he married

11   the love of his life, Kelli, before an overseas combat

12   deployment.  I stood beside him as we assisted in initiating

13   Operation Iraqi Freedom off the coast with Naval Special Warfare

14   in Iraq.  I stood beside him also in the volatile mountains of

15   Afghanistan in combat operations there.  I then stood beside him

16   once again in Iraq while protecting high-level diplomats for the

17   Department of State.  I stood beside him during his last

18   sentencing and have stood beside him while trying to keep it

19   together during visits at the federal correction facility in

20   Memphis.

21   Overall, throughout our friendship, I have always known

22   Dustin to be a man of utmost integrity, one who possesses strong

23   world character and steadfast resolve.

24   Your Honor, with a humble heart, I merely stand here today

25   asking for leniency and also -- for Dustin and for the men of

Raven 23.  Unsurprisingly, since the last sentencing, much has changed, not only in the lives of these men but also in the lives of their families.  Consequently, these men have been stripped of nearly everything they've spent their entire lives trying to establish:  Their honor, their integrity, and their overarching sense of duty to country and family.  All the while, these men have sat helplessly in prison as their marriages have been challenged to the utmost and significantly strained. They've sat helplessly in prison while their families' names have been slandered and while their children have been bullied and picked on in school because of this ongoing nightmare.  And ultimately, they have sat helplessly in federal prison for having done what they believe they had to do to protect not only themselves but their brothers in arms and also the dignitaries which they were ordered to protect.

Therefore, Your Honor, I'm pleading with you, on behalf of myself, family, friends, show leniency to Dustin and the men of Raven 23 the way God has shown great mercy to each and every one of us in this courtroom.

Thank you.

THE COURT:  Thank you.

MR. SCHERTLER:  Thank you, Your Honor.  That concludes our presentation for Mr. Heard.

THE COURT:  Thank you very much, Mr. Schertler.

Okay, Mr. Coffield.

1          MR. COFFIELD:  Your Honor, may it please the Court.

2      Your Honor, here we are again.  I get to go last and after

3 lunch.  Everybody is tired.  The courtroom is warm.

4          THE COURT:  I've got a fan under here, though.

5          MR. COFFIELD:  Don't let me up there.

6      As Your Honor knows, I'm not going to come up and repeat

7 what counsel has said.

8          THE COURT:  I always appreciate that about you.

9          MR. COFFIELD:  Thank you, Your Honor.  And I would ask

10 that the Court allow me to adopt the arguments made both by

11 Mr. Heberlig and Mr. Schertler.

12     Your Honor, with that in mind, I am going to let the people

13 who are up here to speak for Evan come and speak, and then I

14 will say something.  As is my usual practice, if they say

15 something that I don't need to address, I'm not going to address

16 it again.

17     The first person I would like to invite up is Brad Stanton,

18 who is Evan's cousin.

19          MR. STANTON:  Good afternoon, Your Honor.

20          THE COURT:  Good afternoon.

21          MR. STANTON:  My name is Brad Stanton.  I've never had

22 the opportunity to address a court from this perspective.  I'm

23 used to standing at that table there advocating for clients,

24 irrespective of my personal feelings or my personal beliefs.

25 But Judge, my personal feelings are very much involved in these

1    cases.  Evan Liberty is my cousin.

2         As an advocate in an adversarial system, I regularly get to

3    disagree.  We have the luxury of working in a civilized society.

4    Our system of justice is one of the greatest in the world, but

5    it's not necessarily infallible.  Our system's in place because

6    of men like this that are willing to risk their lives to protect

7    that system.  There's no doubt that this case is representative

8    of tragedy.  The loss of innocent life in all respects is

9    terrible.  But to compound that tragedy by imposing long

10   incarcerated sentences on these men does not achieve any

11   rational purpose.

12        My cousin and I grew up together in New England.  We spent

13   our childhood in the White Mountains in New Hampshire, the Maine

14   wilderness.  Our grandfather was our mentor.  He was a veteran

15   and actively involved in public service as a New Hampshire Fish

16   and Game commissioner for 24 years.  He taught us many things,

17   but most importantly, he instilled a sense of hard work,

18   dedication, and respect for others.

19        As long as I can remember, I have admired my cousin for his

20   strength and his compassion.  Our grandfather passed away last

21   spring while my cousin was incarcerated.  He didn't get a chance

22   to say good-bye.  He's missed weddings.  He's missed funerals,

23   family gatherings.

24        Evan is a man of honor, integrity, and respect for his

25   country.  His strength throughout this process has kept our

1    family together.  He is greatly loved and missed.

2         As Your Honor is well aware, the appeals court recognized

3    four societal justifications for sentencing:  Incapacitation,

4    rehabilitation, retribution, and deterrence.  The court

5    ultimately concluded that these sentences cannot be justified

6    under any of our society's penological goals and that this Court

7    should instead use more nuanced tools to impose sentences

8    proportionally tailored to the culpability of each defendant.

9         Judge, I ask that you impose a sentence that allows Evan

10   and these other men to come home today.  Five years is long

11   enough for men that have dedicated their lives to serve our

12   country.

13        Thank you.

14            THE COURT:  Thank you.

15            MR. COFFIELD:  Your Honor, Chris Buslovich spoke at

16   the original sentencing.  He's going to come up here today and

17   speak with his wife, Rebecca.

18            THE COURT:  Okay.  Good afternoon.

19            MR. BUSLOVICH:  Good afternoon, Your Honor.  My name

20   is Chris Buslovich, a life-long friend and Marine Corps brother

21   to Evan.

22        I had the pleasure of sharing some of Evan's character with

23   you five years ago.  Since then, my respect and admiration has

24   only grown.

25        Over the past 12 years, I had a front seat to Evan's life.

While it's been full of sadness, trials, and disappointment, there's one thing that's remained, that one thing I hope I can instill in my children, Christopher, Evan, and Wyatt, who are here today.  It is one thing that I will try to emulate the rest of my life.  That one think is the positive attitude that Evan has carried with him through all of this.

Evan has stood steadfast beyond reproach in the absolute worst of situations.  Evan is the one who has kept it together for us and for his family.

Liberty is defined as the state of being free within a society from oppressive restrictions imposed by authority on one's way of life.  Ironically, for the last 19 years, Evan's entire adult life has been one without liberty.

More specifically, the last 12 years, I have watched Evan's life been put on hold.  As you will hear and have heard today, Evan has continuously attempted to serve selflessly.  Your Honor, 12 years of Evan's life has already been taken.  Arguably, the best years of adult life are gone.  He has missed countless birthdays and holidays.  Evan will likely never have a career he wanted.  Your Honor, Evan's punishment is far from over when he's free from prison.  He will forever be marked as a convicted felon.  He will be unemployable by most companies' standards.

With this, there's no doubt in my mind that he will find a way to selflessly serve others when given a chance.  A man with

such desire to serve should not remain incarcerated.  He still
has time to raise a family, and I can think of no better person
suited to raise children than Evan, and I ask that you give that
chance, Your Honor.

MS. BUSLOVICH:  I want to thank you for the
opportunity to speak on behalf of my friend, Evan Liberty.

I questioned whether or not what I could share about Evan
was worth standing before you today among all of these other
people here.  But it struck me that if not now, when would be a
more perfect opportunity to give back to Evan even just a bit of
what he has given me.

I've had the distinct pleasure of knowing Evan for about 15
years through my husband, Chris.  In just those 15 years, Evan
has managed to be there for some of the most important and
vulnerable days of my life.  Shortly after our first son
Christopher was born, Evan was there visiting with us late into
the night.  Two years later, on the day our son, Evan, was born,
Evan was there in the hospital when not even my own mother was
present.

But perhaps more impressionable than either of these two
events was the day I had to move my mother's belongings from her
home.  To many, this may seem like a mundane, typical friend
helping friend day, but this was anything other than ordinary to
me.  My mother, who is severely mentally ill, had been living in
a mental health hospital for over a year and was not going to be

1    returning to her home.  As her guardian, it was my

2    responsibility to sell and empty her house.

3         In my lifetime, only a handful of friends have ever met my

4    mom, never mind been in her home.  Her home was filthy.  The

5    walls were covered in tar literally dripping from the ceiling.

6    Cigarette burns covered the sofa and rugs.  Food stashed away

7    was full of insects, and mice had made homes of her closet.

8    Mouse droppings littered nearly every surface.

9         Very, very reluctantly, I allowed Chris to bring Evan to

10   help us.  I was mortified and embarrassed.  It felt like having

11   the ugliest, most raw part of myself on display, vulnerable to

12   anyone's bulging eyes or scoffing voice.

13        But not Evan.  He was just there.  Without a flinch, he

14   moved through that house, every moment sparing my vulnerability.

15   Never once did I see him think twice.  Like every other moment,

16   he was there.

17        And so it's my chance, and that's why I'm here.  I'm here

18   to say that Evan Liberty is not a man deserving of imprisonment.

19   Already, he has lost precious years of his life.  He's a man

20   loved by so many, his mom and dad, his brother, his

21   sister-in-law, his niece and nephews, countless aunts, uncles,

22   and cousins and his friends.  He needs to be there for them.  We

23   need him to be there like he has always been for us.

24        Thank you.

25             THE COURT:  Thank you.

1           MR. COFFIELD:  Your Honor, the last person from -- to

2    speak on Evan's behalf is Aaron.  Your Honor may remember that

3    the last sentencing was on April the 13th, 2015.  Aaron was

4    planning on being here, but his wife went into labor, and Evan

5    insisted he stay there with his wife, Katie.  That's why he

6    wasn't here at the last sentencing, but he is here today.

7           THE COURT:  Who was born that day?

8           MR. AARON LIBERTY:  What's that?

9           THE COURT:  Who was born that day?

10          MR. AARON LIBERTY:  My daughter was born that day.  My

11   wife couldn't get me out of this today.

12          My name is Aaron Liberty.  I am Evan Liberty's older

13   brother.

14          Evan and I have always been close.  As kids, we were

15   inseparable.  We did what kids do in growing up in New

16   Hampshire.  We hiked, fished, and spent a great deal of time

17   just exploring the outdoors with our parents, grandfather, and

18   cousins.  We also dedicated plenty of time to our legendary

19   one-on-one basketball battles in our parents' driveway.

20          I often think back to those childhood days as some of the

21   best in my life, and I know that Evan would agree.  Only as an

22   adult did I realize how lucky Evan and I were to be surrounded

23   by so many positive role models and people that loved us and

24   supported us along the way.  Looking back on it, we had the type

25   of childhood that I hope my wife and I can provide for our two

children.

Although I was the older sibling by three years, I always looked up to Evan because he possessed many skills and personality traits that I did not. For example, I can recall being envious of how gifted an athlete he was when I would simply --

THE COURT: Slow down a little bit.

MR. AARON LIBERTY: I'm sorry. When I would simply struggle to put one foot in front of the other. He would win road races and break town records, some of which I think still stand today, while I could do no better than participant ribbons. From an early age, he had a never-quit attitude and a mental toughness about him that I admired. I can never recall him ever saying I can't do this or I quit because that was simply not his mind-set. I also remember how independent and self-sufficient he seemed to be, even at a young age. He always had self-confidence and hated relying on or inconveniencing others.

In our late teens, Evan and I went our separate ways. I opted for the safe, traditional route and left for college, grad school, and a 9-to-5 federal job here in D.C. Meanwhile, Evan enlisted in the Marine Corps at 17 and eventually signed on with Blackwater. For many years, we would only see each other occasionally, typically around the holidays. I always looked forward to seeing him and catching up. When our visits

concluded, I would also fret about his safety in the back of my mind.  I would wonder if that was the last time I would get to see him.  I knew that his line of work was dangerous and that too many young men and women had lost their lives in Iraq up to that point.  He had told me horrific stories of what he had seen and the means by which some of his friends and colleagues had been killed while serving in Iraq.  I prayed Evan wouldn't become a casualty of the war and that some day he would opt for a different career path before it was too late.  But I knew Evan all too well and that this was never his plan.

The fall of 2007 was stressful for Evan and my family as the press of this incident began and the investigation unfolded over the course of several months.  The one positive from that period was being able to reconnect with Evan after so many years apart.  While the stress in our family continued for years, the trial in 2014 brought Evan and I even closer.  Each Friday, he would take the commuter train to my house, and he would spend the weekend with my wife and I and our two-year-old son. Despite the dark cloud hanging overhead, we spent our weekends reminiscing and cooking and trying to unwind from the prior week's events.  But most importantly, he had an opportunity to bond with my son.  Evan was so good with him.  I loved watching their interactions, and my son immediately became attached to him.  To this day, my son still remembers the summer Evan stayed with us.

Thankfully, my now six-year-old son and four-year-old daughter have yet to connect the dots of where we are when we visit their uncle in prison.  I have long dreaded that conversation with my kids, but I know an explanation will soon be necessary.  My plan is to describe to them the brother that I grew up with and the person that I know today and let each come to their own conclusion that he is a good person and someone to be admired.

Evan has always been an ethical person with a spotless record.  Growing up, he was never in trouble for any reason.  As far as I know, he has never even received a speeding ticket.  As an adult, he lived a cleaner life than most of us, including myself.  He wouldn't touch anything with sugar in it.  I have never once seen him drink a beer in his 37 years.  He once told me that he chose not to drink because he always wanted to be in control of his actions, and he feared drinking may cloud his judgment.  This is a perfect example of how the reality of who Evan is as a person is so at odds with the reasons why I am having to address the Court today.

To further prove my point, Evan has been a model inmate for the entirety of his nearly five years in federal custody.  There have been times when I know he has been treated unfairly and has suffered greatly as a result of his incarceration.  Not once has he lashed out or caused any trouble at any of the facilities he has been confined to.

I don't know much about the sentencing process or the typical relationship between prison staff and inmates, but I can't imagine an inmate receiving letters of support from COs at a federal prison is commonplace.  However, I know several such letters have been submitted on Evan's behalf.  Those letters alone should speak volumes to his character.

All Evan ever wanted out of life was to serve.  When his country needed him, he stepped up.  He was going to give it all to die for his country.  He asked for nothing in return.  We mustn't forget that he volunteered to go to Iraq.  Nobody forced him to go.  He volunteered to do a job that most of us couldn't do or wouldn't want to do.  He volunteered because he thought it was the right thing to do.  I have no doubt that he would reenlist today if given the opportunity and the circumstances were different.

For years, he dreamed of using his experience with the Marine Corps and Blackwater to some day get the opportunity to become a Navy Seal.  As soon as the charges against Evan were dismissed in December of 2009, he visited a Navy recruiting office and discussed his options for reenlisting with the military.  After all he had been through up to that point, he was going to continue serving.  That, to me, is an incredible gesture, and I don't think many others in his shoes would have done the same.

However, with every passing year that his case was tied up

in the courts, he realized his window of opportunity was closing

and his dreams would never be fulfilled.  I truly believe that

the United States was the real loser here because it lost out on

a great Navy Seal in Evan.

Reflecting on the past 12 years of Evan's life brings back

a flood of emotions.  There were periods when I was so very

angry.  There were other times when I was filled with an

overwhelming sadness and a feeling of despair and helplessness.

And there have been other periods when I was so very confused.

Only recently have I decided that reflecting on the past serves

no real purpose because I will never fully understand how we got

to this point, and I unfortunately can't change any of it.

The one thing that has helped me overcome all of these

emotions more so than anything else has been Evan's attitude

towards the whole process.  He has often told me that he holds

no ill will towards anything or anyone, including our justice

system.  His perspective and outlook on life continue to amaze

me.

Years from now, I often wonder what I would tell my kids if

either of them came to me and said, Dad, I am considering

joining the military.  I wish I could tell them that their

service would be appreciated and rewarded with unwavering

support from a country that stands behind them.  I wish I could

tell them that if they joined the military they would be given

the benefit of the doubt if they were forced to rely upon their

training and experience to make split-second decisions that
nobody wants to make.  I wish I could tell them that nobody
would ever second-guess them for these decisions when things
don't go according to plan.

But I am no longer that naive.  Look at where a life of
service has gotten Even.  At 37 years old, all of his worldly
possessions sit in a couple of cardboard boxes in my garage.
His marriage fell apart because of the stresses associated with
this case and because it continued to drag on with no end in
sight.  And his name and reputation have been trashed, and the
damage that has been done is impossible to repair in the
Internet age.

From where I stand, none of it seems worth it.  So my
advice to my kids would be to go to talk to their uncle and get
his thoughts on joining the military.  And I honestly think
Evan's advice to either of my kids would be to join because it
is honorable and it is the right thing to do.

In closing, Evan, I want to reassure you that your family
and friends will always stand behind you.  You will forever have
our love and support.  Your courageousness is beyond compare,
and you inspired me to always put my best foot forward and to
never give up, no matter the pursuit.  I hope and pray that this
chapter of your life is soon coming to an end so you can
accomplish all of the great things we know you are capable of.
Your friends and family know what you are capable of, and more

importantly here today, we know what you are not capable of.
You are a good, kind-hearted person with so much to offer the
world.  Please don't ever forget that or let anyone else
convince you otherwise.

Judge Lamberth, thank you for this opportunity to address
the Court.  I hope that you take into consideration what I and
others have said here today and in the numerous letters of
support that have been submitted on behalf of Evan.  Were he
released now, there is still an opportunity for him to have a
family of his own and experience the joys that come with being a
father.  I can assure you he would raise children that were
honorable and dedicated to serving others.

Please have mercy on Evan and grant him an opportunity to
prove to everyone that second chances can lead to a productive
and meaningful life.  Thank you.

THE COURT:  Thank you, Mr. Liberty.

MR. COFFIELD:  May it please the Court.

Your Honor, the government has portrayed these men as
depraved killers.  This despite the Court of Appeals finding
that the tragedy at Nisur Square owed more to panic and poor
judgment than anything else.  It's clear these fine young men
just panicked.

THE COURT:  I said that myself.

MR. COFFIELD:  That's exactly what you said, Your
Honor.  I'm quoting you.

1    I know this Court will not let justice take a back seat to

2  trying to extract the longest sentence possible, because it

3  would shake the faith in our system, and I know the Court won't

4  allow that.

5    Your Honor, I'm not going to go through the sentencing

6  factors.  They've been talked about.  I will say that I think

7  the Court has appropriately identified one of the most

8  significant, if not the most significant one, and that's

9  character.  And these men have shown character.  And there's

10  been a lot said about these men.

11    And I'm not going to go through all the things that were in

12  the letters or all the things that we adopted from the previous

13  sentencing.  But I do want to share a couple of things that

14  speak more than anything else than I think has been shown.

15    At the last sentencing hearing, three people spoke on

16  Evan's behalf, and I remarked to the Court that it was uncanny

17  that they had never met each other before the sentencing, but

18  when you heard them speak about Evan, it was clear they were

19  talking about the same person.  They were talking about the same

20  character.  They were talking about someone who was selfless and

21  sought to serve others.

22    Chris grew up with Evan.  Josh was in the Marine Corps with

23  Evan.  Rich served in Blackwater with Evan.  And as Josh put it,

24  he's a protector of the weak.  He's a defender of those who are

25  unable to fight for themselves.  He's a patron for the

downtrodden and the abused.  He is not an aggressor who would

ever intentionally harm others.  That's Evan Liberty.

Aaron just touched on something.  One week after Judge

Urbina's decision, Evan went down to a Navy recruiter and signed

a contract to go into BUD/S Training.  That's Evan Liberty.

Evan is stationed at -- Evan is incarcerated at FCI

Schuylkill, Your Honor, which is in Minersville, Pennsylvania,

which is only about a three-hour drive from here.  That permits

me the good fortune to see him every several months.  And it

never fails that whenever I go to visit the prison facility, as

soon as any correctional officer understands that I am there to

see Evan Liberty, they go out of their way to come up to me and

tell me what an extraordinary influence he is on the rest of the

inmates at that prison.  And they want to shake my hand for the

character of Evan Liberty.

And I know the Court has gotten letters from some of those

correctional officers.  And I have never been in a case where

that has occurred.  But I would say to the Court that what's

more impressive than what those letters say is the fact that

Evan didn't ask them to write those letters.  They found out

that he was going to be sentenced, and they asked if they could

send letters.  That's Evan Liberty.

One other thing about those visits, Your Honor.  The

inmates there wear a khaki shirt and khaki pants with a belt and

shoes.  Every time I go there, Evan's uniform is pressed.  His

belt buckle is cleaned, and his belt buckle is aligned with his
button line.  He cleans and presses his uniform.

On Monday, I went to visit him at the Piedmont Regional
Jail where he was moved to be transported here for purposes of
sentencing.  I had to go in and I had to tell him that the
government had argued that there's a 10-year mandatory minimum
and, beyond that, they were asking this Court to sentence him to
26 years.  His reaction to me stunned me.  He wasn't concerned
about that.  What he was concerned about was the dirty, shoddy
jumpsuit that they had given him in the prison that he couldn't
launder and the fact that he couldn't get a haircut or get a
shave because he didn't think his appearance would accord the
respect to Your Honor.

Your Honor.  Excuse me.  May I approach?

(Bench conference.)

MR. COFFIELD:  I would ask that this be put under
seal.

(Sealed transcript follows.)

1

2

3

4          (End of sealed transcript.)

5          (End of bench conference.)

6          MR. COFFIELD:  Your Honor, some other people have

7    touched on this, but I just want to make sure that it's clear.

8          I think that this has been more than five years.  For seven

9    years, these men suffered the anxiety of being under the threat

10   of indictment and then actually under indictment.  The pressure

11   was constant.  They haven't been able to hold any kind of

12   meaningful job before they were incarcerated.  Their lives were

13   turned upside down.  Evan's now lost the ability to become a

14   Navy Seal.  It was his dream, and it is gone now.

15         The other thing is, and this has been talked about both in

16   the previous sentencing and here, Evan was very, very close to

17   his grandfather, Ellis Hatch, who was a New Hampshire Fish and

18   Game commissioner.  In fact, Evan's grandfather tied fishing

19   flies, and he tied one for Evan called "Our Marine," and then he

20   tied one for Raven 23, and he tied both of those and issued them

21   out to people.  You don't see "Our Marine" because I actually

22   caught a trout with it.

23         Your Honor, the other thing that I just want to simply

24   touch on is, I know Mr. Heberlig went through the unique

25   circumstances that we found ourselves in in this case.  And I

1    want to emphasize, we weren't just in the most dangerous city in

2    the most dangerous part of the world at the time that this

3    happened.  But the circumstances about that day were also

4    unique.

5         Mr. Heberlig went through them, and he talked about the

6    previous attacks, and he talked about responding, the fact that

7    Raven 23 was actually responding to a VBIED attack on a diplomat

8    and talked about the fact that the BOLO report for that morning

9    had said that a white sedan was to be cautioned.

10        But the one thing that I just want to remind the Court that

11   Colonel Tarsa brought to everybody's attention was that just

12   months before, Nisur Square itself had been the subject of a

13   VBIED that had blown a crater, according to Colonel Tarsa --

14             THE COURT:  In the Square itself?

15             MR. COFFIELD:  In the Square, the size of a football

16   field.

17        Your Honor, in summing up, I believe all counsel who are

18   here today on both sides of both tables, all the lawyers that

19   are here in the courtroom and likely Your Honor, have a shared

20   experience, and that was, when we were young lawyers at the

21   beginning of our careers, we got devastated by any kind of

22   little setback that we would experience, whether it be we lost a

23   motion or we had a bad deposition or a verdict went the wrong

24   way.  And as the years went on, every year, you get a little bit

25   more thick-skinned.  And you finally got to the point where your

skin was thick enough that you figured you could weather the
setbacks.

I have to say that this case has shaken me like no other.
At the original sentencing, I said this case haunts us.  Four
and a half years, it still haunts us.  I still wake up at night,
and I wonder what could I have done to help Evan, what could I
have done to help Evan's case.  This is my last opportunity --

THE COURT:  You can't change the facts.

MR. COFFIELD:  This is my last opportunity to advocate
on his behalf and try to accomplish something that might make a
difference in his life, Your Honor.

I honestly believe time served accomplishes the goals of
sentencing.  These are fine young men.  Our society is better
served with them in our communities than behind bars.  And I am
confident that the Court knows, like I do, that the day these
three men walk out of prison, they will lead lives marked with
humility, love of country, and service to others.  And I pray
you give them that opportunity now.

Thank you, Your Honor.

THE COURT:  Thank you, Mr. Coffield.

Before I hear from the defendants, I would like the
government to address the question that the defendants raised
about disparity among defendants as to Ridgeway.

MR. MARTIN:  And Your Honor --

THE COURT:  I don't recall what the government had

1   asked for.  I know I went to one year, but I don't recall what

2   the government asked me to do.  You may not recall yourself.

3        MR. MARTIN:  Your Honor, I don't recall that.  I feel

4   like it was three years, but I don't recall.  Maybe --

5        (Government counsel conferred.)

6        MR. MARTIN:  We're not sure enough, Your Honor.

7        THE COURT:  It was probably different government

8   counsel then; right?

9        MR. MARTIN:  I was there.  I'm pretty sure it was

10  three years.  But I just don't remember.

11       MR. CAMPOAMOR-SANCHEZ:  Your Honor, I believe it was

12  32 months we asked for, so not quite three.  But it's going from

13  memory.  So I'm not 100 percent sure of that.

14       MR. MARTIN:  But to Your Honor's question, it is a

15  great question.

16       This system, the justice system, works on the belief that

17  similarly situated defendants should be treated similarly.

18  That's the bottom line.  That's just fundamental fairness.  And

19  it doesn't have to be spelled out, although it is.  We all know

20  that, and we all do our best to abide by that.

21       With all due respect to counsel, they're just not similarly

22  situated.  Mr. Ridgeway acknowledged his wrongdoing.

23  Mr. Ridgeway pled guilty to a set of facts to two manslaughters

24  and two attempted manslaughters.  Mr. Ridgeway, in other ways,

25  documented how he had shot without seeing a hostile out there,

just followed the lead of the first, I would say, big gun

shooter, Mr. Slough, and didn't second-guess it and then

continued to abide by that lie to protect himself and his

colleagues, his fellow shooters throughout.  And you will

remember vividly, he protected that lie until he saw the

evidence that the government was going to bring to bear.

THE COURT:  Until?

MR. MARTIN:  Until he saw the evidence that the

government was going to bring to bear.  And as Your Honor said,

facts are stubborn things.  It's been said by other people as

well, but facts are stubborn things.  And all of those facts,

including all the mitigating factors, war zone, the Square had

previously been bombed, there being elements within the Iraqi

government and elsewhere that did not want us there in that

country and were trying to keep us out of that country and

trying to keep us from doing right by the Iraqi people, all

those facts were before a jury, and the jury determined that

these men, for those 20 minutes, acted excessively.  They were

trained to do otherwise; they did not.  And there was a

humongous loss of life because of it.

Mr. Ridgeway accepted that two years after this event.  In

2009, he pled guilty.  He started cooperating with the

government.  He was on the stand, Your Honor, for three days.  I

think it was maybe five hours for the government, but it was

another two days and another three hours being crossed every

1    which way but Sunday.  His own life has been up-ended by the

2    felony, by the Internet, by his willingness to come forward and

3    say, I did it and these men did it, too.

4            THE COURT:  And I was wrong.

5            MR. MARTIN:  And I was wrong.  And I think what is

6    missing, again with all due respect, from this presentation is

7    yes, he cooperated, but that's not the only reason Your Honor

8    decided that he deserved a lesser sentence.  He acknowledged his

9    wrongdoing, and he cooperated.  And in your Court's view, in

10   Your Honor's view, it was extraordinary, the cooperation.  And I

11   would dare say that even all of the K Street, L Street, all the

12   drug conspiracy '90s cases that you have presided over, he has

13   been one of the most cooperative cooperators that has ever been

14   presented on the stand by the government but nonetheless crossed

15   again for two and a half days to test the mettle of what he is

16   saying, and he was credited by the jury.

17       So for those reasons, Your Honor, I don't think there is a

18   disparity, because they're not similarly situated.  They're just

19   not, maybe in conduct but not in every other way.  And for that

20   reason, we do not think it is a disparate sentence to have

21   Mr. Ridgeway sentenced to a year and a day and still for Your

22   Honor --

23           THE COURT:  My own recollection was that the

24   government did not want me to go to the sentence I actually

25   gave, but I was totally impressed with the way he had also

1    turned his life around.

2              MR. MARTIN:  That's right.

3              THE COURT:  And it was a very tough turnaround for him

4    as well, where he was now living, and a lot of things went into

5    how I decided what I did there.

6              MR. MARTIN:  That's right, Your Honor.  I don't

7    remember how much we asked for, but I am quite certain you gave

8    a half or a third of what we asked for.  But as the Court

9    alludes to, he was not working full-time.  He was dedicating his

10   time to charities, and he was doing other things to do right by

11   his family.

12       He, as well as these gentlemen, suffered from PTSD, and

13   nobody should go through that.  But he has had a hard row to

14   hoe.  But he should be given credit not only for his cooperation

15   but also for acknowledging what he did very early on in the

16   process.

17       Thank you.

18              THE COURT:  I will let each counsel add anything you

19   want to add before I hear from your clients as well.

20              MR. HEBERLIG:  Just very briefly on that last point,

21   Your Honor.

22       If I heard Mr. Martin correctly, the difference between

23   Mr. Ridgeway and these defendants was acceptance of

24   responsibility.  The guidelines account for that by giving a

25   three-point reduction.  So 34 points under the guideline would

have led Mr. Ridgeway to get 31 points.  That is nothing
remotely resembling the disparity that they are proposing in
this case.

Three points under the guideline, that's standard across
our system.  That's what acceptance of responsibility gets you,
not a 97 percent reduction from what your co-defendants who did
the exact same thing.  And frankly, much worse, he did much
worse than they did.  I think that's objective.  That's just not
right.  That's just not fair.

A lot has been said about Mr. Ridgeway, but I think it is
also relevant that after he pled guilty, he lied to the
government.  He had a plea agreement that required him to tell
the truth, and he didn't tell the truth, and he faced no
consequences for that.  He admitted that he changed his story
after he pled guilty, after he had proffered the first time.

So he may have turned his life around in other respects,
but he is an admitted liar, and it's just not fair, that
disparity.

THE COURT:  Mr. Schertler?

MR. SCHERTLER:  Nothing further, Your Honor.

MR. COFFIELD:  No, Your Honor.

THE COURT:  All right.  I will hear from each of your
clients, then.  Then I am going to take a short recess before I
come back and announce the sentences.

Your day is finally here, Mr. Slough.

1          DEFENDANT SLOUGH:  Yes, sir.

2      Your Honor, thank you for allowing me to address your

3  Court.  I want to thank my wife and my family and everybody for

4  being here, and forgive me.  To put into words the previous

5  five, really 12 years is incredibly difficult.  Yet, I have

6  thought diligently over the past two years to the man who holds

7  my and my family's future in his hands.

8      Your Honor, this time and this experience has been

9  crushing, and I am beyond horrified that innocent life was taken

10  that day.  Your Honor, I take full acceptance for my own

11  actions, and I thank God for his providence that Mr. Rubia'y

12  knows who I am and that some day I might find forgiveness in his

13  eyes and the two of us may, indeed, be healed.

14      Your Honor, by God's grace, I, too, am a father, a son, a

15  brother, a husband, and an uncle.  And it is crippling to even

16  consider losing my wife, our daughter, my parents, my in-laws,

17  brothers, sisters, and their siblings.  But just as crushing and

18  horrifying and crippling, Your Honor, is being forever branded

19  with this loss of life.

20      Your Honor, I offer that this time and experience has not

21  been wasted and that me and my gift of a family have continued

22  to maintain our connection and tirelessly struggle to some day

23  realize the freedom and restoration with one another.  Your

24  Honor, we have and we will continue to maintain our individual

25  missions of service:  Our parenting, our marriages,

self-improvement with a kingdom mind-set.

In light of all this, Your Honor, I am pleading for mercy and the grace to have a second chance at life.  My desires are simple.  I want to go home to be a husband and a daddy, to be a brother and a son, to give back to the community that has given so much to me, and to some day be able to continue to develop and even implement Paraclete Ministries, which is my own birth child from this experience that helps men and women that find themselves in different arenas of bondage.

One of the mainstays and centerpieces of my prayer life, as Mr. Martin alluded to, is that God would continue to restore and recreate me into the man that he created me to be, the husband and the father.  And Your Honor, today, you indeed hold the key that could be the one that allows me finally -- excuse me, Your Honor, to go out and indeed execute the mission I believe to be my own now.

Your Honor, I hope the previous 39 years, five of which, of course, being incarcerated, speaks of your characterization a fine young man, albeit imperfect.  And Your Honor, the letters that you have received would indeed reflect a man who has tried to be an agent of peace and restoration in an environment and a situation that promotes just the opposite.

Finally, Your Honor, I look forward to the future with a renewed sense of hope, purpose, and redemption, living life with my family and fulfilling the mission of redeeming what was

1    brought to ashes in a war, never again to take one person, one

2    event, or one day for granted.

3         Thank you, Your Honor.

4             THE COURT:  Thank you, Mr. Slough.

5         Okay.  Mr. Heard?

6             DEFENDANT HEARD:  Your Honor, thank you for this time

7    for me to address the Court.  I would like to thank everyone

8    here for the support.  And I would like to say I love you to my

9    son and daughter.  I love you, Hannah.

10         Your Honor, I take responsibilities for my actions and my

11   actions alone.  I regret any innocent life lost due to my

12   actions that day.  I got the order from my team leader to return

13   fire.  I did not.  I didn't have a target.  So I'm not going to

14   take shots just blindly.  I'm not going to do suppressive fire.

15   That wasn't my job.  I only engaged threats that day.  I did

16   what I thought I had to do under the circumstances, and I

17   understand the jury found that I was wrong.  I accept that.

18         I've had a lot of time to reflect on things in the past

19   five years.  I've also had a lot of negative influences, too.

20   I've seen more drugs and drug use in prison than I've ever seen

21   in my life.  I personally do not partake.

22             THE COURT:  I'm glad none of you all saw that in the

23   military.

24             DEFENDANT HEARD:  Whenever I was in, it wasn't

25   prevalent that I had seen.  It's different from your day,

1   obviously.

2       I am ready to put this behind me and focus on the positive

3   things in my life and the things that mean the most to me, my

4   family.  I missed the first few years of being a father to my

5   daughter while I was in Iraq.  I've missed half of her life now.

6   I've missed almost two-thirds of my son's life.  He's eight --

7   or nine.  Excuse me.  He's nine, and he was three whenever I

8   left.  So I was there whenever he was little, and he hasn't got

9   to experience me any time since then.

10      Please give me a chance to be their father before they're

11  grown.  I would appreciate your consideration.  I'm ready to get

12  back to the life of being a father, a son, and just being with

13  my family.

14      I appreciate your consideration today and your time for

15  letting me speak.  Thank you.

16          THE COURT:  Thank you, Mr. Heard.

17      Mr. Liberty?  You look fine.  Better than most defendants I

18  see.

19          DEFENDANT LIBERTY:  Thank you.  I was a little worried

20  about that, Your Honor.

21      Good afternoon.  Thank you for giving me the opportunity to

22  address the Court.  I would like to thank all the family and

23  friends that have come to show their support to the three of us

24  today.

25      I'm normally a man of few words, but I wanted to take this

opportunity to speak and put a voice to the face you've seen in the courtroom for more than a decade.

I regret my actions that day.  I sincerely regret that innocent lives were lost on September 16th, 2007.  I never intended that any innocent lives be impacted.  This is something that will weigh on my conscience for the rest of my life.  12 years has passed since that day and nearly five years since I was incarcerated.  I have used this time to examine my life and try to become a better person.  I have matured and grown tremendously.  I believe I am more thoughtful and considerate. I am closer to my family and value my friends more.  I have come to realize that the most important thing in my life is the positive impact I can have on others.

One thing has not changed in the past 12 years, and that is the love I have for my country.  I am proud that I had the chance to serve, and I would serve again right now if I could. I know further military service is not possible for me, but I intend to find a way to give back if given the chance.  Whether that is by working with a wounded warrior organization, helping veterans with PTSD, or coaching future soldiers in physical fitness, I believe I can make a positive impact in people's lives.  I want to contribute to something bigger than myself and make my family and country proud.

Your Honor, please give me the chance to reunite with my family, the chance to serve, and the opportunity to prove to the

1    Court the person I have become.  Thank you.

2              THE COURT:  Thank you, Mr. Liberty.

3        The Court will take a short recess before I announce my

4    verdict.

5              (Recess taken from 3:17 p.m. to 3:37 p.m.)

6              (Call to order of the court.)

7              THE COURT:  You may be seated.  If the defendants will

8    come forward with their counsel.

9        The Court of Appeals recognized that the convictions of

10   these three defendants for voluntary manslaughter involved

11   extreme recklessness and gross misjudgments but not an intent to

12   kill innocent people.  The Court of Appeals specifically held

13   the following:  "We by no means intend to minimize the carnage

14   attributable to Slough, Heard, and Liberty's actions.  Their

15   poor judgments resulted in the deaths of many innocent people.

16   What happened in Nisur Square defies civilized description."

17       The Court of Appeals in their conclusion again repeated,

18   "We again emphasize these defendants can and should be held

19   accountable for the death and destruction they unleashed on the

20   innocent Iraqi civilians who were harmed by their actions."

21       But the Court of Appeals found that I should not have

22   followed the congressional enactment that required me to impose

23   a mandatory 30-year sentence for use of an automatic weapon in

24   connection with the offenses here.

25       The Court of Appeals recognized that the unusual

circumstances of this case made it exceedingly rare, and indeed, the Court cited a prior opinion by Justice Anthony Kennedy who noted that "we," meaning the Supreme Court, "had never invalidated a penalty mandated by legislature based only on the length of sentence."  Nevertheless, that was exactly what the Court of Appeals proceeded to do when they reversed me in this case.

I do not claim to fully understand either the reasoning or the exact holding of the Court of Appeals, but it does seem to me that some of their language would be just as applicable if I were to impose the 10-year mandatory firearm consecutive sentence on each defendant.  So I will reject the government's request and will not impose any sentence on the mandatory firearm charge on the basis that the Court of Appeals would conclude that such action by me today would be cruel and unusual and, therefore, unconstitutional.

So that brings me to determining the sentence for each defendant on the manslaughter and attempted manslaughter convictions for which the sentencing guidelines would be incarceration for 151 to 188 months unless there is a departure or variance after consideration of all the sentencing factors in 18 U.S.C. 3553.

First and foremost, I squarely reject any notion that this -- that there is any question as to the factual guilt of each of the three defendants, despite the letter from the

1   congressman from Texas yesterday and the letter from the various

2   state senators in Texas yesterday sent on behalf of the

3   defendants.  Each of these defendants was found guilty by a jury

4   after a fair trial that I conducted.  Their rights were fully

5   protected at trial, and the Court of Appeals upheld their

6   convictions, totally resolving not only all of the issues of

7   their convictions but reversing me only on the use of the

8   automatic weapon mandatory minimum that now causes me to also

9   declare that I will not use the mandatory firearm sentence as

10  well.

11      Turning to the nature and seriousness of the offense, and

12  deterrence is the first factor under 3553.  We have 13 Iraqi

13  citizens who were all innocent victims who were killed and 17

14  more who were injured.  The defendants' orders were for

15  self-defense, and they were firing wildly into cars.  They were

16  totally -- some of them turning around in the other direction.

17  Two women were shot just getting off a bus who had nothing in

18  their hands but their purses.  The 77-year-old gardener was

19  getting off the bus who had been on the bus going to his

20  gardening work that day, was shot.  There was just wild shooting

21  that could never be condoned by any court.

22      The seriousness of this criminal conduct, of the number of

23  victims, and the need to promote respect for the rule of law and

24  for just punishment and the need for deterrence for future

25  cases, not to deter these individuals, but the point of

deterrence in the future is a serious problem for the Court in arriving at a just and proper sentence in this case.

Again, I have to totally reject any notion that my sentence in this case is to appease an ally, as the congressman and these senators are raising with me in the letter yesterday.  I am not here to appease an ally.

There is a message, though, that this Court in sentencing does consider, and that is, what kind of country is the United States.  We hold our Armed Forces and our contractors accountable for their actions.  We did in cases I worked on in Vietnam sometimes as a defense attorney.  In the Republic of Vietnam, I defended a team of six Army Rangers accused of war crimes in 1969.  We believe in the rule of law in our country. We believed it in Vietnam, and we believed it in Iraq, and our courts try to enforce the rule of law, and I believe as a judge my duty is to enforce the rule of law.

I also totally reject the idea that any of the mistakes made by the government in this case ultimately had any effect on the outcome.  I didn't get into this case until after the original judge's decision to dismiss the case had been reversed by the Court of Appeals by unanimous opinion, joined by Judge Merrick Garland, who found the original district judge who had this case had failed to conduct a proper legal analysis and, indeed, had applied the wrong legal standard.

I then came into this case at the time I was the chief

1    judge of the court, and I spent weeks, maybe months of hearings

2    to get this case ready for the first trial, the trial that all

3    of you were in.  I got it to trial, and we went through a trial

4    in which I have now been affirmed on all but the sentence.  And

5    you know from what I said at the sentencing that I was

6    uncomfortable with the sentence that I was required by Congress

7    to impose.  And I said it enough clearly that the Court of

8    Appeals decided to send it back for resentencing, which is why

9    we are here today.

10        I do agree that all of these defendants who appear before

11    me are fine young men, as I said at the time, absent this

12    aberration that occurred on this occasion.  I do agree that they

13    do not need to be deterred in the future.  I do agree that they

14    have performed well in their period of incarceration and that it

15    speaks well of them that what has happened during the five years

16    they have now spent that they have good character.

17        But I also have to balance these other factors.  I have to

18    get back to what these other criticisms of the case have been.

19    Although there was mistakes made along the way by the

20    government, by and large, the government found and exposed and

21    delivered to the world a trial where the truth of what happened

22    in Nisur Square came out and was there for the world and the

23    public to see, and I think the government of the United States

24    deserves great credit for how the truth came out in this case

25    and in this trial.

1    And I think that the appropriate disposition in this case

2    is a guideline sentence for these defendants.  I agree with what

3    the Court of Appeals said that a -- that there has to be a

4    distinction between the defendants, and I will make that

5    distinction in the sentences I am about to indicate, what the

6    individual distinctions are.

7    The postconviction conduct has been exemplary but not

8    sufficient in light of the serious nature of the offenses to

9    warrant a downward departure.  The seriousness of the offenses

10   and the need for a appropriate sentence for the number of counts

11   of manslaughter and attempted manslaughter are such that the

12   Court believes a guideline sentence in each instance is the

13   appropriate sentence, and the Court will not do an upward

14   departure either as requested by the government or do an upward

15   variance, but the Court also declines to do a downward

16   departure.  And I do not agree that any sentencing disparity

17   would warrant a downward departure either.

18   As to Defendant Slough, he has 13 man counter -- deaths on

19   the manslaughter charges and 17 attempted manslaughter woundings

20   of individuals, a total of 30 victims.  As to Defendant Liberty,

21   he has a total of eight deaths and 11 wounded, a total of 19

22   victims.  As to Defendant Heard, he has a total of six deaths

23   and 11 wounded, so a total of 17 victims.  So there is, just by

24   shear numbers, a difference in their conduct that would warrant

25   somewhat different sentences that I will announce as I go

1    through the individual sentences.

2        First as to Paul -- is it Slough?  Slough.  You are hereby

3    committed to the custody of the Bureau of Prisons for a term of

4    180 months, comprised of -- on Counts 2 through 14 and 15

5    through 24 to run concurrently to each other, as well as 26

6    through 32, and then 180 months on Count 33 to run concurrent,

7    which is the gun count.  And rather than being consecutive, I

8    will just say concurrent.

9        You are further ordered to serve a sentence of 36 months of

10    supervised release.  Although it could be 60 on the gun count, I

11    will just make it 36 and run it all concurrent on all the

12    counts.  You are required to pay a $3,100 special assessment

13    required to be imposed by law, which is $100 per count, and

14    restitution joint and several with co-defendants in an amount to

15    be determined.  I don't remember if that was ever determined or

16    not.  The government will have to see what happened on that.

17    The Court finds you do not have the ability to pay a fine,

18    therefore waives imposition of a fine.  And I will give you the

19    rest of the sentence after I go through Mr. Heard.

20        It is the judgment of the Court that the Defendant

21    Mr. Heard is committed to the custody of the Bureau of Prisons

22    to be imprisoned for a term of 151 months on Counts 3 through 8

23    to run concurrently and Counts 15 through 29 to run concurrently

24    and Count 33 to run concurrently, and then 36 months of

25    supervised release on all of those counts to run concurrently

1    and to pay a special assessment of $1,800, which is $100 per

2    count, and restitution joint and several with the co-defendants

3    in a separate proceeding.  The Court finds you do not have the

4    ability to pay a fine, therefore waives imposition of a fine in

5    this case.  I will give you the remainder of the sentence as to

6    all three.

7        As to Defendant Evan Liberty, it is the judgment of the

8    Court that you are hereby committed to the custody of the Bureau

9    of Prisons for a term of 168 months on Counts 2 to 8 and 14 and

10   Counts 15 through 22 and 26 to 29, all to run concurrently, and

11   168 months on Count 33 to run concurrently.

12       You are further sentenced to serve 36 months' supervised

13   release on all those counts, and you are further ordered to pay

14   a $2,100 special assessment and restitution joint and several

15   with all the co-defendants, your two other co-defendants.  The

16   Court finds you do not have the ability to pay a fine and,

17   therefore, waives imposition of a fine in this case.

18       As to all three of you, these are the following parts of

19   the sentence, and they will be the same as to each of the three

20   of you:  The special assessment and restitution are payable to

21   the Clerk of Court, U.S. District Court, District of Columbia.

22   Within 30 days of any change of address, you should notify the

23   Clerk of Court of the change until such time as the financial

24   obligation is paid in full.  The Court waives any interest or

25   penalties that may accrue on any unpaid balances.  Restitution

1    payments shall be made to the Clerk of Court for disbursement to

2    the victims.  The government will provide a list of victims and

3    contact information.

4         Within 72 hours of release from custody, you shall report

5    in person to the probation office in the district to which you

6    are released.  While on supervision, you shall submit to

7    collection of DNA identification information.  You shall not

8    possess a firearm or other dangerous weapon.  You shall not use

9    or possess any illegal controlled substance.  You shall not

10   commit another federal, state, or local crime.

11        You shall also abide by the general conditions of

12   supervision adopted by the probation office, as well as the

13   following special conditions:  One, you shall participate in a

14   mental health treatment program which may include outpatient

15   counseling or residential placement as approved and directed by

16   the probation office; two, you shall provide the probation

17   office income tax returns authorization for release of pertinent

18   information and information about any business or finances in

19   which you have a control or interest until all restitution

20   balance is satisfied; three, you shall pay the balance of any

21   restitution owed at a rate of no less than for each of you $100

22   per month and provide verification of same to the probation

23   office.

24        The probation office shall release the presentence

25   investigation report to all appropriate agencies in order to

1    execute the sentence of the Court.  The treatment agency shall

2    return the presentence report to the probation office upon the

3    defendant's completion or termination from treatment.

4        Now, this applies to each of the three of you.  Pursuant to

5    18 U.S.C. Section 3742, you have a right to appeal the sentence.

6    If you choose to appeal, you must file your appeal within 14

7    days after the Court enters judgment.  If you are unable to

8    afford the cost of an appeal, you may request permission from

9    the Court to file an appeal without cost to you.

10       As defined in 28 U.S.C. Section 2255, you also have the

11   right to challenge the sentence imposed if new or currently

12   unavailable information becomes available to you or on a

13   claim -- if you are unable to afford the cost of an appeal, of

14   course, you may request permission to file an appeal without

15   cost to you.  Be sure to work with your counsel to get your

16   notice of appeal in on time.

17       I did consider in connection with Mr. Heard's sentence the

18   ex parte information that I received at the bench and in

19   connection -- in connection with Mr. Liberty, and in connection

20   with Mr. Heard, I considered the sealed information that I had

21   authorized to be filed under seal yesterday.

22       Under *U.S. v. Hunter*, is there any additional objection to

23   anything in the sentencing proceedings that any counsel needs to

24   put on the record today?

25            MR. MARTIN:  Your Honor, for the government, no, and I

1    also will add that the government is not seeking additional

2    restitution.

3              THE COURT:  Okay.  So we can forget the restitution?

4    I couldn't remember if we ever did anything on that or not.

5              MR. MARTIN:  We did --

6              THE COURT:  So no restitution order was ever entered?

7              MR. MARTIN:  That's correct, Your Honor.

8              THE COURT:  So there will be no restitution ordered in

9    this J&C at this time.

10             MR. HEBERLIG:  That's correct, Your Honor.  On

11   July 13, we had a hearing, and the Court denied restitution.

12             THE COURT:  Then I will put that in this J&C this

13   time.

14             MR. HEBERLIG:  I would also add for purposes of

15   preserving that we object to the sentence as substantively

16   unreasonable and greater than necessary to serve the purposes of

17   sentencing under Section 18 U.S.C. 3553(a)(2) for the reasons

18   we've submitted and argued on the record today.

19         We also had some requests about the BOP designations.

20             THE COURT:  Let's do that at the end.

21             MR. HEBERLIG:  Will do.

22             THE COURT:  Other objections?

23             MR. COFFIELD:  Your Honor, I join the objection that

24   was just made.  Thank you.

25             MR. SCHERTLER:  I join the objection, Your Honor, on

1    behalf of Mr. Heard.

2              THE COURT:  All right.  Let's talk about the BOP.

3              MR. HEBERLIG:  What we propose, Your Honor, is

4    submitting something to you in writing.  I was going to say this

5    afternoon, but we are near the end of the day now.  Probably

6    tomorrow.

7              THE COURT:  Sure, because we will have to get the J&Cs

8    all written tomorrow anyways.  I don't know where they are and

9    what BOP would have planned, although they always consider a

10   recommendation from me anyway.

11             MR. HEBERLIG:  We understand that.  What we are going

12   to be asking, just to preview, is that the Court recommend to

13   the Bureau of Prisons to waive certain public safety factors

14   that we don't believe are applicable in this case that could

15   have a dramatic --

16             THE COURT:  They have been model prisoners, I agree,

17   and it is clear from the record they are.

18             MR. HEBERLIG:  Well, I think it could have a dramatic

19   impact on their remaining sentences.  Once you are under 10

20   years, as long as those factors are waived, it can lead to

21   minimum security or even camps.

22        We are also going to be making a specific request on behalf

23   of Mr. Slough to be incarcerated at FCI Seagoville, which is

24   near Fort Worth, much closer to his family.

25             THE COURT:  I don't have any problem with that.

1          MR. HEBERLIG:  And there will be a recommendation

2     about prerelease custody.  We will put it in a letter to the

3     Court with language that you can just paste right into the J&C

4     if you are so inclined.

5          THE COURT:  Okay.  The sooner we get that -- I won't

6     sign the J&Cs until I have that.  It will have more impact if it

7     goes with the J&C.

8          MR. HEBERLIG:  Correct.  We will get it to you

9     tomorrow morning.

10         THE COURT:  Anything else you all want to raise today?

11         MR. SCHERTLER:  No, sir.

12         MR. COFFIELD:  No, Your Honor.

13         THE COURT:  I think what I said is sufficient.  I

14    don't know whether I need to say more about the distinction I

15    made.  Does the government want more?

16         MR. MARTIN:  No, Your Honor.  We are satisfied.

17         THE COURT:  All right.  The Court will be in recess.

18    Good luck to you guys.

19         (Proceedings adjourned at 3:58 p.m.)

20

21

22

23

24

25

CERTIFICATE OF OFFICIAL COURT REPORTER

     I, Sara A. Wick, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/ Sara A. Wick          September 26, 2019

SIGNATURE OF COURT REPORTER     DATE